Elizabeth K. Green, admitted *pro hac vice*
GREEN HEALTH LAW APC
201 N. Brand Blvd., Suite 200
Telephone: (818 722-1164
E-mail: egreen@greenhealthlaw.com

Attorneys for Plaintiff
John Doe

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

| | |
|---|---|
| JOHN DOE, | 23-CV-04743-JPC |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 56** |
| -against- | |
| DELOITTE LLP GROUP INSURANCE PLAN, | ECF CASE |
| Defendant. | |

-------------------------------------------------------------X

Plaintiff John Doe, through his undersigned counsel and pursuant to Federal Rules of Civil Procedure 56, submits the following Memorandum of Points and Authorities in support of Plaintiff's Motion for Summary Judgment. Plaintiff hereby moves the Court for judgment for recovery of ERISA health benefits under 29 U.S.C. 1132(a)(1)(B).

<u>TABLE OF CONTENTS</u>

I.     Introduction ................................................................................................................ 1

II.    Summary of the Case ................................................................................................. 1

III.   Statement of Facts ..................................................................................................... 4

       A.  ERISA Plan ...................................................................................................... 4

       B.  A.D.'s Mental Illness and Treatment History ................................................. 5

            1.  Early Childhood Development and Diagnoses ...................................... 5

            2.  Hospitalizations .................................................................................... 5

       C.  Aetna In-Network Providers Were Unavailable and/or Inappropriate for
           A.D.'s Residential Treatment .......................................................................... 9

       D.  A.D.'s Admission to Residential Treatment and Request for Benefits .................... 11

            1.  Aetna's Denial of Benefits .................................................................. 12

            2.  Plaintiff's First Appeal ....................................................................... 12

            3.  Aetna's Denial of Plaintiff's First Appeal .......................................... 15

            4.  Plaintiff's Second Appeal ................................................................... 15

            5.  Aetna's Denial of Plaintiff's Second Appeal ...................................... 15

       E.  The Court's Order and Remand to Aetna ..................................................... 16

IV.    Aetna Denied Benefits on Remand ......................................................................... 16

       A.  Aetna's Denial ............................................................................................... 16

       B.  Plaintiff's Appeal .......................................................................................... 17

       C.  Aetna's Appeal Denial .................................................................................. 19

V.     Plaintiff is Entitled to Summary Judgment ............................................................ 23

       A.  The Default De Novo Standard Applies to the Court's Review .................... 23

       B.  Under a De Novo Review, Plaintiff is Entitled to Benefits Under the Plan ............. 24

            1.  In-Network Residential Treatment Facilities Were Unavailable
                and/or Inappropriate ........................................................................... 25

            2.  Sandhill Satisfied the Plan Terms for Residential Treatment
                Facility        ....................................................................................... 26

            3.  Federal and State Laws Support Approval of Out-of-Network
                Providers When There is Network Inadequacy ................................... 27

VI.    Under a Discretionary Review, Aetna's Denial Is Unreasonable and Unsupported ....... 28

     A.  Aetna Ignored Evidence Showing the Inadequacy of In-Network Facilities ............ 29

     B.  Aetna Failed to Adhere to the Plan Requirements for Coverage.............................. 31

VII.     Requested Relief ............................................................................................. 32

## TABLE OF AUTHORITIES

CASES

*Abatie v. Alta Health & Life Ins. Co.*,
    458 F.3d 955 (9th Cir. 2006) ............................................................................ 28

*Aramony v. United Way Replacement Benefit Plan*,
    191 F.3d 140 (2nd Cir. 1999) ........................................................................... 26

*Boyle v. Legacy Health Plan No. 504*,
    No. 6:20-CV-00705-AA, 2023 WL 6318923 (D. Or. Sept. 28, 2023) ............ 26

*Celardo v. GNY Auto. Dealers Health & Welfare Tr.*,
    318 F.3d 142 (2d Cir. 2003) ............................................................................. 28

*Firestone Tire & Rubber Co. v. Bruch*,
    489 U.S. 101; 109 S. Ct. 948; 103 L. Ed. 2d 80 (1989) ............................ 23, 24

*IUE-CWA v. Gen. Elec. Co.*,
    745 F. App'x 583 (6th Cir. 2018) .................................................................... 26

*Jacobs v. Kaiser Found. Health Plan Inc.*,
    265 F. App'x 652 (9th Cir. 2008) .................................................................... 26

*Jamie F. v. UnitedHealthCare Ins. Co.*,
    No. 19-CV-1111-YGR, 2020 WL 6802416 (N.D. Cal. Nov. 19, 2020) ..... 3, 26

*Kinstler v. First Reliance Standard Life Ins. Co.*,
    181 F.3d 243 (2d Cir. 1999) ............................................................................. 23

*Locher v. Unum Life Ins. Co. of America*,
    389 F.3d 288 (2d Cir. 2004) ............................................................................. 25

*M & G Polymers USA, LLC v. Tackett*,
    574 U.S. 427; 135 S. Ct. 926; 190 L. Ed. 2d 809 (2015) ................................ 26

*Macalou v. First Unum Life Ins. Co., No. 22-CV-10439 (PKC)*,
    2024 WL 4867091 (S.D.N.Y. Nov. 22, 2024) ................................................ 25

*McCauley v. First Unum Life Ins. Co.*,
    551 F.3d 126 (2d Cir. 2008) ............................................................................. 28

*McDonnell v. First Unum Life Ins. Co.*,
    No. 10 CV 8140 RPP, 2013 WL 3975941 (S.D.N.Y. Aug. 5, 2013) .......... 24, 25

*Rubio v. Chock Full O'Nuts Corp.*,
    254 F. Supp. 2d 413 (S.D.N.Y. 2003)...............................................................................24

<u>FEDERAL STATUTES</u>

29 U.S.C. § 1105(c)(1)...................................................................................................................23

<u>FEDERAL REGULATIONS</u>

29 C.F.R. § 2560.503................................................................................................................28, 29

45 C.F.R. § 156.230(a)(2)........................................................................................................27, 28

MEMORANDUM OF POINTS AND AUTHORITIES

I.     Introduction

This is an ERISA action brought by Plaintiff John Doe to recover mental health benefits for his then 10-year-old son's residential treatment under Plaintiff's employer's group health benefit plan. Plaintiff's son, referenced by his initials A.D., is a covered dependent under the Defendant Deloitte LLP Group Insurance Plan (the "Plan"), administered by Aetna Life Insurance Company ("Aetna"). Aetna denied benefits for A.D.'s residential treatment, claiming that an in-network facility was available and that the out-of-network facility that did treat A.D. did not meet Aetna's criteria. In February 2025, this Court issued an order finding that Aetna's denial was arbitrary and capricious, and remanded for a new review by Aetna. ECF No. 44.

Aetna's new appeal decision is again arbitrary and capricious because it was without reason and unsupported by substantial evidence. Aetna did not have an in-network provider available or appropriate for A.D.'s critical healthcare needs. As a result, Aetna was required to approve coverage for the out-of-network residential treatment facility which fully satisfied the Plan requirements for residential treatment.

Plaintiff requests that the Court enter summary judgment in his favor and award benefits, attorney's fees, costs, and prejudgment interest, to be determined by separate motion.

II.     Summary of the Case

Plaintiff and his wife were living in fear when they admitted their young son to residential treatment in October 2022. A.D. had several severe mental health conditions which resulted in years of aggressive and violent behaviors that had worsened over time. His treatment

providers unanimously agreed that he had to be admitted to a long-term residential treatment program for his safety and the safety of his family.

In the months and years leading to the residential treatment at issue, A.D. had become increasingly aggressive and physically and verbally threatening. He expressed both homicidal and suicidal ideation. As a young child, he hit, kicked, bit, and attempted to strangle his family, peers, and treatment providers. His parents arranged in-home therapy, outpatient therapy, day treatment programs, and numerous hospitalizations for his safety.

From June to September 2022, at ages 9 and 10 years old, A.D. threatened to drown himself in a pool, jump out a window, and strangle himself. He destroyed property, hit his father, attempted to strangle his mother, and brandished a knife on his family. He threatened to kill his mother, brother, in-home therapists, and hospital staff. His frequent target was his younger brother who was traumatized by numerous assaults including being hit, pushed, choked, and threatened with a knife. A.D. was unrepentant following such violent acts, as one therapist wrote: "He does not display remorse once the malicious act has been committed."

On September 6, 2022, A.D. was admitted to psychiatric hospitalization after he brandished a knife on his family. The hospital staff and outpatient treatment providers unanimously recommended residential treatment and insisted that A.D. not return home due to safety concerns for A.D.'s family but instead, transfer directly to residential treatment. Plaintiff and his wife sought a residential treatment center that was available and appropriate to treat their 10-year-old son given his mental health diagnoses, which included autism spectrum disorder ("ASD"), and history of physical violence.

Aetna was unable to identify an in-network residential treatment provider within Plaintiff's home state of Utah, or any other state, which was available and appropriate to treat

A.D. After extensive research, Plaintiff and his wife arranged for A.D.'s admission to Sandhill Treatment Center ("Sandhill") in New Mexico. As a residential treatment center licensed by the State of New Mexico, Sandhill met the Plan requirements for a residential treatment provider.

Plaintiff requested that Aetna approve benefits for A.D.'s residential treatment at Sandhill. For several years, Aetna had approved A.D.'s out-of-network outpatient psychotherapist based on a single case agreement[1] ("SCA") due to unavailability within Aetna's provider network. Plaintiff similarly requested that Aetna approve A.D.'s out-of-network residential treatment at Sandhill based on a SCA due to unavailability within Aetna's provider network. Aetna denied coverage A.D.'s residential treatment at Sandhill, claiming the Plan did not provide out-of-network coverage, and denied Plaintiff's appeal.

Plaintiff filed the present case seeking reimbursement of benefits for A.D.'s residential treatment at Sandhill. The parties filed dispositive briefing seeking judgment.

By its Memorandum Opinion and Order ("Order") dated February 24, 2025, this Court denied Defendant's Motion for Summary Judgment and granted Plaintiff's Cross-Motion in part. ECF No. 44. The Court determined Aetna's decision to deny benefits was arbitrary and capricious and rendered "without reason," and remanded for a new review by Aetna. *Id.* at p. 6.

Aetna conducted a review on remand and issued a decision denying benefits on May 1, 2025. Plaintiff appealed that decision on August 13, 2025. Aetna denied the appeal on November 11, 2025. On November 25, 2025, the Court set a briefing schedule for the parties' cross-motions for summary judgment.

---

[1] A single case agreement is an agreement to which the claims administrator agrees to pay a set rate for residential treatment for a single member to a non-network facility. *Jamie F. v. UnitedHealthCare Ins. Co.*, No. 19-CV-1111-YGR, 2020 WL 6802416, at *1 (N.D. Cal. Nov. 19, 2020).

Plaintiff contends that Aetna's new decision on remand is arbitrary and capricious because Aetna unreasonably refused a SCA when evidence showed that an in-network provider was unavailable and/or inappropriate for A.D., and Aetna unreasonable refused to approve benefits with the out-of-network residential treatment facility that met the Plan requirements for a residential treatment center.

The default de novo standard of review applies to the Court's review because there is no valid delegation of discretionary authority to Aetna and Aetna is not entitled to a deferential review based on its arbitrary and capricious handling of Plaintiff's original claim and appeal. Regardless of the applicable standard of review, Aetna's denial was arbitrary and capricious because it was not supported by substantial evidence, unduly restricted coverage permitted by the Plan, and lacked rational connection to the evidence.

For these reasons, Plaintiff request judgment in his favor.

III.    Statement of Facts

A.    ERISA Plan

A.D. is a covered dependent under the Plan pursuant to his father's employment with the plan sponsor, Deloitte LLP. DGIP1651-1757.[2] The Plan is described in the "Aetna Open Access Select EPO Plan Summary Plan Description (SPD)" (hereinafter "SPD"). *Id.* The SPD provides general information about the Plan and does not cover all provisions, limitations, and exclusions. DGIP1655. The SPD states that it does not provide benefits for out-of-network providers except on a limited basis. *i.e.* DGIP1663, 1669. The SPD does not list services from out-of-network providers as an exclusion. DGIP1705-1706.

---

[2] Citations with the prefix "DGIP" refer to the page numbers of the administrative record produced by Defendant with the page numbers shortened to four-digit numbers for ease of reference. Defendant filed the full administrative record at ECF No. 55.

The SPD provides benefits for residential treatment for patients of patients diagnosed with mental health disorders. DGIP1682. The SPD requires that residential treatment facilities must be "appropriately licensed by the state Department of Health or its equivalent." *Id.* The SPD defines a "provider" as "a facility licensed or certified by law to provide health care services to you." DGIP1752. The SPD requires prior authorization before receiving services from an out-of-network provider and for residential treatment. DGIP1667, 1668.

B.     A.D.'s Mental Illness and Treatment History

In October 2022, A.D. was a 10-year-old boy with mental health diagnoses including ASD, major depressive disorder, attention deficit hyperactivity disorder ("ADHD"), generalized anxiety disorder, mood dysregulation disorder, and oppositional defiant disorder. DGIP0130-0131, 0146, 0150.

1.     Early Childhood Development and Diagnoses

At age 3, A.D. was diagnosed with ASD and began receiving applied behavior analysis ("ABA") therapy 20 to 25 hours per week. DGIP0131, 1857. At age 5, A.D. was diagnosed with ADHD. DGIP0131. At age 7, A.D.'s aggressive incidents increased and much of ABA therapy became focused on maintaining safety. *Id.*

2.     Hospitalizations

In March 2019, Plaintiff and his wife took A.D. (age 7) to the emergency department due to increasing violence at home. DGIP0131, 0182. He was hospitalized in the general pediatric unit awaiting a psychiatric bed. *Id.* He was emotionally dysregulated and alternatively cried for and attached his mother: "Furniture and equipment had to be removed from his room. He attacked the social worker when she asked to speak with his mother outside the room." *Id.* He was transferred to a psychiatric hospital and hospitalized for nine weeks due to ongoing concerns

about his ability to remain safe. DGIP0131, 0181. His outbursts gradually decreased but he "continued to endorse thoughts of killing certain staff members and made lists of those he wanted to hurt." DGIP0182.

Following hospitalization, he was admitted to residential treatment for approximately six weeks. DGIP0131, 0182. In residential treatment, A.D. did not act out. DGIP1816. However, "every time he spoke to his parents he would discuss how he wanted to kill certain staff members and would describe how he would do so." *Id.*

Following residential treatment, in June 2019, A.D. was admitted to the University of Utah's Huntsman Center ("Huntsman") Comprehensive Assessment and Treatment ("CAT") Program for diagnostic assessment and recommendations for treatment. DGIP0131, 0181. The reason for hospitalization was stated as: "Risk of harm toward others." DGIP0181. It was reported that over the past year, his tantrums became so severe that his mother and brother had to lock themselves in their rooms to stay safe. DGIP0181. A.D. hit, kick, bit, and tried to strangle others and threatened to kill his mother, brother, and in-home therapists. *Id.* The behaviors occurred during emotional outbursts but A.D. also hurt others when he was calm. *Id.* He reported seeing and hearing things that do not exist. DGIP0181-0182. A.D. was hospitalized for his safety and the safety of others. DGIP0184. During his treatment, A.D. did not demonstrate physical aggression but did make several statements about wanting to kill or harm staff or peers including wanting to shoot a staff member in the heart and writing a "death list" which described wanting to hurt specific staff members. DGIP0200.

Following the CAT Program, A.D. stepped down to the partial hospitalization, followed by outpatient treatment, followed by hospitalization again. DGIP0131. During this time, Plaintiff

and his family relocated to Salt Lake City, Utah, for A.D. to attend the partial hospitalization while living at home. DGIP0131, 0208.

In February 2021, A.D.'s condition worsened and he was hospitalized at Huntsman three times over the following six months. DGIP0131. When he attempted to return to in-person school in the fall of 2021, he had multiple daily incidents of "out-of-control" and aggressive behaviors escalated continuously including property destruction, physical aggression, and threats toward peers and adults. DGIP0131-0132, 1786, 1812. He tried to cut a peer with scissors, punched other children at summer camp, tried to strangle his behavioral therapist, threw things at them, threw a four-year-old across a sport court, and hit a six-year-old while on vacation. DGIP0157, 1800. He had been eloping from his 1:1 aide at school and having outbursts of screaming and threatening to kill himself at recess. DGIP0156. He has also hit and tried to strangle babysitters. DGIP1800.

ABA therapy was inconsistently provided due to the provider being unable to locate staff that were willing to treat A.D. due to his aggression. DGIP0157, 1786, 1812. According to the ABA therapist, A.D. "displayed malicious behavior and can often hold onto negative feelings for an extended period of time without indication or sign of anger; He does not display remorse once the malicious act has been committed." DGIP1858.

By September 2022, A.D.'s condition further escalated. He was physically violent with his parents and brother and had homicidal and suicidal ideation at home and school. DGIP0132, 0156, 1812. He had suicidal intent with a plan to drown himself in a pool, jump out a window, or strangle himself. DGIP0156, 0157. He regularly banged his head, punched and kicked his mother, threatened his brother with a knife, repeatedly slapped his mother and brother out of the blue, attempted to strangle his mother, and choked a child at school. DGIP1175, 0156, 0158. His

brother, B.D. age 7, was psychiatrically hospitalized due to trauma from his brother's aggression, which included A.D. punching him in the face causing his nose to bleed. DGIP0156-0158, 1175, 1797. Plaintiff and his wife were afraid of A.D. DGIP1797.

On September 6, 2022, A.D. was hospitalized at the Huntsman Mental Health Institute. DGIP0155, 1175. This was A.D.'s seventh admission to Huntsman.[3] DGIP0156. The Huntsman treatment team and outpatient providers unanimously recommended long-term residential treatment for A.D. DGIP0130, 0132, 0146, 0148, 0152, 0154, 0167. A.D. reported that he was at Huntsman because "something really sudden happened and I got mad at my brother, and I got out a steak knife and told him I was going to kill him." DGIP0155.

At this time, A.D.'s providers and caregivers withdrew their services. DGIP0131. The ABA provider withdrew its services because their staff did not feel safe after prior incidents with A.D. DGIP1786. The ABA provider raised concerns that A.D.'s behavior may be a threat to B.D. as well as Plaintiff and his wife. *Id.* A.D.'s nanny service determined that the nanny needed to leave the home for her safety. DGIP1787.

The treatment team at Huntsman and two outpatient clinical psychologists recommended that A.D. be admitted to residential treatment directly from the hospital, without any time at home, for the safety of A.D.'s family. DGIP0146, 0148, 0154. The care plan was to have A.D. transferred and admitted to residential treatment within two weeks from September 15, 2022. DGIP1797.

---

[3] Huntsman provided a timeline of the major milestones of A.D.'s life including treatment history, diagnosis, and interventions. DGIP0170-0172.

C.    Aetna In-Network Providers Were Unavailable and/or Inappropriate for
A.D.'s Residential Treatment

Plaintiff and his wife contacted Aetna for assistance locating a residential treatment facility. DGIP1812. Plaintiff and his wife informed Aetna that they were afraid that A.D. would hurt a family member. *Id.* Plaintiff and his wife enlisted the aid of a placement consultant to assist in reviewing the residential treatment facilities offered by Aetna. DGIP0132. They searched for a facility that would meet their son's immediate and long-term needs and satisfy the treatment recommendations: long-term residential treatment for a 10-year-old boy with several mental health diagnoses, including ASD, and history aggressive and violent behaviors towards family, peers, and staff. DGIP0132. Plaintiff advised Aetna that A.D. is "highly triggered by children who have low IQ and are very low functioning and is likely to hurt them." DGIP1835.

The in-network facilities identified by Aetna were inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons:

- Discovery Mood, TX (aka Center for Discovery): two to four week wait, did not treat children with ASD, A.D. was too young for their program, did not accept children under age 11, short-term stabilization and assessment, not a long-term program, placed patients in mixed milieu (patients diagnosed mental health disorders placed with patients diagnosed with substance abuse disorder). DGIP0132, 1775, 1815, 1854.

- Meridell, TX: A.D. was too young for their program, did not accept children under age 11, did not respond to telephone calls from Plaintiff. DGIP0132, 1825.

- Kennedy Krieger, MD: hospitalization only, not a residential treatment program. DGIP0132, 1817.

- Oak Plains Academy, TN: five week wait, short term program, allegations of children harmed in the facility, accepts patients with very low IQ which did not describe A.D. DGIP0132, 1765.

- San Marcos Treatment Center: six to eight week wait, did not respond to telephone calls from Plaintiff, allegations of child abuse and riots. DGIP0133, 1764, 1765.

- North Springs Behavioral Health, VA: did not accept children outside of Virginia, allegations of children harmed in the facility including a child who died during improper restraints, no response to Aetna's inquiry. DGIP0133, 1765, 1781, 1787.

- Texas Neurorehab: would not accept because A.D.'s IQ was too high, facility worked with developmentally delayed patients and A.D. would not be appropriate. DGIP1764.

- Provo Canyon School: A.D. was too young for their program. DGIP1766.

- Willow Springs: A.D. was too young for their program, minimum age is 12. DGIP1768.

- Pathlight Mood and Anxiety Center: A.D. was too young for their program, minimum age is 12. DGIP1776.

- BellFaire: waitlist extends "well into 2023." DGIP1792.

- Millcreek of Pontotoc: no response to Aetna's inquiry. DGIP1793.

- Harbor Point Behavioral Health Center: unable to accommodate a patient with an ASD diagnosis. DGIP1807.

- Youthcare: A.D. was too young for their program, minimum age is 11. DGIP1818.

-10-

- Great Circle: six to eight month wait. DGIP1839.

In sum, there were no in-network facilities available or appropriate for residential treatment for A.D. Aetna conceded it had no network provider within 100 miles of Plaintiff's home. DGIP 1797. Then Aetna conceded it had no network provider within the entire state of Utah. DGIP1792. Then Aetna emailed Plaintiff and his wife on September 20, 2023 stating that "the results of the provider search did not yield anything" and would they be "willing to enroll the member in RTC out of state." *Id.*

Plaintiff found two residential facilities that were appropriate for A.D. and would accept him as a patient: Sandhill and Intermountain Academy. DGIP0133. Intermountain Academy declined to accept A.D. because his level of violence was too high. *Id.* Sandhill would accept A.D. as a patient and was in New Mexico which was driving distance from the family's home in Utah. *Id.* Sandhill is fully licensed as a residential treatment center by the State of New Mexico. DGIP0136, 0890.

On October 3, 2022, Aetna denied further benefits for A.D.'s hospitalization at Huntsman. DGIP1826. Plaintiff informed Aetna that A.D. was not safe out of the hospital and not safe to return home. DGIP1825-1826. Plaintiff arranged for A.D.'s admission to Sandhill on October 11, 2022, the soonest he could be admitted. DGIP1826.

D.     A.D.'s Admission to Residential Treatment and Request for Benefits

On October 11, 2022, A.D. was discharged from Huntsman and admitted directly to Sandhill for residential treatment. DGIP0131.

Plaintiff requested Aetna approve benefits for A.D.'s residential treatment at Sandhill. DGIP0130. Plaintiff also requested a SCA for Sandhill to be covered as an in-network provider due to the unavailability of a network provider. DGIP0136.

1.    Aetna's Denial of Benefits

In an October 17, 2022 letter, Aetna denied benefits for the sole reason that "this is not a covered service under the terms of the plan." DGIP0011-0012. Aetna agreed residential treatment was medically necessary. DGIP0134, 1175.

2.    Plaintiff's First Appeal

On November 14, 2022, Plaintiff submitted a written expedited appeal. DGIP0126-0226. Plaintiff provided A.D.'s mental health and treatment history, letters of support from treatment providers, psychiatric evaluation and treatment records, correspondence with Aetna, and Sandhill treatment plan for A.D. *Id.* The appeal documented the above treatment history. Plaintiff explained that he researched and contacted the facilities provided by Aetna and none of the facilities were available or appropriate to provide residential treatment to A.D. for various reasons (detailed above), including: would not accept a child as young as 10 years old, would not accept a child with ASD diagnosis, not a residential program, a short-term stabilization program and did not provide long-term care, did not return calls to Plaintiff, and/or would not accept treatment of a child who lived out-of-state. *i.e.* DGIP0132-0133.

Plaintiff requested that Aetna approve Sandhill for a SCA because it was a fully licensed residential treatment center, met A.D.'s treatment needs, was willing to accept him promptly, and was located in a neighboring state. DGIP0133. Plaintiff provided letters from A.D.'s treatment providers:

- Dr. Ryan Cephas, Child Psychiatrist at Huntsman, and Maggie Blau, LCSW Youth Inpatient Social Worker at Huntsman. Dr. Cephas and Ms. Blau treated A.D. on an inpatient basis and in day treatment at Huntsman. DGIP0146. They wrote: "The inpatient treatment team is recommending that A.D. transition to a

residential treatment facility to address aggression, mood, family relationships, and ASD. . . He is not safe to discharge home prior to finding next placement due to unsafe behaviors and danger to family members." *Id.*

- <u>Dr. Anne Tatti, Clinical Psychologist</u>. Dr. Tatti wrote that A.D. had been in her care since October 2019 and she has seen him two times per week during the past three years. DGIP0148. She wrote that over the past three months A.D. had become increasingly aggressive and threatening. *Id.* Dr. Tatti wrote that A.D.'s target when aggressive or violent had always been his family and particularly his younger brother. *Id.* She wrote that B.D. "endured numerous assaults at the hands of [A.D.], including being hit, pushed, choked and most recently threatened with a knife. *Id.* Dr. Tatti wrote that during this most recent incident with the knife, [A.D.] reportedly stated to his brother, 'I am going to kill you in real life' and then secured a knife from the kitchen." *Id.* Dr. Tatti wrote that she agreed with A.D.'s inpatient treatment team and outpatient ABA team that residential treatment was the appropriate level of care. Dr. Tatti wrote that while he needed to be hospitalized and not discharged back home because B.D.'s "physical as well as mental well being are at severe risk if [A.D.] is allowed to re-enter the home before a transfer to Residential Treatment is secured." *Id.*

Dr. Tatti wrote that although A.D. worked well in treatment and made progress, "his inclination towards aggression and violence has remained." DGIP0150. In the summer of 2022, A.D. became "increasingly aggressive and threatening" which culminated in A.D. brandishing a knife in front of his family. *Id.* Dr. Tatti wrote that A.D.'s propensity towards aggression and threats remained

a serious concern and "needs to be addressed in a higher level of care" and recommended that he be transferred to residential treatment. *Id.*

- <u>Lavere Harward, Board Certified Behavior Analyst</u>. Mr. Harward was an ABA therapist for A.D. and recommended that A.D. be committed to a residential treatment facility due to the severity of behaviors witnessed during treatment, and safety concerns for A.D. and his family. DGIP0152. Mr. Harward wrote that he observed "[m]ultiple instances of calculated, patient, and malicious behavior" by A.D. *Id.* Mr. Harward further wrote that A.D. "is extremely patient and selective when he decides to act with ill intent, and can often hold onto negative/malicious feelings for extended periods of time without indication or sign of anger, nor remorse once the act has been committed." *Id.*

Plaintiff also included a letter from B.D.'s psychologist:

- <u>Pamela C. Wilkison, Licensed Psychologist</u>. Ms. Wilkison treated B.D. due to the traumatic experiences living with A.D. DGIP0154. Ms. Wilkison wrote that she witnessed interactions between A.D. and his brother and that B.D. "was assaulted numerous times over the years, including being choked, threatened with a knife, pushed down. hit, and bit. He's endured verbal threats of harm, put downs, and comments about fears to believe." *Id.* She wrote that it "is imperative that [A.D.] remain hospitalized until he can enter residential treatment, without any time at home, for [B.D.'s] safety and psychological well-being." *Id.*

Plaintiff requested that Aetna immediately approve benefits for A.D.'s residential treatment at Sandhill and approve a SCA for Sandhill. DGIP0136.

###### 3.    Aetna's Denial of Plaintiff's First Appeal

In a December 14, 2022 letter, Aetna denied Plaintiff's first appeal for the sole reason that "your plan does not cover out of network benefits." DGIP0871. Aetna denied the request for a SCA without explanation. DGIP0871.

###### 4.    Plaintiff's Second Appeal

On February 22, 2023, Plaintiff submitted a written second level appeal. DGIP0881-1000. Plaintiff explained that Aetna does approve services with out-of-network providers when an in-network provider is unavailable. DGIP0882, 0888. Plaintiff wrote that the ACA required Aetna to provide a sufficient provider network without unreasonable delay. DGIP0882. Plaintiff explained that the in-network facilities offered by Aetna were unavailable and/or inappropriate for A.D. DGIP0885-0886. Plaintiff requested that Aetna immediately approve benefits for A.D.'s residential treatment at Sandhill. DGIP0890.

Subsequently, Plaintiff emailed Aetna and wrote that A.D. "is at Sandhill because his entire medical team recommended it, and none of the programs on Aetna's in-network list were appropriate, and you haven't given us any reasonable alternatives." DGIP1789.

###### 5.    Aetna's Denial of Plaintiff's Second Appeal

In a February 28, 2023 letter, Aetna denied Plaintiff's second appeal for the sole reason that "the plan does not cover services performed by out-of-network providers." DGIP1132-1134.

On March 1, 2024, A.D. discharged from Sandhill. Plaintiff paid the cost of A.D.'s treatment at Sandhill. (Declaration of Elizabeth K. Green, ¶ 2).

E.     The Court's Order and Remand to Aetna

On February 24, 2025, this Court issued a Memorandum Opinion and Order ("Order")

denying Defendant's Motion for Summary Judgment and granted Plaintiff's Cross-Motion in

part. ECF No. 44. The Court determined Aetna's decision to deny benefits was arbitrary and

capricious and rendered "without reason," and remanded for a new review by Aetna. *Id.* at p. 6.

IV.     Aetna Denied Benefits on Remand

A.     Aetna's Denial

Aetna issued a new decision denying benefits on May 1, 2025. DGIP1862-1910. Aetna

claimed there were "multiple suitable in-network residential treatment facilities available to

promptly accept" A.D. for treatment and named three facilities: Meridell Achievement Center,

Oak Plains Academy, and Center for Discovery.[4] DGIP1863.

Aetna did not cite or address the Plan language describing the requirements for coverage

of mental health services at residential treatment facilities[5], or the Plan definition of a healthcare

provider[6] despite Plaintiff specifically quoting the applicable Plan language in his appeals.

DGIP0134, 0887.

Instead, Aetna claimed that it would not authorize Sandhill for A.D.'s residential

treatment because it contended Sandhill did not meet Aetna's criteria in "Aetna Criteria for

---

[4] Aetna would include fourth facility, San Marcos Treatment Center, in its appeal denial. DGIP1959-1960.

[5] DGIP1682 ("This Plan covers room and board at the semi-private room rate and other services and supplies provided during your stay in a psychiatric hospital or residential treatment facility, appropriately licensed by the state Department of Health or its equivalent.").

[6] DGIP1752 ("A physician, health professional, person, or facility, licensed or certified by law to provide health care services to you. If state law does not specifically provide for licensure or certification, they must meet all Medicare approval standards even if they don't participate in Medicare.").

Recognizing Non-Contracted Residential Treatment Facilities: ALIC (Traditional Plans) –

Residential Treatment Facility (Mental Disorders) – ALIC (Traditional), effective for Plan year

2022" ("Aetna ALIC Criteria"). DGIP1863. Aetna did not explain its application of the Aetna

ALIC Criteria instead of the Plan terms. *Id.* Aetna claimed it had no obligation to comply with

the Affordable Care Act ("ACA"). *Id.* Aetna claimed the Plan did not specifically provide for

SCAs and that it made the correct decision to not offer a SCA based on Aetna's "National

Clinical Services (NCS) 512 Non-Participating Provider Requests for In-Network Benefits

Policy and Procedure." ("Aetna NCS Criteria"). *Id.*

      B.    <u>Plaintiff's Appeal</u>

Plaintiff appealed Aetna's decision on August 13, 2025. DGIP1911-1950. Plaintiff wrote

that the Plan provides for SCAs, citing this Court's Order: "The Plan provides for such an

exception, *see* DGIP 1667-1668 (discussing procedures for the receipt of "Covered Health

Services from an Out-of-Network provider"). . ." ECF No. 44 at p. 7. Plaintiff wrote that Aetna

routinely approved SCAs for A.D.'s outpatient psychologist. DGIP1915, fn 3. Plaintiff wrote

that the ACA requires insurers, such as Aetna, to maintain sufficient provider networks.

DGIP1915. Plaintiff wrote that the ACA requirements apply to Aetna's provider network which

has the same provider network for insured plans and self-funded plans. *Id.* Plaintiff wrote that the

New York State Department of Financial Services ("DFS"), which regulates health insurance

policies issued in New York, provides guidance as to the network adequacy requirements. *Id.*

Plaintiff wrote that the facilities named by Aetna were unavailable and/or inappropriate

for A.D., as confirmed by Plaintiff, his wife, and A.D.'s treatment team. DGIP1916. Plaintiff

provided a detailed explanation of the research of, and communications with, each in-network

facility named by Aetna, confirming that none were available and/or appropriate to treat A.D. DGIP1916-1918.

Plaintiff's provided letters from Dr. Russell Hyken and Ms. Jennifer Taylor, residential treatment specialists, who have years of experience assisting with the placement of patients into residential facilities. DGIP1942-1943 (Dr. Hyken: "I am deeply knowledgeable about Sandhill and other treatment programs. . . I have visited and worked with multiple facilities that were recommended on this list."); DGIP1947 (Ms. Taylor: "We are a residential specialist and therapeutic educational advocacy group for children between the ages of 6 and 24. Our practice has been consulting since 2016. Our practice visits and tours over 120 programs a year including some of the noted programs below."). Dr. Hyken and Ms. Taylor provided information about each in-network facility identified by Aetna and confirmed that none were available and/or appropriate to treat A.D. DGIP1942-1944, 1947-1948.

Plaintiff explained that A.D.'s treatment team recommended Sandhill as the only viable and appropriate treatment option and provided letters of support from his treatment team. DGIP1918-1920. Dr. Tatti, A.D.'s longstanding outpatient clinical psychologist, wrote:

> Sandhill works exclusively with children 8-13 years old, with diagnoses/concerns being Autism Spectrum Disorder, emotional dysregulation, unsafe behaviors, manipulative behaviors, depression and anxiety disorders and resistance to adult care just to name a few. This program was tailor-made for a child with [A.D.'s] level of complexity as well as need.
>
> The other programs Aetna offered were not, in any way, appropriate to address [A.D.'s] needs.

DGIP1937. Lavere Harward, A.D.'s therapist from Advanced Behavior Analysis, wrote:

> As a team, Sandhill Center was specifically selected due to its specialization in treating children aged 8–13 with emotional and behavioral dysregulation. No in-state facilities provided equivalent expertise or staffing models to address the complexity of [A.D.'s] case at the time. This placement prevented repeated

hospitalizations, preserved family stability, and allowed [A.D.] to make measurable progress in a safe, structured environment.

DGIP1941.

Plaintiff disputed Aetna's claim that Sandhill did not qualify for a SCA. DGIP1920-1922. Plaintiff again cited the Plan language defining a healthcare provider and residential treatment facility and asserted that Sandhill satisfied the Plan requirements because it was licensed by the state as a residential treatment facility (and enclosed certificates of licensure). DGIP1921, 1949-1950. Plaintiff wrote that Aetna has approved benefits for residential treatment of other patients at Sandhill, as confirmed by Dr. Hyken and Ms. Taylor. DGIP1920. Plaintiff wrote that the Aetna ALIC and NCS Criteria were undisclosed to participants, applied new requirements for coverage that do not exist in the Plan, and not reflective of the standard of care for residential treatment of children. DGIP1921.

C.     Aetna's Appeal Denial

Aetna denied the appeal on November 11, 2025. DGIP1951-1966. Aetna claimed there was no network deficiency, no basis for consideration of a SCA for Sandhill, and regardless, Sandhill did not meet Aetna's ALIC Criteria. DGIP1952-1953.

Aetna largely restated its previous denial without addressing specific issues raised by Plaintiff. Aetna reiterated that the ACA does not apply to "self-funded plans like the Plan" but Aetna did not address the argument made in Plaintiff's appeal that the ACA requires insurers, such as Aetna, to maintain sufficient provider networks and Aetna uses the same provider network for both self-funded and insured plans. DGIP1915. Aetna did not address Plaintiff's argument regarding the New York State DFS regulations. *Id.* Aetna did not address the Court's Order finding that the Plan provides for SCAs. ECF No. 44 at p. 7.

Aetna disagreed with Plaintiff's statement that it was a challenge for Aetna to locate an available and appropriate residential treatment facility that would accept A.D. as a patient. DGIP1954. Yet, for the entire United States, Aetna was able to identify only four in-network facilities that it claimed would have provided residential treatment to A.D. *Id.* Aetna admitted that it initially offered several other in-network facilities which Aetna later "removed from consideration." DGIP1954, 1931-1934.

Aetna did not dispute facts provided in Plaintiff's appeal which demonstrated that in-network facilities were unavailable and/or inappropriate for A.D. Aetna did not dispute that Plaintiff did not receive return phone calls from Meridell (DGIP1916) and San Marcos (DGIP1917). DGIP1957, 1959. Aetna did not dispute that Plaintiff received the following information:

- Meridell and Center for Discovery did not accept children under age 11 and A.D. was newly age 10 and emotionally immature for his age. DGIP1916, 1957, 1960[7];

- The in-network facilities focused on short-term assessment and stabilization and A.D. required intensive long-term residential care. DGIP1957-1960;

- Multiple facilities cited long waitlists for admission (*i.e.* five week wait for Oak Plains (DGIP1917); six to eight week wait for San Marcos (DGIP1917)). DGIP1958-1959.

- Oak Plains was unavailable to accept A.D. because it was not taking new referrals until April 1, 2023, more than six months after A.D. was discharged from Huntsman. DGIP001769, 1918.

---

[7] Aetna did not provide evidence to support its claim that Ms. Taylor confirmed information with Center for Discovery. DGIP1960.

Aetna disputed and minimized information concerns that the facilities were potentially unsafe for A.D., other patients, and staff. Plaintiff raised safety concerns regarding Oak Plains, citing a published news article and law enforcement officials who confirmed the fatal overdose of two female adolescent patients at Oak Plains during the time which Aetna recommended placement for A.D.[8] DGIP1917, 1958. Oak Plains accepted children with an IQ as low as 65, and Plaintiff advised Aetna that A.D. was triggered by, and exhibited violent behavior toward, children of low IQ. DGIP1958. Aetna dismissed Plaintiff's concern by speculating as to the facility's approach and assuming the facility to have "appropriate de-escalation and restraint procedures, if needed," without acknowledging the A.D.'s history of violent behaviors. DGIP1958.

Aetna dismissed the opinions of residential treatment specialists (*i.e.* Dr. Russell Hyken and Jennifer Taylor), who provided specific knowledge of the in-network facilities identified by Aetna.[9] DGIP1956. Aetna did not provide any contrary evidence from a residential treatment specialist. *Id.* The denial letter was signed by Patricia Roode, Senior Manager, Complaints and Appeals, a non-clinician with no identifiable experience evaluating residential treatment facilities and who did not consult with a residential treatment specialist. DGIP1966. Although Ms. Roode

---

[8] Aetna claimed the deaths were not "substantiated by any authority," despite confirmation of the deaths by the Montgomery County Sheriff's Office. DGIP1917. https://www.wdbj7.com/2022/12/01/two-teens-die-benadryl-overdoses-treatment-facility-sheriffs-office-says/. Aetna claimed this information "was not part of the administrative record." DGIP1958. To the contrary, the news report was placed into the administrative record by virtue of Plaintiff providing it with his appeal to Aetna.

[9] The information provided by Dr. Hyken and Ms. Taylor was based on their years of experience in assisting with the placement of patients in residential facilities. DGIP1942-1943; DGIP 1947. For example, Dr. Hyken reported that San Marco is more of a hospital program, a statement that Aetna dismissed without reason. In another example, Ms. Taylor reported that Center for Discovery did not treat patients with ASD and verified her statement by reporting that she had toured Center for Discovery. DGIP1948, 1960. Aetna rejected their reports without offering contrary evidence.

referenced an unnamed physician reviewer, Aetna did not disclose the reviewer's qualifications, the physician's review, or the physician's identity. DGIP1951-1966. The Aetna physician reviewer opined on appropriate placement for A.D. without ever meeting or evaluating him, without visiting the in-network facilities, and without addressing the opinions of Dr. Tatti, Dr. Hyken, and Ms. Taylor who met or evaluated A.D. and/or visited the in-network facilities.

Aetna dismissed the timing of A.D.'s transfer to residential treatment, contending "there was no clinical evidence" suggesting a transfer from Huntsman to residential treatment was "needed immediately." DGIP1956. That contention is directly contradicted by Plaintiff's appeal: "[A.D.'s] need to transfer to residential treatment was accelerated when Aetna denied further benefits for [A.D.'s] hospitalization at Huntsman on October 3, 2025, and Huntsman unequivocally stated that [A.D.] was unsafe to return home." DGIP1917. Aetna did not address these facts.

Aetna claimed that Sandhill did not qualify for a SCA because it did not meet Aetna's requirements for a residential treatment facility. Aetna did not address or acknowledge the Plan language that only required residential treatment facilities to be "appropriately licensed by the state Department of Health or its equivalent," or the Plan language that defined healthcare providers as facilities "licensed or certified by law to provide health care services to you." DGIP1921. Aetna did not address Plaintiff's contention that he satisfied the terms of the Plan because he requested residential treatment for his son with a state licensed provider.

Aetna ignored Plaintiff's contention that Aetna may not impose new requirements for coverage that do not exist in the Plan and Aetna must apply to the Plan terms for coverage. Aetna ignored Plaintiff's contention that the Aetna ALIC and NCS Criteria are undisclosed additional requirements for residential treatment. Aetna did not identify any Plan provision that permitted it

to impose the Aetna ALIC or NCS Criteria in denying Plaintiff's benefit request. Aetna ignored

the specific reasons cited by Dr. Hyken to support finding that Sandhill is an appropriately

licensed residential treatment center. DGIP1943-1944. Aetna claimed that its "standards and

requirements" were not met, without citing any such requirements set forth by the Plan.

DGIP1962. Aetna ignored confirmed reports from Dr. Hyken and Ms. Taylor that Aetna has

approved and paid for residential treatment at Sandhill. DGIP1920.

V.    Plaintiff is Entitled to Summary Judgment

    A.    The Default De Novo Standard Applies to the Court's Review

The default standard of review in an ERISA benefit case is de novo. *Firestone Tire &*

*Rubber Co. v. Bruch*, 489 U.S. 101, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989). A plan administrator is

only entitled to deferential review if it can demonstrate that the plan grants it discretionary authority

to determine benefit eligibility. *Id.* at 114-115. Defendants have the burden of demonstrating that

they are entitled to deferential review. *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d

243, 249 (2d Cir. 1999) ("the party claiming deferential review should prove the predicate that

justifies it").

Defendant cannot show that it is entitled to a deferential review because there is no

evidence that the Plan had the authority to delegate discretion to Aetna or that the Plan contained

specific procedures for delegation. Defendant has not produced "the instrument" under which the

Plan is maintained. 29 U.S.C. § 1105(c)(1) ("The instrument under which a plan is maintained

may expressly provide for procedures . . . for named fiduciaries to designate persons other than

named fiduciaries to carry out fiduciary responsibilities . . . under the plan." The only plan

related document produced by Defendant is the SPD which is self-described as providing only

"general information" about the Plan and does not cover all provisions, limitations, and

exclusions. DGIP1655. The SPD defers to a "Plan document" which was never produced and therefore cannot be considered by the Court.[10] *Id.*

The specific procedures and authority of named fiduciaries to designate fiduciary responsibilities must be expressly provided for in the ERISA plan. *Rubio v. Chock Full O'Nuts Corp.*, 254 F. Supp. 2d 413, 422 (S.D.N.Y. 2003). The SPD does not provide specific procedures for the delegation of discretionary authority or whether the Plan Administrator may have the authority to designate its fiduciary responsibilities. ERISA explicitly states that an outside party not named in the Plan may only be vested with discretionary authority "pursuant to a procedure specified in the plan." *McDonnell v. First Unum Life Ins. Co.*, No. 10 CV 8140 RPP, 2013 WL 3975941, at *10 (S.D.N.Y. Aug. 5, 2013). The authority to delegation discretion "is not inherent; a named fiduciary can delegate discretionary authority provided to it by a benefits plan only when the plan sets out the authority and procedures for doing so and those procedures are followed." *Id.* at *11.

Defendant cannot meet its burden to alter the default *de novo* standard of review because there is no evidence of an ERISA Plan document, an "instrument under which a Plan is maintained," which provides that the Plan Administrator has discretion, the specific procedures by which the Plan Administrator may delegate its discretion, and the authority of the Plan Administrator to delegate its discretion.

B.      <u>Under a De Novo Review, Plaintiff is Entitled to Benefits Under the Plan</u>

Under de novo review, the Court is called upon to determine whether Plaintiff is entitled to benefits under the terms of the Plan without deference to either party's interpretation. *Firestone*, 489

---

[10] The SPD makes other references to "other Plan documents" which were never produced in litigation. *i.e.* DGIP1739, 1741.

U.S. at 112; *see also Locher v. Unum Life Ins. Co. of America*, 389 F.3d 288, 296 (2d Cir. 2004) ("[U]pon de novo review, a district court may render a determination on a claim without deferring to an administrator's evaluation of the evidence."). The Court "interprets the terms of the benefits plan, . . . determines the proper diagnostic criteria, . . . reviews the medical evidence, and reaches its own conclusion about whether the plaintiff has shown, by a preponderance of the evidence, that she is entitled to benefits under the plan." *McDonnell*, 2013 WL 3975941 at *12 (citations omitted). "The question for the Court is simply whether the decision to deny Plaintiff's claim was correct." *Macalou v. First Unum Life Ins. Co.*, No. 22-CV-10439 (PKC), 2024 WL 4867091, at *1 (S.D.N.Y. Nov. 22, 2024).

> 1.    <u>In-Network Residential Treatment Facilities Were Unavailable and/or Inappropriate</u>

The record establishes that Aetna's in-network residential treatment facilities were inadequate for A.D's unique and critical mental health needs. In multiple appeals, Plaintiff provided the information he received from and about the in-network facilities which demonstrated that the facilities were inappropriate and/or unavailable. DGIP0132-0133, 0885-0888, 1916-1918. Plaintiff informed Aetna that telephone calls to facilities were not returned, A.D. was too young for the facilities, the facilities were focused on short-term assessment and stabilization and A.D. required intensive long-term care, long waitlists, and safety concerns. DGIP1916-1918.

The Plan provides Aetna to approve out-of-network services when in-network services are unavailable (DGIP1667-1668, 1739), and Aetna has approved out-of-network services for A.D. through SCAs. DGIP0882, 1771, 1915. Aetna's care manager agreed that if an in-network facility was not available, he would "help the family obtain a single case agreement or network exception" (DGIP0888). When the provider network is inadequate, as here, claims administrators

arrange SCAs with out-of-network providers to ensure that members can access Plan benefits. *Jamie F.*, 2020 WL 6802416, at *1.

Absent such accommodation, the plan benefit is illusory because it is effectively inaccessible to the plan participants. "[T]he provisions of an ERISA plan should be construed so as to render all provisions meaningful and to avoid illusory promises." *Aramony v. United Way Replacement Benefit Plan*, 191 F.3d 140, 150 (2nd Cir. 1999) (internal quotation marks and citations omitted). The illusory promises doctrine "instructs courts to avoid constructions of contracts that would render promises illusory because such promises cannot serve as consideration for a contract." *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 440, 135 S. Ct. 926, 936, 190 L. Ed. 2d 809 (2015); *IUE-CWA v. Gen. Elec. Co., 745 F. App'x* 583, 600 (6th Cir. 2018) (Stranch, J., concurring) ("Broken promises matter. They matter in ordinary contract law, and they matter in ERISA law.").

An analogous ERISA plan can be found in the Ninth Circuit decision *Jacobs v. Kaiser Found. Health Plan Inc.*, 265 F. App'x 652, 654 (9th Cir. 2008). The Ninth Circuit held that Kaiser was required to approve coverage for services with an out-of-network provider if an in-network provider was not available. *Id.*; *see also Boyle v. Legacy Health Plan No. 504*, No. 6:20-CV-00705-AA, 2023 WL 6318923, at *12 (D. Or. Sept. 28, 2023).

### 2.     Sandhill Satisfied the Plan Terms for Residential Treatment Facility

Plaintiff satisfied the terms of the Plan for benefits for A.D.'s residential treatment at Sandhill because it was a state licensed residential treatment facility. The Plan provides benefits for residential treatment for patients of patients diagnosed with mental health disorders. DGIP1682. The Plan defines "providers" as "licensed or certified by law to provide health care services to you." *Id.* The Plan requires that residential treatment facilities to be "appropriately licensed by

the state Department of Health or its equivalent." *Id.* Sandhill met the Plan requirements because it was a fully licensed residential treatment center in New Mexico. DGIP0136, 1921.

### 3. Federal and State Laws Support Approval of Out-of-Network Providers When There is Network Inadequacy

The Affordable Care Act ("ACA") requires that provider networks be "sufficient in number and types of providers, including providers that specialize in mental health and substance abuse services, to assure that all services will be accessible without unreasonable delay." 45 CFR § 156.230(a)(2). As a health insurance company, Aetna is required to comply with the ACA and provide a sufficient network for members in the Deloitte benefit plan. As an ERISA fiduciary, Defendant must ensure that the provider network promised to plan members is sufficient in number and type of providers and can be accessed without unreasonable delay.

Pursuant to New York Insurance Law, health insurers such as Aetna are required to ensure that its provider networks are adequate to meet the health needs of members and provide an appropriate choice of providers sufficient to render the services covered under the health plan. NY Ins L § 3241(a) ("[a] contract with a network of health care providers shall ensure that the network is adequate to meet the health needs of insureds and provide an appropriate choice of providers sufficient to render the services covered under the policy or contract.").

The New York State DFS provides guidance as to the network adequacy requirements under Section 3241.[11] An adequate network needs to contain "a sufficient number and array of providers to meet the diverse needs of the insured population and to ensure that all services will

---

[11]https://www.dfs.ny.gov/apps_and_licensing/health_insurers/network_adequacy_reqs_standards_submission_instructions

be accessible without undue delay," including mental health providers *Id.* The DFS informs

consumers of the right to go out-of-network when an in-network provider is unavailable.[12]

VI.    <u>Under a Discretionary Review, Aetna's Denial Is Unreasonable and Unsupported</u>

      Under an abuse of discretion review, the Court considers whether the administrator's

decision was made "without reason, unsupported by substantial evidence or erroneous as a matter of

law." *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 132 (2d Cir. 2008) (citation omitted).

"Substantial evidence is such evidence that a reasonable mind might accept as adequate to support

the conclusion reached . . .  [and] requires more than a scintilla but less than a preponderance."

*Celardo v. GNY Auto. Dealers Health & Welfare Tr.*, 318 F.3d 142, 146 (2d Cir. 2003) (internal

quotation omitted).

      This Court ruled that Aetna's original denials were arbitrary and capricious because Aetna

violated ERISA by failing to adequately explain the basis for denial by not addressing the

requested SCA for the out-of-network provider. ECF No. 44 at p. 8 (citing 29 C.F.R. §

2560.503–1(g)). Aetna's misconduct is not erased by the Court affording Aetna another review

on remand. Aetna's arbitrary and capricious decisions must be weighed within the totality of the

circumstances in evaluating the reasonableness of Aetna's new appeal decision. *Abatie v. Alta*

*Health & Life Ins. Co.*, 458 F.3d 955, 968 (9th Cir. 2006) ("A straightforward abuse of discretion

analysis allows a court to tailor its review to all the circumstances before it.").

      Aetna's new appeal decision fairs no better. Aetna has again issued an appeal decision

which is unreasonable, nonresponsive to issues raised on appeal, and not supported by

substantial evidence. Aetna's decision rests on two incorrect assertions: there was an in-network

---

[12] https://www.dfs.ny.gov/consumers/health_insurance/your_rights_as_a_health_insurance_consumer

facility available and appropriate, and Sandhill did not meet Aetna's criteria for a SCA. Both arguments fail.

A.      Aetna Ignored Evidence Showing the Inadequacy of In-Network Facilities

As explained above, Plaintiff's appeals document that in-network facilities proffered by Aetna were unavailable and/or inappropriate for several reasons including location, age, diagnosis, and long waitlists. ERISA requires a full and fair review in which the administrator to "takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim." 29 C.F.R. § 2560.503-1(h)(2)(iv). Aetna did not provide a full and fair review because it failed to address facts and arguments raised on appeal, did not dispute facts which showed the inadequacy of in-network facilities, and dismissed opinions of residential treatment specialists without offering contrary evidence.

Aetna minimized the extreme challenge of finding appropriate placement for A.D. given his young age, violent behaviors, multiple diagnoses, and level of care. Aetna claimed it was not a challenge to locate an available and appropriate residential treatment facility. DGIP1954. Such an assertion is not credible. For the entire United States, Aetna was able to identify *only four* in-network facilities that it claimed could have provided residential treatment to A.D. *Id.* Aetna admitted that it initially offered several other in-network facilities which Aetna later "removed from consideration." DGIP1954, 1931-1934.

Aetna did not dispute information showing the in-network facilities were unavailable and/or inappropriate. Aetna did not dispute that Plaintiff did not receive return phone calls from Meridell (DGIP1916) and San Marcos (DGIP1917). DGIP1957, 1959. Aetna did not dispute that Plaintiff received information that Meridell and Center for Discovery did not accept children under age 11, or that A.D. was newly age 10 and emotionally immature for his age. DGIP1916, 1957, 1960.

Aetna did not dispute that Plaintiff received information that the in-network facilities focused on short-term assessment and stabilization and that A.D. required intensive long-term care. DGIP1957-1960. Aetna did not dispute that Plaintiff received information that there was a five week wait for Oak Plains (DGIP1917) and six to eight week wait for San Marcos (DGIP1917). DGIP1958-1959. Aetna did not address Plaintiff's contentions regarding the ACA and New York State DFS regulations regarding network adequacy.

Aetna unreasonably minimized, and failed to give credence to, safety issues which rendered the in-network facilities inappropriate. Plaintiff raised safety concerns regarding Oak Plains, citing a published news article regarding the fatal overdose of two female adolescent patients at Oak Plains during the time which Aetna recommended placement for A.D. DGIP1917, 1958. Aetna wrongly claimed the deaths were not "substantiated by any authority," when the deaths were confirmed by the Montgomery County Sheriff's Office. DGIP1917. Oak Plains accepted children with an IQ as low as 65, and Plaintiff advised Aetna that A.D. was triggered by, and exhibited violent behavior toward, children of low IQ. DGIP1958. Aetna wrongly dismissed Plaintiff's concern by speculating as to the facility's approach and assuming the facility to have "appropriate de-escalation and restraint procedures, if needed," without acknowledging A.D.'s history of violent behaviors. DGIP1958.

Aetna unreasonably dismissed the opinions of residential treatment specialists (*i.e.* Dr. Russell Hyken and Jennifer Taylor) without providing contrary evidence or consulting with a residential treatment specialist. Aetna's physician reviewer opined on appropriate placement for A.D. without ever meeting or evaluating him, without visiting the in-network facilities, and without addressing the reports of Dr. Tatti, Dr. Hyken, and Ms. Taylor, all of whom either evaluated A.D. and/or visited the in-network facilities.

Aetna ignored the critical timing of A.D.'s transfer to residential treatment, contending "there was no clinical evidence" suggesting a transfer from Huntsman to a residential treatment was facility was "needed immediately." DGIP1956. That contention is directly contradicted by facts set forth in Plaintiff's appeal: "A.D.'s need to transfer to residential treatment was accelerated when Aetna denied further benefits for [A.D.'s] hospitalization at Huntsman on October 3, 2025, and Huntsman unequivocally stated that [A.D.] was unsafe to return home." DGIP1917. Aetna did not address these facts.

     B.    <u>Aetna Failed to Adhere to the Plan Requirements for Coverage</u>

Aetna has completely ignored the Plan requirements for residential treatment facilities which Sandhill met as a state licensed residential treatment facility. Aetna did not address or acknowledge the Plan language that only required residential treatment facilities to be "appropriately licensed by the state Department of Health or its equivalent" or the Plan language that defined healthcare providers as facilities "licensed or certified by law to provide health care services to you." DGIP1921. Aetna ignored Plaintiff's contention that Sandhill satisfied the terms of the Plan because it is a state licensed residential treatment facility. Aetna failed to cite any Plan provision which permitted it to impose previously undisclosed Aetna ALIC or NCS Criteria in deciding that Sandhill was not a qualified residential treatment facility under the Plan. Aetna ignored specific reasons cited by Dr. Hyken which supported that Sandhill is an appropriately licensed residential treatment center and that Aetna's criteria was not reasonable. DGIP1943-1944. Aetna ignored reports from Dr. Hyken and Ms. Taylor that Aetna has approved and paid for residential treatment at Sandhill. DGIP1920.

VII.    <u>Requested Relief</u>

For the foregoing reasons, Plaintiff respectfully requests the Court grant Plaintiff's

motion for summary judgment and enter judgment in Plaintiff's favor. Plaintiff requests the

Court award benefits, attorney's fees, costs, and prejudgment interest to Plaintiff, to be

determined by separate motion.

Dated: January 30, 2026              By: <u>/s/ *Elizabeth K. Green*</u>
                                        Elizabeth K. Green, admitted *pro hac vice*
                                        California State Bar No. 199634
                                        GREEN HEALTH LAW, APC
                                        201 N. Brand Blvd., Suite 200
                                        Telephone: (818 722-1164
                                        E-mail: egreen@greenhealthlaw.com

                                        Eugene Killian, Jr., Esq. (Attorney ID 2043289)
                                        Dimitri Teresh, Esq. (Attorney ID 5125281)
                                        THE KILLIAN FIRM, P.C.
                                        48 Wall Street, 11th Floor,
                                        New York, NY 10005
                                        (732) 912-2100
                                        E-mail: ekillian@tkfpc.com
                                        E-mail: dteresh@tkfpc.com

                                        Attorneys for Plaintiff
                                        John Doe

## <u>CERTIFICATE OF COMPLIANCE PURSUANT TO L.R. 11-6.2</u>

The undersigned, counsel of record for Plaintiff John Doe, certifies that this brief contains

8,733 words, which complies with the word limit of Local Civil Rule 7.1(c).

Dated: January 30, 2026                    By: <u>/s/ *Elizabeth K. Green*</u>
                                            Elizabeth K. Green, admitted *pro hac vice*
                                            California State Bar No. 199634
                                            GREEN HEALTH LAW, APC
                                            201 N. Brand Blvd., Suite 200
                                            Telephone: (818 722-1164
                                            E-mail: egreen@greenhealthlaw.com