Elizabeth K. Green, admitted *pro hac vice*
GREEN HEALTH LAW APC
201 N. Brand Blvd., Suite 200
Telephone: (818 722-1164
E-mail: egreen@greenhealthlaw.com

Attorneys for Plaintiff
John Doe

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

JOHN DOE,                                        23-CV-04743-JPC

               Plaintiff,            **PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1**

      -against-

DELOITTE LLP GROUP INSURANCE PLAN,            ECF CASE

              Defendant.

------------------------------------------------------------X

        Plaintiff John Doe respectfully submits the following Statement of Undisputed Material Facts Pursuant to Local Rule 56.1.

### PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

    A.     <u>ERISA Plan</u>

    1.     A.D. is a covered dependent under the Plan pursuant to his father's employment with the plan sponsor, Deloitte LLP. DGIP1651-1757.

    2.     The Plan is described in the "Aetna Open Access Select EPO Plan Summary Plan Description (SPD)" (hereinafter "SPD"). DGIP1651.

3.      The SPD provides general information about the Plan and does not cover all provisions, limitations, and exclusions. DGIP1655.

4.      The SPD states that it does not provide benefits for out-of-network providers except on a limited basis. *i.e.* DGIP1663, 1669.

5.      The SPD does not list services from out-of-network providers as an exclusion. DGIP1705-1706.

6.      The SPD provides benefits for residential treatment for patients of patients diagnosed with mental health disorders. DGIP1682.

7.      The SPD requires that residential treatment facilities must be "appropriately licensed by the state Department of Health or its equivalent." DGIP1682.

8.      The SPD defines a "provider" as "a facility licensed or certified by law to provide health care services to you." DGIP1752.

9.      The SPD requires prior authorization before receiving services from an out-of-network provider and for residential treatment. DGIP1667, 1668.

B.      A.D.'s Mental Illness and Treatment History

10.     In October 2022, A.D. was a 10-year-old boy with mental health diagnoses including ASD, major depressive disorder, attention deficit hyperactivity disorder ("ADHD"), generalized anxiety disorder, mood dysregulation disorder, and oppositional defiant disorder. DGIP0130-0131, 0146, 0150.

1.      Early Childhood Development and Diagnoses

11.     At age 3, A.D. was diagnosed with ASD and began receiving applied behavior analysis ("ABA") therapy 20 to 25 hours per week. DGIP0131, 1857.

12.     At age 5, A.D. was diagnosed with ADHD. DGIP0131.

13.     At age 7, A.D.'s aggressive incidents increased and much of ABA therapy became focused on maintaining safety. DGIP0131.

       2.     <u>Hospitalizations</u>

14.     In March 2019, Plaintiff and his wife took A.D. (age 7) to the emergency department due to increasing violence at home. DGIP0131, 0182.

15.     A.D. was hospitalized in the general pediatric unit awaiting a psychiatric bed. DGIP0131, 0182.

16.     A.D. was emotionally dysregulated and alternatively cried for and attached his mother: "Furniture and equipment had to be removed from his room. He attacked the social worker when she asked to speak with his mother outside the room." DGIP0131, 0182.

17.     A.D. was transferred to a psychiatric hospital and hospitalized for nine weeks due to ongoing concerns about his ability to remain safe. DGIP0131, 0181.

18.     A.D.'s outbursts gradually decreased but he "continued to endorse thoughts of killing certain staff members and made lists of those he wanted to hurt." DGIP0182.

19.     Following hospitalization, A.D. was admitted to residential treatment for approximately six weeks. DGIP0131, 0182.

20.     In residential treatment, A.D. did not act out. DGIP1816. However, "every time he spoke to his parents he would discuss how he wanted to kill certain staff members and would describe how he would do so." *Id.*

21.     Following residential treatment, in June 2019, A.D. was admitted to the University of Utah's Huntsman Center ("Huntsman") Comprehensive Assessment and Treatment ("CAT") Program for diagnostic assessment and recommendations for treatment. DGIP0131, 0181.

22.    The reason for hospitalization was stated as: "Risk of harm toward others." DGIP0181.

23.    It was reported that over the past year, A.D.'s tantrums became so severe that his mother and brother had to lock themselves in their rooms to stay safe. DGIP0181.

24.    A.D. hit, kick, bit, and tried to strangle others and threatened to kill his mother, brother, and in-home therapists. DGIP0181.

25.    The behaviors occurred during emotional outbursts but A.D. also hurt others when he was calm. DGIP0181.

26.    A.D. reported seeing and hearing things that do not exist. DGIP0181-0182.

27.    A.D. was hospitalized for his safety and the safety of others. DGIP0184.

28.    During his treatment, A.D. did not demonstrate physical aggression but did make several statements about wanting to kill or harm staff or peers including wanting to shoot a staff member in the heart and writing a "death list" which described wanting to hurt specific staff members. DGIP0200.

29.    Following the CAT Program, A.D. stepped down to the University of Utah's Kidstar partial hospitalization, followed by outpatient treatment, followed by hospitalization again. DGIP0131.

30.    During this time, Plaintiff and his family relocated to Salt Lake City, Utah, for A.D. to attend the partial hospitalization while living at home. DGIP0131, 0208.

31.    In February 2021, A.D.'s condition worsened and he was hospitalized at Huntsman three times over the following six months. DGIP0131.

32.    When A.D. attempted to return to in-person school in the fall of 2021, he had multiple daily incidents of "out-of-control" and aggressive behaviors escalated continuously

including property destruction, physical aggression, and threats toward peers and adults. DGIP0131-0132, 1786, 1812.

33.     A.D. tried to cut a peer with scissors, punched other children at summer camp, tried to strangle his behavioral therapist, threw things at them, threw a four-year-old across a sport court, and hit a six-year-old while on vacation. DGIP0157, 1800.

34.     A.D. had been eloping from his 1:1 aide at school and having outbursts of screaming and threatening to kill himself at recess. DGIP0156.

35.     A.D. has also hit and tried to strangle babysitters. DGIP1800.

36.     ABA therapy was inconsistently provided due to the provider being unable to locate staff that were willing to treat A.D. due to his aggression. DGIP0157, 1786, 1812.

37.     According to the ABA therapist, A.D. "displayed malicious behavior and can often hold onto negative feelings for an extended period of time without indication or sign of anger; He does not display remorse once the malicious act has been committed." DGIP1858.

38.     By September 2022, A.D.'s condition further escalated. DGIP0132, 0156, 1812.

39.     A.D. was physically violent with his parents and brother and he had homicidal and suicidal ideation at home and school. DGIP0132, 0156, 1812.

40.     A.D. had suicidal intent with a plan to drown himself in a pool, jump out a window, or strangle himself. DGIP0156, 0157.

41.     A.D. regularly banged his head, punched and kicked his mother, threatened his brother with a knife, repeatedly slapped his mother and brother out of the blue, attempted to strangle his mother, and choked a child at school. DGIP1175, 0156, 0158.

42.     A.D.'s brother, B.D. age 7, was psychiatrically hospitalized due to trauma from his brother's aggression, which included A.D. punching him in the face causing his nose to bleed. DGIP0156-0158, 1175, 1797.

43.     Plaintiff and his wife were afraid of A.D. DGIP1797.

44.     On September 6, 2022, A.D. was hospitalized at the University of Utah's Huntsman Mental Health Institute ("Huntsman"). DGIP0155, 1175.

45.     This was A.D.'s seventh admission to Huntsman. DGIP0156.

46.     Huntsman provided a timeline of the major milestones of A.D.'s life including treatment history, diagnosis, and interventions. DGIP0170-0172.

47.     The Huntsman treatment team and outpatient providers unanimously recommended long-term residential treatment for A.D. DGIP0130, 0132, 0146, 0148, 0152, 0154, 0167.

48.     A.D. reported that he was at Huntsman because "something really sudden happened and I got mad at my brother, and I got out a steak knife and told him I was going to kill him." DGIP0155.

49.     At this time, A.D.'s providers and caregivers withdrew their services. DGIP0131.

50.     The ABA provider withdrew its services because their staff did not feel safe after prior incidents with A.D. DGIP1786.

51.     The ABA provider raised concerns that A.D.'s behavior may be a threat to B.D. as well as Plaintiff and his wife. DGIP1786.

52.     A.D.'s nanny service determined that the nanny needed to leave the home for her safety. DGIP1787.

53.     The treatment team at Huntsman and two outpatient clinical psychologists recommended that A.D. be admitted to residential treatment directly from the hospital, without any time at home, for the safety of A.D.'s family. DGIP0146, 0148, 0154.

54.     The care plan was to have A.D. transferred and admitted to residential treatment within two weeks from September 15, 2022. DGIP1797.

C.     Aetna In-Network Providers Were Unavailable and/or Inappropriate for A.D.'s Residential Treatment

56.     Plaintiff and his wife contacted Aetna for assistance locating a residential treatment facility. DGIP1812.

57.     Plaintiff and his wife informed Aetna that they were afraid that A.D. would hurt a family member. DGIP1812.

58.     Plaintiff and his wife enlisted the aid of a placement consultant to assist in reviewing the residential treatment facilities offered by Aetna. DGIP0132.

59.     Plaintiff and his wife searched for a facility that would meet their son's immediate and long-term needs and satisfy the treatment recommendations: long-term residential treatment for a 10-year-old boy with several mental health diagnoses, including ASD, and history aggressive and violent behaviors towards family, peers, and staff. DGIP0132.

60.     Plaintiff advised Aetna that A.D. is "highly triggered by children who have low IQ and are very low functioning and is likely to hurt them." DGIP1835.

61.     Discovery Mood, TX (aka Center for Discovery) was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: 2-4 week wait, did not treat children with ASD, A.D. was too young for their program, did not accept children under age 11, short-term stabilization and assessment, not a long-term program, placed patients in

mixed milieu (patients diagnosed mental health disorders placed with patients diagnosed with substance abuse disorder). DGIP0132, 1775, 1815, 1854.

62.    Meridell, TX was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: A.D. was too young for their program, did not accept children under age 11, did not respond to telephone calls from Plaintiff. DGIP0132, 1825.

63.    Kennedy Krieger, MD was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: hospitalization only, not a residential treatment program. DGIP0132, 1817.

64.    Oak Plains Academy, TN was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: five week wait, short term program, allegations of children harmed in the facility, accepts patients with very low IQ which did not describe A.D. DGIP0132, 1765.

65.    San Marcos Treatment Center was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: six to eight week wait, did not respond to telephone calls from Plaintiff, allegations of child abuse and riots. DGIP0133, 1764, 1765.

66.    North Springs Behavioral Health, VA was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: did not accept children outside of Virginia, allegations of children harmed in the facility including a child who died during improper restraints, no response to Aetna's inquiry. DGIP0133, 1765, 1781, 1787.

67.    Texas Neurorehab was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: would not accept because A.D.'s IQ was too high, facility worked with developmentally delayed patients and A.D. would not be appropriate. DGIP1764.

68.     Provo Canyon School was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: A.D. was too young for their program. DGIP1766.

69.     Willow Springs was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: A.D. was too young for their program, minimum age is 12. DGIP1768.

70.     Pathlight Mood and Anxiety Center was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: A.D. was too young for their program, minimum age is 12. DGIP1776.

71.     BellFaire was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: waitlist extends "well into 2023." DGIP1792.

72.     Millcreek of Pontotoc was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: no response to Aetna's inquiry. DGIP1793.

73.     Harbor Point Behavioral Health Center was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: unable to accommodate a patient with an ASD diagnosis. DGIP1807.

74.     Youthcare was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: A.D. was too young for their program, minimum age is 11. DGIP1818.

75.     Great Circle was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: six to eight month wait. DGIP1839.

76.     Aetna conceded it had no network provider within 100 miles of Plaintiff's home. DGIP 1797.

77.    Then Aetna conceded it had no network provider within the entire state of Utah. DGIP1792.

78.    Then Aetna emailed Plaintiff and his wife on September 20, 2023 stating that "the results of the provider search did not yield anything" and would they be "willing to enroll the member in RTC out of state." DGIP1792.

79.    Plaintiff found two residential facilities that were appropriate for A.D. and would accept him as a patient: Sandhill and Intermountain Academy. DGIP0133.

80.    Intermountain Academy declined to accept A.D. because his level of violence was too high. DGIP0133.

81.    Sandhill which would accept A.D. as a patient and was in New Mexico which was driving distance from their home in Utah. DGIP0133.

82.    Sandhill is fully licensed as a residential treatment center by the State of New Mexico. DGIP0136, 0890.

83.    On October 3, 2022, Aetna denied further benefits for A.D.'s hospitalization at Huntsman. DGIP1826.

84.    Plaintiff informed Aetna that A.D. was not safe out of the hospital and not safe to return home. DGIP1825-1826.

85.    Plaintiff arranged for A.D.'s admission to Sandhill on October 11, 2022, the soonest he could be admitted. DGIP1826.

D.    A.D.'s Admission to Residential Treatment and Request for Benefits

86.    On October 11, 2022, A.D. was discharged from Huntsman and admitted directly to Sandhill for residential treatment. DGIP0131.

87.     Plaintiff requested Aetna approve benefits for A.D.'s residential treatment at Sandhill. DGIP0130.

88.     Plaintiff also requested a single case agreement ("SCA") for Sandhill to be covered as an in-network provider due to the unavailability of a network provider. DGIP0136.

        1.     <u>Aetna's Denial of Benefits</u>

89.     In an October 17, 2022 letter, Aetna denied benefits for the sole reason that "this is not a covered service under the terms of the plan." DGIP0011-0012.

90.     Aetna agreed residential treatment was medically necessary. DGIP0134, 1175.

        2.     <u>Plaintiff's First Appeal</u>

91.     On November 14, 2022, Plaintiff submitted a written expedited appeal. DGIP0126-0226.

92.     Plaintiff provided A.D.'s mental health and treatment history, letters of support from treatment providers, psychiatric evaluation and treatment records, correspondence with Aetna, and Sandhill treatment plan for A.D. DGIP0126-0226.

93.     The appeal documented the above treatment history. DGIP0126-0226.

94.     In his appeal, Plaintiff explained that he researched and contacted the facilities provided by Aetna and none of the facilities were available or appropriate to provide residential treatment to A.D. for various reasons (detailed above), including: would not accept a child as young as 10 years old, would not accept a child with ASD diagnosis, not a residential program, a short-term stabilization program and did not provide long-term care, did not return calls to Plaintiff, and/or would not accept treatment of a child who lived out-of-state. *i.e.* DGIP0132-0133.

95.     Plaintiff requested that Aetna approve Sandhill for a single case agreement because it was a fully licensed residential treatment center, met A.D.'s treatment needs, was willing to accept him, and was located in a neighboring state. DGIP0133.

96.     Plaintiff provided letters from A.D.'s treatment providers. DGIP0126-0226.

97.     Plaintiff provided a letter from Dr. Ryan Cephas, Child Psychiatrist at Huntsman, and Maggie Blau, LCSW Youth Inpatient Social Worker at Huntsman. Dr. Cephas and Ms. Blau treated A.D. on an inpatient basis and in day treatment at Huntsman. DGIP0146.

98.     Dr. Cephas and Ms. Blau wrote: "The inpatient treatment team is recommending that [A.D.] transition to a residential treatment facility to address aggression, mood, family relationships, and ASD. . . He is not safe to discharge home prior to finding next placement due to unsafe behaviors and danger to family members." DGIP0146.

99.     Plaintiff provided a letter from Dr. Anne Tatti, Clinical Psychologist. Dr. Tatti wrote that A.D. had been in her care since October 2019 and she has seen him two times per week during the past three years. DGIP0148.

100.     Dr. Tatti wrote that over the past three months A.D. had become increasingly aggressive and threatening. DGIP0148.

101.     Dr. Tatti wrote that A.D.'s target when aggressive or violent had always been his family and particularly his younger brother. DGIP0148.

102.     Dr. Tatti wrote that B.D. "endured numerous assaults at the hands of [A.D.], including being hit, pushed, choked and most recently threatened with a knife. DGIP0148.

103.     Dr. Tatti wrote that during this most recent incident with the knife, [A.D.] reportedly stated to his brother, 'I am going to kill you in real life' and then secured a knife from the kitchen." DGIP0148.

104.    Dr. Tatti wrote that she agreed with A.D.'s inpatient treatment team and outpatient ABA team that residential treatment was the appropriate level of care. DGIP0148.

105.    Dr. Tatti wrote that while he needed to be hospitalized and not discharged back home because B.D.'s "physical as well as mental well being are at severe risk if [A.D.] is allowed to re-enter the home before a transfer to Residential Treatment is secured." DGIP0148.

106.    Dr. Tatti wrote that although A.D. worked well in treatment and made progress, "his inclination towards aggression and violence has remained." DGIP0150.

107.    In the summer of 2022, A.D. became "increasingly aggressive and threatening" which culminated in A.D. brandishing a knife in front of his family. DGIP0150.

108.    Dr. Tatti wrote that A.D.'s propensity towards aggression and threats remained a serious concern and "needs to be addressed in a higher level of care" and recommended that he be transferred to residential treatment. DGIP0150.

109.    Plaintiff provided a letter from Lavere Harward, Board Certified Behavior Analyst, an ABA therapist for A.D. Mr. Harward recommended that A.D. be committed to a residential treatment facility due to the severity of behaviors witnessed during treatment, and safety concerns for A.D. and his family. DGIP0152.

110.    Mr. Harward wrote that he observed "[m]ultiple instances of calculated, patient, and malicious behavior" by A.D. DGIP0152.

111.    Mr. Harward further wrote that A.D. "is extremely patient and selective when he decides to act with ill intent, and can often hold onto negative/malicious feelings for extended periods of time without indication or sign of anger, nor remorse once the act has been committed." DGIP0152.

112.    Plaintiff provided a letter from B.D.'s psychologist, Pamela C. Wilkison, Licensed Psychologist. DGIP0154.

113.    Ms. Wilkison treated B.D. due to the traumatic experiences living with this brother. DGIP0154.

114.     Ms. Wilkison wrote that she witnessed some of A.D.'s interactions with his brother and that B.D. "was assaulted numerous times over the years, including being choked, threatened with a knife, pushed down. hit, and bit. He's endured verbal threats of harm, put downs, and comments about fears to believe." DGIP0154.

115.    She wrote that it "is imperative that [A.D.] remain hospitalized until he can enter residential treatment, without any time at home, for [B.D.'s] safety and psychological well-being." DGIP0154.

116.    Plaintiff requested that Aetna immediately approve benefits for A.D.'s residential treatment at Sandhill and approve a SCA for Sandhill. DGIP0136.

    3.    Aetna's Denial of Plaintiff's First Appeal

117.    In a December 14, 2022 letter, Aetna denied Plaintiff's first appeal for the sole reason that "your plan does not cover out of network benefits." DGIP0871.

118.    Aetna denied the request for a single case agreement without explanation. DGIP0871.

    4.    Plaintiff's Second Appeal

119.    On February 22, 2023, Plaintiff submitted a written second level appeal. DGIP0881-1000.

120.    Plaintiff explained that Aetna does approve services with out-of-network providers when an in-network provider is unavailable, as demonstrated by Aetna's approval of A.D.'s out-of-network psychologist, Dr. Tatti, for several years. DGIP0882, 0888.

121.    Plaintiff wrote that the Plan did not disclose how it complied with Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA") despite Plaintiff's request. DGIP0883.

122.    Plaintiff further wrote that the ACA required Aetna to provide a sufficient provider network without unreasonable delay. DGIP0882.

123.    Plaintiff explained that the facilities offered by Aetna were unavailable or inappropriate for A.D. DGIP0885-0886.

124.    Plaintiff requested that Aetna immediately approve benefits for A.D.'s residential treatment at Sandhill. DGIP0890.

125.    Subsequently, Plaintiff emailed Aetna and wrote that A.D. "is at Sandhill because his entire medical team recommended it, and none of the programs on Aetna's in-network list were appropriate, and you haven't given us any reasonable alternatives." DGIP1789.

5.    Aetna's Denial of Plaintiff's Second Appeal

126.    In a February 28, 2023 letter, Aetna denied Plaintiff's second and final appeal for the sole reason that "the plan does not cover services performed by out-of-network providers." DGIP1132-1134.

127.    Again, Aetna did not acknowledge, address, or dispute arguments raised in Plaintiff's appeal, including Plaintiff's contention that the facilities Aetna recommended to Plaintiff were inappropriate and/or unavailable for residential treatment for A.D. and that the Plan did approve out-of-network providers for A.D., *e.g.* Dr. Tatti. DGIP1132-1134.

128.    On March 1, 2024, A.D. discharged from Sandhill. Plaintiff paid the cost of A.D.'s treatment at Sandhill. Green Decl., ¶ 2.

E.    The Court's Order and Remand to Aetna

129.    On February 24, 2025, this Court issued a Memorandum Opinion and Order ("Order") denying Defendant's Motion for Summary Judgment and granted Plaintiff's Cross-Motion in part. ECF No. 44.

130.    The Court determined Aetna's decision to deny benefits was arbitrary and capricious and rendered "without reason," and remanded for a new review by Aetna. *Id.* at p. 6.

Aetna Denied Benefits on Remand

A.    Aetna's Denial

131.    Aetna issued a new decision denying benefits on May 1, 2025. DGIP1862-1910.

132.    Aetna claimed there were "multiple suitable in-network residential treatment facilities available to promptly accept" A.D. for treatment and named three facilities: Meridell Achievement Center, Oak Plains Academy, and Center for Discovery.[1] DGIP1863.

133.    Aetna did not cite or address the Plan language describing the requirements for coverage of mental health services at residential treatment facilities[2], or the Plan definition of a healthcare provider[3] despite Plaintiff specifically quoting the applicable Plan language in his appeals. DGIP0134, 0887.

---

[1] Aetna would include fourth facility, San Marcos Treatment Center, in its appeal denial. DGIP1959-1960.

[2] DGIP1682 ("This Plan covers room and board at the semi-private room rate and other services and supplies provided during your stay in a psychiatric hospital or residential treatment facility, appropriately licensed by the state Department of Health or its equivalent.").

[3] DGIP1752 ("A physician, health professional, person, or facility, licensed or certified by law to provide health care services to you. If state law does not specifically provide for licensure or

134.    Aetna claimed that it would not authorize Sandhill for A.D.'s residential treatment because it contended Sandhill did not meet Aetna's criteria in "Aetna Criteria for Recognizing Non-Contracted Residential Treatment Facilities: ALIC (Traditional Plans) – Residential Treatment Facility (Mental Disorders) – ALIC (Traditional), effective for Plan year 2022" ("Aetna ALIC Criteria"). DGIP1863.

135.    Aetna did not explain its application of the Aetna ALIC Criteria instead of the Plan terms. DGIP1863.

136.    Aetna claimed it had no obligation to comply with the Affordable Care Act ("ACA"). DGIP1863.

137.    Aetna claimed the Plan did not specifically provide for SCAs and that it made the correct decision to not offer a SCA based on Aetna's "National Clinical Services (NCS) 512 Non-Participating Provider Requests for In-Network Benefits Policy and Procedure." ("Aetna NCS Criteria"). DGIP1863.

B.    Plaintiff's Appeal

138.    Plaintiff appealed Aetna's decision on August 13, 2025. DGIP1911-1950.

139.    Plaintiff wrote that the Plan provides for SCAs, citing this Court's Order: "The Plan provides for such an exception, *see* DGIP 1667-1668 (discussing procedures for the receipt of "Covered Health Services from an Out-of-Network provider"). . ." ECF No. 44 at p. 7.

140.    Plaintiff wrote that Aetna routinely approved SCAs for A.D.'s outpatient psychologist. DGIP1915, fn 3.

141.    Plaintiff wrote that the ACA requires insurers, such as Aetna, to maintain sufficient provider networks. DGIP1915.

---

certification, they must meet all Medicare approval standards even if they don't participate in Medicare.").

142.    Plaintiff wrote that the ACA requirements apply to Aetna's provider network which has the same provider network for insured plans and self-funded plans. DGIP1915.

143.    Plaintiff wrote that the New York State Department of Financial Services ("DFS"), which regulates health insurance policies issued in New York, provides guidance as to the network adequacy requirements. DGIP1915.

144.    Plaintiff wrote that the facilities named by Aetna were unavailable and/or inappropriate for A.D., as confirmed by Plaintiff, his wife, and A.D.'s treatment team. DGIP1916.

145.    Plaintiff provided a detailed explanation of the research of, and communications with, each in-network facility named by Aetna, confirming that none were available and/or appropriate to treat A.D. DGIP1916-1918.

146.    Plaintiff's provided letters from Dr. Russell Hyken and Ms. Jennifer Taylor, residential treatment specialists, who have years of experience assisting with the placement of patients into residential facilities. DGIP1942-1943 (Dr. Hyken: "I am deeply knowledgeable about Sandhill and other treatment programs. . . I have visited and worked with multiple facilities that were recommended on this list."); DGIP1947 (Ms. Taylor: "We are a residential specialist and therapeutic educational advocacy group for children between the ages of 6 and 24. Our practice has been consulting since 2016. Our practice visits and tours over 120 programs a year including some of the noted programs below.").

147.    Dr. Hyken and Ms. Taylor provided information about each in-network facility identified by Aetna and confirmed that none were available and/or appropriate to treat A.D. DGIP1942-1944, 1947-1948.

148.    Plaintiff explained that A.D.'s treatment team recommended Sandhill as the only

viable and appropriate treatment option and provided letters of support from his treatment team.

DGIP1918-1920.

149.    Dr. Tatti, A.D.'s longstanding outpatient clinical psychologist, wrote:

> Sandhill works exclusively with children 8-13 years old, with
> diagnoses/concerns being Autism Spectrum Disorder, emotional
> dysregulation, unsafe behaviors, manipulative behaviors, depression and
> anxiety disorders and resistance to adult care just to name a few. This
> program was tailor-made for a child with [A.D.'s] level of complexity as
> well as need.
>
> The other programs Aetna offered were not, in any way, appropriate to
> address [A.D.'s] needs.

DGIP1937.

150.    Lavere Harward, A.D.'s therapist from Advanced Behavior Analysis,

wrote:

> As a team, Sandhill Center was specifically selected due to its
> specialization in treating children aged 8–13 with emotional and
> behavioral dysregulation. No in-state facilities provided equivalent
> expertise or staffing models to address the complexity of [A.D.'s] case at
> the time. This placement prevented repeated hospitalizations, preserved
> family stability, and allowed [A.D.] to make measurable progress in a
> safe, structured environment.

DGIP1941.

151.    Plaintiff disputed Aetna's claim that Sandhill did not qualify for a SCA.

DGIP1920-1922.

152.    Plaintiff again cited the Plan language defining a healthcare provider and

residential treatment facility and asserted that Sandhill satisfied the Plan requirements because it

was licensed by the state as a residential treatment facility (and enclosed certificates of

licensure). DGIP1921, 1949-1950.

153.     Plaintiff wrote that Aetna has approved benefits for residential treatment of other patients at Sandhill, as confirmed by Dr. Hyken and Ms. Taylor. DGIP1920.

154.     Plaintiff wrote that the Aetna ALIC and NCS Criteria were undisclosed to participants, applied new requirements for coverage that do not exist in the Plan, and not reflective of the standard of care for residential treatment of children. DGIP1921.

     C.     <u>Aetna's Appeal Denial</u>

155.     Aetna denied the appeal on November 11, 2025. DGIP1951-1966.

156.     Aetna claimed there was no network deficiency, no basis for consideration of a SCA for Sandhill, and regardless, Sandhill did not meet Aetna's ALIC Criteria. DGIP1952-1953.

157.     Aetna reiterated that the ACA does not apply to "self-funded plans like the Plan" but Aetna did not address the argument made in Plaintiff's appeal that the ACA requires insurers, such as Aetna, to maintain sufficient provider networks and Aetna uses the same provider network for both self-funded and insured plans. DGIP1915.

158.     Aetna did not address Plaintiff's argument regarding the New York State DFS regulations. DGIP1915.

159.     Aetna did not address the Court's Order finding that the Plan provides for SCAs. ECF No. 44 at p. 7.

160.     Aetna disagreed with Plaintiff's statement that it was a challenge for Aetna to locate an available and appropriate residential treatment facility that would accept A.D. as a patient. DGIP1954.

161.     Yet, for the entire United States, Aetna was able to identify only four in-network facilities that it claimed would have provided residential treatment to A.D. DGIP1954.

162.    Aetna admitted that it initially offered several other in-network facilities which Aetna later "removed from consideration." DGIP1954, 1931-1934.

163.    Aetna did not dispute facts provided in Plaintiff's appeal which demonstrated that in-network facilities were unavailable and/or inappropriate for A.D. Aetna did not dispute that Plaintiff did not receive return phone calls from Meridell (DGIP1916) and San Marcos (DGIP1917). DGIP1957, 1959.

164.    Aetna did not dispute that Plaintiff received information that Meridell and Center for Discovery did not accept children under age 11 and A.D. was newly age 10 and emotionally immature for his age. DGIP1916, 1957, 1960.

165.    Aetna did not provide evidence to support its claim that Ms. Taylor confirmed information with Center for Discovery. DGIP1960.

166.    Aetna did not dispute that Plaintiff received information that the in-network facilities focused on short-term assessment and stabilization and A.D. required intensive long-term residential care. DGIP1957-1960;

167.    Aetna did not dispute that Plaintiff received information that multiple facilities cited long waitlists for admission (*i.e.* five week wait for Oak Plains (DGIP1917); six to eight week wait for San Marcos (DGIP1917)). DGIP1958-1959.

168.    Aetna did not dispute that Plaintiff received information that Oak Plains was unavailable to accept A.D. because it was not taking new referrals until April 1, 2023, more than six months after A.D. was discharged from Huntsman. DGIP001769, 1918.

169.    Aetna disputed Plaintiff's safety concerns regarding Oak Plains and Plaintiff citing a published news article and law enforcement officials who confirmed the fatal overdose

of two female adolescent patients at Oak Plains during the time which Aetna recommended placement for A.D. DGIP1917, 1958.

170.    Aetna claimed the deaths were not "substantiated by any authority," despite confirmation of the deaths by the Montgomery County Sheriff's Office. DGIP1917. https://www.wdbj7.com/2022/12/01/two-teens-die-benadryl-overdoes-treatment-facility-sheriffs-office-says/.

171.    Plaintiff received information that Oak Plains accepted children with an IQ as low as 65, and Plaintiff advised Aetna that A.D. was triggered by, and exhibited violent behavior toward, children of low IQ. DGIP1958.

172.    Aetna dismissed Plaintiff's concern by speculating as to the facility's approach and assuming the facility to have "appropriate de-escalation and restraint procedures, if needed," without acknowledging the A.D.'s history of violent behaviors. DGIP1958.

173.    Aetna dismissed the opinions of residential treatment specialists (*i.e.* Dr. Russell Hyken and Jennifer Taylor), who provided specific knowledge of the in-network facilities identified by Aetna. DGIP1956.

174.    The information provided by Dr. Hyken and Ms. Taylor was based on their years of experience in assisting with the placement of patients in residential facilities. DGIP1942-1943; DGIP 1947.

175.    Dr. Hyken reported that San Marco is more of a hospital program, a statement that Aetna dismissed without reason. DGIP1959.

176.    Ms. Taylor reported that Center for Discovery did not treat patients with ASD (a statement confirmed by Dr. Tatti) and verified her statement by reporting that she had toured Center for Discovery. DGIP1948, 1960.

177.    Aetna rejected Ms. Taylor's reports without offering contrary evidence. DGIP1960.

178.    Aetna did not provide any contrary evidence from a residential treatment specialist. DGIP1951-1966.

179.    The denial letter was signed by Patricia Roode, Senior Manager, Complaints and Appeals, a non-clinician with no identifiable experience evaluating residential treatment facilities and who did not consult with a residential treatment specialist. DGIP1966.

180.    Although Ms. Roode referenced an unnamed physician reviewer, Aetna did not disclose the reviewer's qualifications, the physician's review, or the physician's identity. DGIP1951-1966.

181.    Aetna dismissed the timing of A.D.'s transfer to residential treatment, contending "there was no clinical evidence" suggesting a transfer from Huntsman to residential treatment was "needed immediately." DGIP1956.

182.    That contention is directly contradicted by Plaintiff's appeal: "[A.D.'s] need to transfer to residential treatment was accelerated when Aetna denied further benefits for [A.D.'s] hospitalization at Huntsman on October 3, 2025, and Huntsman unequivocally stated that [A.D.] was unsafe to return home." DGIP1917. Aetna did not address these facts. DGIP1951-1966.

183.    Aetna claimed that Sandhill did not qualify for a SCA because it did not meet Aetna's requirements for a residential treatment facility. DGIP1961-1963.

184.    Aetna did not address or acknowledge the Plan language that only required residential treatment facilities to be "appropriately licensed by the state Department of Health or its equivalent," or the Plan language that defined healthcare providers as facilities "licensed or certified by law to provide health care services to you." DGIP1921, 1961-1963.

185.    Aetna did not address Plaintiff's contention that he satisfied the terms of the Plan because he requested residential treatment for his son with a state licensed provider. DGIP1951-1966.

186.    Aetna ignored Plaintiff's contention that Aetna may not impose new requirements for coverage that do not exist in the Plan and Aetna must apply to the Plan terms for coverage. DGIP1951-1966.

187.    Aetna ignored Plaintiff's contention that the Aetna ALIC and NCS Criteria are undisclosed additional requirements for residential treatment. DGIP1951-1966.

188.    Aetna did not identify any Plan provision that permitted it to impose the Aetna ALIC or NCS Criteria in denying Plaintiff's benefit request. DGIP1951-1966.

189.    Aetna ignored the specific reasons cited by Dr. Hyken to support finding that Sandhill is an appropriately licensed residential treatment center. DGIP1943-1944, 1951-1966.

190.    Aetna claimed that its "standards and requirements" were not met, without citing any such requirements set forth by the Plan. DGIP1962.

191.    Aetna ignored confirmed reports from Dr. Hyken and Ms. Taylor that Aetna has approved and paid for residential treatment at Sandhill. DGIP1920, 1951-1966.

Dated: January 30, 2026

By: _/s/ Elizabeth K. Green_
Elizabeth K. Green, admitted _pro hac vice_
GREEN HEALTH LAW, APC
201 N. Brand Blvd., Suite 200
Telephone: (818 722-1164
E-mail: egreen@greenhealthlaw.com

Eugene Killian, Jr., Esq. (Attorney ID 2043
Dimitri Teresh, Esq. (Attorney ID 5125281
THE KILLIAN FIRM, P.C.
48 Wall Street, 11th Floor,
New York, NY 10005
(732) 912-2100
E-mail: ekillian@tkfpc.com
E-mail: dteresh@tkfpc.com

Attorneys for Plaintiff
John Doe