UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| John Doe,<br><br>              Plaintiff,<br><br>          v.<br><br>Deloitte LLP Group Insurance Plan,<br><br>              Defendant. | Civil Action No. 1:23-cv-04743-JPC<br><br>**DEFENDANT DELOITTE LLP GROUP INSURANCE PLAN'S STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1**<br><br>**Judge John P. Cronan** |

Pursuant to Local Civil Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Defendant Deloitte LLP Group Insurance Plan ("Defendant") respectfully submits this statement of undisputed material facts in support of its concurrently filed motion for summary judgment and memorandum of law in support thereof. Paragraphs 1 through 87 below are the same undisputed material facts set forth in Defendant's Statement of Undisputed Material Facts filed on May 29, 2024 (Doc. 39) with Defendant's pre-remand Motion for Summary Judgment (Docs. 36; 36-1). Paragraphs 88-144 below contain additional undisputed material facts arising since the Court's Memorandum Opinion and Order dated February 24, 2025 (Doc. 44).

**A.      Plan Information.**

1.      Deloitte LLP sponsors multiple ERISA-governed health and welfare benefit plans through which it offers medical and other insurance coverage to its employees. (DGIP001655-56; 1738.)[1]

---

[1] Citation to "DGIP00_____" refers to Bates-labeled pages in Exhibit A to Defendant's Unopposed Motion for Leave to File Under Seal (Doc. 55). Because Plaintiff's Complaint alleges a single claim for a denial of benefits under Section 1132(a)(1)(B) of the Employee Retirement and Income

2.      Defendant is the legal entity through which Deloitte LLP provides health and welfare benefits to eligible individuals under the plans it sponsors. (DGIP001655-56; DGIP001738.)

3.      One of the ERISA-governed health and welfare benefit plans sponsored by Deloitte LLP and offered through DGIP is the self-funded Aetna Open Access Select EPO Plan. (DGIP001655; 1733; 1738.)

4.      The Aetna Open Access Select EPO Plan Summary Plan Description (the "Plan") is an ERISA plan document that sets forth and describes in detail medical benefit options, coverage, and claims administration for Plan participants. (DGIP001651-1757.)

5.      More specifically, the Plan is the ERISA plan document that comprises both the plan itself as well as the summary plan description setting forth its terms. (DGIP001655: "This summary represents the Aetna Open Access Select EPO medical benefit option, herein 'the Plan', for eligible Partners, Principals, and employees of Deloitte LLP and its subsidiaries (the "Deloitte Firms") effective January 1, 2022.")

6.      The Plan designates Aetna Life Insurance Company ("Aetna") as the Claims Administrator. (DGIP001733; 1745.)

7.      References to "We" in the Plan refer to the Plan Sponsor, Deloitte LLP. (DGIP001655.)

8.      The Plan invests Aetna, as Claims Administrator, with discretionary authority to interpret the Plan, determine benefits, and construe Plan terms:

---

Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), Exhibit A (DGIP00001 – DGIP001966), which is the administrative record of Plaintiff's benefit claim (supplemented with 105 additional pages of post-remand documents), constitutes the complete factual record in this case (the "Administrative Record").

### Interpretation of Benefits

We and the Claims Administrator have sole and exclusive discretion to do all of the following:

- Interpret Benefits under the Plan
- Interpret the other terms, conditions, limitations, and exclusions of the Plan, including this SPD and any Riders and Amendments
- Make factual determinations related to the Plan and its Benefits

We and the Claims Administrator may delegate this discretionary authority to other persons or entities that provide services in regard to the administration of the Plan.

(DGIP001739.)

9.      The Plan contains a detailed description of the claims administration process, including that the Claims Administrator (Aetna) makes final benefit claims and appeals determinations. (DGIP001710-15.)

**B.      Plaintiff Doe is a Plan Participant.**

10.      Plaintiff is a participant in the Plan. (Complaint (Doc. 1), ¶ 2.)

11.      Plaintiff's dependent son, A.D., is a beneficiary eligible for medical benefits pursuant to the terms of the Plan by virtue of Plaintiff's participation in the Plan. (Complaint (Doc. 1), ¶ 2.)

**C.      The Plan Covers Medically Necessary Residential Treatment Center Care Expenses, But Not For Out-of-Network Providers.**

12.      The Plan distinguishes between network, or "participating," providers and out-of-network providers. (DGIP001663; 1749-50.)

13.      A "network provider" is defined in the Plan as "[a] provider listed in the directory for your plan. . . . A network provider can also be referred to as an in-network provider." (DGIP001749.)

14.      An "out-of-network provider" is defined in the Plan as "[a] provider who is not a network provider." (DGIP001750.)

15.    Medical expenses incurred by Plan participants or beneficiaries from network or "participating" providers are potentially covered by the Plan under a defined Schedule of Benefits and description of what services are covered. (DGIP001663-66; 1669-1704.)

16.    The Plan expressly states: "Out-of-Network care is not a covered expense in this Plan." (DGIP001663 (emphasis in original).)

17.    The Plan covers listed health care-related services, including mental health services for Plan participants and beneficiaries, so long as Plan requirements are met, including that the service is provided by an in-network provider (*i.e.*, a member of the "network of participating physicians, specialist, and hospitals that meet Aetna's requirements for quality and service" and "are monitored for quality of care, patient satisfaction, cost-effectiveness of treatment, office standards and ongoing training") and the service is "medically necessary for the prevention, diagnosis or treatment of [the individual's] illness or condition." (DGIP001663;1665;1668-69; 1682-84.)

18.    Some health care-related services require that a Plan participant or beneficiary request and receive from the Claims Administrator prior authorization for those services to be "Covered Health Services" under the Plan. (DGIP001667-68.)

19.    Mental health care-related services at a "Residential Treatment Facility"[2] are a type of service that requires prior authorization to be a "Covered Health Service" under the Plan. (DGIP001667-68.)

20.    Mental health care services consisting of Residential Treatment Facility care generally refers to "treatment of mental health disorders by behavioral health providers" and "room

---

[2] The term "Residential Treatment Facility" is also referred to as a "Residential Treatment Center," or an "RTC," throughout the Administrative Record and the parties' briefing.

and board at a semi-private room rate and other services and supplies provided" during a stay at a Residential Treatment Facility "appropriately licensed by the state Department of Health or its equivalent." (DGIP001682.)

21.    The Plan defines a "Treatment Center" as "[a] facility that provides a program of effective Mental Disorder Treatment and meets all of the following requirements: it is established and operated in accordance with any applicable state law; it provides a program of treatment approved by a Physician and the Claims Administrator; it has or maintains a written, specific, and detailed regimen requiring full-time residence and full-time participation by the patient; [and] it provides at least the following basic services: Room and Board (if this Plan provides inpatient benefits at Treatment Center; Evaluation and Diagnosis; Counseling; Referral and orientation to specialized community resources. A Treatment Center which qualifies as a Hospital is covered as a Hospital and not a Treatment Center." (DGIP001754-55.)

22.    Residential Treatment Facility care expenses incurred by a Plan participant or beneficiary are covered as Covered Health Services by the Plan if the Residential Treatment Facility is in-network, the services provided are medically necessary, and the participant or beneficiary obtains prior authorization prior to receiving services from the Residential Treatment Facility. (DGIP001663; 1665; 1667-69; 1682-83.)

23.    The Plan states, "[y]our mental health/substance use disorder benefits will be provided by participating behavior health providers," and "[y]ou are encouraged to contact the Mental Health/Substance Abuse Disorder Administrator for referrals to providers and coordination of care." (DGIP001682-83.)

24.    Regarding out-of-network care, the Plan states, "if you choose to receive Covered Health Services from an Out-of-Network provider, you are responsible for obtaining prior

authorization before you receive the services. . . . To obtain prior authorization, call the toll-free telephone number on the back of your I.D. card. This call starts the utilization review process." (DGIP001667.)

26. The utilization review process on a request for prior authorization for services provided by an out-of-network Residential Treatment Facility provider entails Aetna assessing the safety and adequacy of the facility through "formal techniques designed to monitor the use of, or evaluate the clinical necessity, appropriateness, efficacy, or efficiency of, health care services, procedures, or settings. Such techniques may include ambulatory review, prospective review, second opinion, certification, concurrent review, case management, discharge planning, retrospective review or similar programs." (DGIP001667-68.) (*See also, infra* at ¶ 58.)

25. The contact information on the I.D. card directs participants to Aetna, the Claims Administrator responsible for reviewing out-of-network prior authorization requests and conducting the utilization review process. (DGIP001662; 1667-68.)

**D.     Plaintiff's Dependent, A.D., Has a Long and Complex Medical History.**

27. A.D.'s medical records show significant complex, long-term mental health issues beginning as a young child and continuing into 2022, which is the timeframe relevant to this matter. (DGIP0000037.)

28. A.D. has been diagnosed with disruptive mood dysregulation disorder, generalized anxiety disorder, attention deficit hyperactivity disorder, and autism spectrum disorder. (DGIP000037.)

29. Prior to 2022, A.D. had utilized a variety of health care services and Plaintiff had worked extensively with Aetna regarding coverage and coordination of care under the terms of the Plan. (*See generally,* DGIP001758-1861.)

30.     On or around September 6, 2022, A.D. was admitted to Huntsman Mental Health Institute ("Huntsman") based on "danger of harm to himself and others and inability to function in a less restrictive setting." (DGIP000037; 46-58.)

31.     On or about September 21, 2022, Huntsman as well as A.D.'s treating clinical psychologist (Dr. Anne Tatti), his behavior therapist (Lavere Harward), and another treating psychologist (Pamela C. Wilkison) each recommended A.D.'s admission into a Residential Treatment Facility (a/k/a "RTC" (see note 2, *supra*)) upon discharge from Huntsman. (DGIP00037-45.)

32.     A.D.'s health care providers recommended RTC care at a facility that would accept A.D, but none recommended for or against any specific RTC facility. (DGIP00037-45.)

33.     At the time relevant for his admission into RTC care, A.D. was 10 years old (date of birth ███ 2012). (DGIP00037.)

**E.     Aetna Agrees RTC Care is Appropriate for A.D. in September 2022 and Provides Multiple In-Network Options, Which Plaintiff Rejects.**

34.     Shortly after A.D.'s admission to Huntsman and his health care providers' recommendation that A.D. transition directly to RTC care after discharge, Aetna agreed to provide in-network RTC care options covered by the Plan. (DGIP001846-51.)

35.     Kevin Gutierrez Barrios, Aetna's designated Care Advocate ("CA") liaison between Plaintiff and Aetna, assisted Plaintiff in identifying in-network RTCs to allow for A.D.'s RTC expenses to be covered in accordance with the terms of the Plan. (*See generally* DGIP001758-1861.)

36.     Mr. Gutierrez Barrios worked extensively with Plaintiff between September 2022 and March 2023 to locate and to refer Plaintiff to appropriate in-network RTCs for A.D.'s

treatment. The communication log between Mr. Gutierrez Barrios and Plaintiff is included in the Administrative Record, with the majority of these communications located at DGIP001758-1861.

37.     On or around September 12, 2022, while A.D. remained in-patient at Huntsman, Aetna, through Mr. Gutierrez Barrios, began researching in-network RTCs and contacting those facilities on behalf of Plaintiff. (DGIP001851.)

38.     Plaintiff informed Aetna on September 13, 2022 that Plaintiff had hired an educational consultant separate from Aetna to independently assist in locating an RTC for A.D.'s treatment. (DGIP001857.)

39.     Neither Aetna nor Plaintiff (or Plaintiff's separately engaged consultant) identified any RTC located in Utah suitable for or available to admit A.D. and thus Plaintiff indicated a willingness to consider in-network but out-of-state RTCs (*See generally,* DGIP001758-1861, and specifically DGIP001794; 1846.)

40.     Aetna vetted more than fifteen in-network RTCs for suitability and availability to admit A.D. Although the majority were unable to admit A.D. after discharge from Huntsman principally due to age limitations and waitlists, those RTC facilities that were presented as viable in-network options were rejected by Plaintiff based on Plaintiff's own considerations. (DGIP001764-69; 1775-81; 1787; 1791-96; 1803; 1807-11; 1813-22; 1824-25; 1828-30; 1835; 1838-40; 1854-55.)

41.     Aetna recommended at least three in-network RTCs covered by the Plan that were available to accept A.D. for admission following discharge from Huntsman, in accordance with the recommendations from A.D.'s health care providers (*see infra* ¶¶ 47-57), however Plaintiff rejected each of these RTCs. (*Id.*)

42.    The only RTCs Plaintiff expressed a willingness to consider for A.D.'s admission were Sandhill Center ("Sandhill") and Intermountain Academy. (Pl. Mot., at 10.)

43.    Neither Sandhill nor Intermountain Academy is an in-network provider under the Plan. (DGIP001784; 1795; 1816-17.)

44.    Intermountain Academy advised Plaintiff that it was not a suitable facility based on A.D.'s needs, and that it would not admit A.D. (Pl. Mot. at 10.)

45.    Of the in-network RTCs offering residential treatment care covered by the Plan, the following were determined to be not suitable for A.D.: Kennedy Krieger Institute (primarily a long-term hospitalization center) (DGIP001777, 1817); Pathlight Mood and Anxiety Center (A.D. too young to be admitted) (DGIP001776); Provo Canyon School (A.D. too young to be admitted) (DGIP001766); Texas NeuroRehab (A.D. did not meet admission profile due to higher IQ than patients cared for at that facility) (DGIP001764); San Marcos Treatment Center (unable to accept A.D. without a substantial delay) (DGIP001764); Willow Springs (A.D. too young to be admitted) (DGIP001768); Bellfaire JCB (unable to accept A.D. without substantial delay) (DGIP001792); Harbor Point Behavioral Health Center (A.D. not a candidate for services based on diagnosis) (DGIP001807); Youthcare (A.D. too young to be admitted) (DGIP001818); CHNK (unable to accept A.D. without substantial delay) (DGIP001830); and Great Circle (unable to accept A.D. without substantial delay) (DGIP001839).

46.    Aetna also identified North Spring Behavioral Healthcare and Millcreek on Pontotoc as potential in-network RTC facilities for A.D. but Aetna was unable to confirm availability to admit A.D. because, as to North Spring Behavioral Healthcare, Plaintiff refused to reach out to the facility, and, as to Millcreek on Pontotoc, Aetna did not receive a response from the facility. (DGIP001765, 1793.)

47.    Of the Plan's in-network RTC facilities, the following were determined to be suitable for A.D. and were able to admit A.D. without substantial delay: Center for Discovery, Meridell Achievement Center ("Meridell"), and Oak Plains. (DGIP001775; 1808-09; 1854.)

48.    Explained in detail below, Plaintiff rejected each of these in-network RTC facilities based on Plaintiff's preference that A.D. instead receive treatment at Sandhill. (DGIP001816-17.)

49.    On September 19, 2022 (and again later on), Aetna advised Plaintiff that Center for Discovery was an in-network RTC that could admit A.D., accounting for A.D.'s specific needs and age, with admission available within a few weeks. (DGIP001775; 1815; 1821; 1845-46.)

50.    Plaintiff's separately engaged consultant confirmed that Center for Discovery indicated it would accept A.D. and that A.D. could be admitted within a few weeks of September 19, 2022. (DGIP001775: "I called them and they told me that they'll take him even though he's 10. There is a 3-4 week waitlist.")

51.    Through communications between September 19 and 23, 2022, Plaintiff refused to admit A.D. to Center for Discovery because Plaintiff and/or Plaintiff's separately engaged consultant "[did] not believe it is a good environment for the member" based upon beliefs that it is a "short-term stabilization and assessment" facility, it was a "mixed milieu" environment, and because it "contracts with insurance companies." (DGIP001775; 1795; 1825; 1835; 1854.)

52.    On September 19, 2022 (and again on September 21, 2022 and later in March 2023), Aetna advised Plaintiff that Meridell was an in-network RTC that could admit A.D. in two weeks (and thus in early October 2022), factoring into consideration A.D.'s specific needs and age. (DGIP001769; 1775; 1791; 1815; 1821; 1846; 1854: "CA emailed parents stating that he had spoken to the facility and the member's age does not exclude him. There is a 2-week waitlist and

they are willing to interview him. CA informed them that this is not short-term and is a residential facility. There is availability in the next 2 weeks.".)

53.     Through communications between September 19 and 22, 2022, Plaintiff refused to admit A.D. for RTC care at Meridell, despite Meridell being fully accredited and vetted by Aetna and approved as an in-network RTC under the Plan, based on Plaintiff's expressed concern that Meridell would not be a good fit due to A.D.'s age and IQ and because Plaintiff's separately engaged consultant believed it was a short-term facility, notwithstanding Aetna's clarification to the contrary. (DGIP001825; 1835; 1854.)

54.     Through communications between September 20 and 21, 2022 (and again in March 2023), Aetna advised Plaintiff that Oak Plains was an in-network RTC that could admit A.D. within seven to ten days, with consideration given to A.D.'s specific needs and age. (DGIP001769; 1808-09: "CA spoke to Marc, the director of admissions 931-362-2008, who stated that the member's age and ASD dx are not exclusionary. There will be availability in the next 7-10 days and the member's parents can call him directly to start the intake process;" *see also* DGIP001820.)

55.     As of September 24, 2022, Plaintiff refused to admit A.D. to Oak Plains, despite Oak Plains being fully accredited and vetted by Aetna and approved as an in-network RTC under the Plan, based on Plaintiff's and/or Plaintiff's separately engaged consultant's review of negative online reviews and based on concerns surrounding A.D.'s IQ and the care environment. (DGIP001765; 1803; 1835.)

56.     Before and after Plaintiff declined the Plan's referrals to suitable, available RTC in-network facilities, Aetna continued answering Plaintiff's inquiries regarding terms of Plan coverage, available in-network RTC facilities covered by the Plan, and how length of stay at an

RTC is determined based on the individual's treatment needs and progress. (*See, e.g.*, DGIP001769; 1828; 1854-55.)

57.     As late as March 2023 – approximately five months after A.D.'s admission to Sandhill – Aetna continued to contact in-network RTC facilities to obtain updated availability to admit A.D. and continually provided updates to Plaintiff with the facilities' ability to admit A.D. and the associated timelines. (*See, e.g.*, DGIP001769; 1791; 1796; 1820; 1840.)

58.     Aetna additionally explained that even if there were no in-network RTCs suitable for A.D.'s care per the terms of the Plan, Sandhill would not be approved on a single case agreement network exception basis because it did not meet the RTC criteria considered when in-network RTC facilities are not available: Sandhill lacked appropriate credentials for an RTC; did not have a licensed behavioral health provider on duty 24/7; did not employ a psychiatrist at the facility; and did not have a medical director that is a psychiatrist. (DGIP001772-73; 1785; 1790; *see also* DGIP001668 (explaining the review process)).

**F.     Plaintiff Submits a Benefits Claim for Reimbursement of Sandhill Expenses, Which is Denied Due to Sandhill's Out-Of-Network Status.**

59.     Despite Plaintiff repeatedly being informed that as an out-of-network provider, services provided to A.D. by Sandhill would not be a covered expense under the express terms of the Plan, Plaintiff arranged for A.D.'s admission to Sandhill following his discharge from Huntsman. (DGIP001795; 1804-05; 1816-17: "The CA informed the parents about Sandhill Center's failure to meet criteria for OON [out of network] RTC's. The parents believe the facility's insurance advocacy team can assist with it. Parents have continued to decline INN [in-network] options.")

60.     A.D. was admitted to Sandhill on October 11, 2022. (DGIP000120.)

61.    After A.D. was admitted to Sandhill, Plaintiff requested that the Plan pay for expenses incurred for A.D.'s treatment and care at Sandhill. (Pl. Mot., at 11; DGIP000011-17.)

62.    On October 17, 2022, Aetna denied Plaintiff's request for reimbursement of Sandhill expenses, consistent with the reasons given to Plaintiff by Aetna's CA over the preceding month. (DGIP000011-17.)

63.    Aetna's claim denial letter does not dispute the medical necessity for A.D.'s receipt of RTC care, but instead explains that the Plan does not cover out-of-network provider expenses. (DGIP000011-17.)

64.    On November 14, 2022, Plaintiff submitted an appeal to Aetna's October 17, 2022 claim denial prepared by an advocacy organization called Mental Health and Autism Insurance Project. (DGIP00021-125; the letter advocating for Plaintiff's position is located at DGIP000021-29, and the documentation provided with the appeal letter is located at DGIP00030-125.)

65.    Through the appeal letter, Plaintiff's advocate alleged the in-network RTC facilities identified and vetted by Aetna, several of which confirmed their ability and willingness to timely admit A.D. following his discharge from Huntsman, were not suitable for A.D. (DGIP000021-27.)

66.    The appeal letter reiterates the exact same issues Plaintiff expressed to Aetna in September 2022 through October 2022 regarding the in-network RTC referrals provided by Aetna, which Aetna had already addressed with Plaintiff, as set forth *supra* ¶¶ 36-58. (DGIP000021-27.)

67.    Plaintiff's advocate attached to the appeal letter correspondence from various of A.D.'s treating health care providers, medical records outlining A.D.'s treatment history, and prior Aetna correspondence. (DGIP00030-125.)

68.    The heath care providers' letters submitted in support of the appeal all recommend RTC care for A.D. upon discharge from Huntsman. (DGIP00037-45.)

69.    None of A.D.'s health care providers recommended any specific RTC facility (including Sandhill) nor did they advise against any specific RTC facility. (DGIP00037-45.)

70.    None of A.D.'s health care providers stated A.D. needed a specific type of RTC facility based on A.D.'s IQ, recommended length of stay, or a specific therapeutic milieu. (DGIP00037-45.)

71.    Plaintiff rejected or otherwise refused to consider the in-network RTC facilities covered by the Plan that would admit A.D. upon discharge from Huntsman, opting instead to admit to Sandhill with full knowledge that Sandhill was an out-of-network provider and that as such, under the terms of the Plan, coverage would not be provided for A.D.'s treatment at Sandhill. (*See, supra*, ¶¶ 41-59.)

72.    On December 14, 2022, Aetna denied Plaintiff's appeal. (DGIP000870-78.)

73.    The appeal denial letter explained the appealable issue, the materials reviewed in responding to the appeal, the decision reached, how the decision was made, and the Plan language and bases for denying the request for reimbursement. (DGIP000870-78.)

74.    The appeal denial letter also explained how Plaintiff could pursue a second level appeal and provided member resources for assistance. (DGIP000873-74.)

75.    Plaintiff's advocate submitted a second level appeal on February 22, 2023. (DGIP000881-1000; the letter advocating for Plaintiff's position is located at DGIP000881-892, and the documentation provided with the appeal letter is located at DGIP000893-1000.)

76.    In this second level appeal, Plaintiff's advocate repeated the position previously expressed in the first appeal regarding issues with the in-network RTC facilities identified by Aetna as suitable for, and available to provide, care to A.D. (which Aetna previously already addressed with Plaintiff), and took issue with both the Plan's out-of-network language and Aetna's

prior authorization for A.D.'s recurring (twice weekly, see DGIP000039) individual therapy from an out-of-network therapist (Dr. Tatti) while rejecting coverage for full-time, residential mental health care services from an out-of-network RTC (Sandhill). (DGIP000881-892.)

77.     Plaintiff's advocate acknowledged in Plaintiff's second level appeal that Aetna does not approve single case agreements for out-of-network providers absent a network inadequacy for the type of health care service requested. (DGIP000888.)

78.     Nearly all documentation submitted by Plaintiff's advocate in support of Plaintiff's second level appeal was duplicative of the materials submitted with Plaintiff's initial appeal. (*Compare* DGIP000891-1000 *with* DGIP00027-125.)

79.     On February 28, 2022, Aetna denied Plaintiff's second level appeal. (DGIP0001148-56.)

80.     The second level appeal denial letter explained the materials reviewed, the decision, the basis for denial and how the determination was made, relevant Plan documents and language relevant to the denial (including terms regarding the Plan's network and the prior authorization process), and Plaintiff's rights to further dispute the Plan's decision. (DGIP0001148-56.)

81.     At all relevant times, Sandhill was a "non-contracted" RTC, *i.e.*, an out-of-network provider for which Plaintiff had not received prior authorization. (DGIP001149; 1816-17.)

82.     The Plan does not cover RTC expenses from out-of-network providers unless prior authorization for services from an out-of-network RTC has been requested and approved. (DGIP001149; 1663; 1667).)

83.     An individual may request coverage for out-of-network RTC prior to services being rendered; whether that request is approved is based upon Aetna's discretionary review of network

status, reported services, member eligibility, and other Plan provisions and limits based on the specific service at issue. (DGIP001149; 1667-68).

84.     When Plaintiff requested the Plan cover Sandhill RTC expenses, Aetna denied that request because Sandhill was an out-of-network provider and in-network providers were available, and even if they were not, Sandhill did not meet Aetna's criteria for single case agreement exception-based coverage of an out-of-network RTC provider. (*See, generally*, DGIP000870-78,1148-56; *see also* DGIP001772-73, 1790, 1816-17.)

### G.    Plaintiff Files A Complaint for Recovery of Plan Benefits Under ERISA.

85.     Plaintiff filed the Complaint on June 6, 2023. (Doc. 1.)

86.     Plaintiff's Complaint alleges a single cause of action for denial of benefits pursuant to 29 U.S.C. § 1132(a)(1)(B). (Doc. 1, ¶¶ 27-34.)

87.     At no time has Plaintiff alleged any other cause of action nor amended the Complaint to seek relief on any other basis, including, without limitation, under the Mental Health Parity and Addiction Equity Act, the Affordable Care Act, or New York Insurance Law. (Doc. 1.)

### H.    The Parties Each Seek Judgment Based Upon the Administrative Record and the Court Orders Remand for Further Administrative Review.

88.     On April 5, 2024, Plaintiff submitted to the Court a Rule 52 Motion for Judgment (Doc. 33).

89.     On May 3, 2024, Defendant submitted to the Court a Rule 56 Motion for Summary Judgment and Opposition to Plaintiff's Rule 52 Motion for Judgment (Doc. 36).

90.     On May 31, 2024, Plaintiff submitted to the Court an Opposition to Defendant's Rule 56 Motion for Summary Judgment and Reply in Support of Plaintiff's Rule 52 Motion for Judgment (Doc. 41).

91.     On June 14, 2024, Defendant submitted to the Court a Reply in Support of its Rule 56 Motion for Summary Judgment. (Doc. 42.)

92.     On February 24, 2025, the Court issued a Memorandum Opinion and Order on Plaintiff's Rule 52 Motion for Judgment and Defendant's Rule 56 Motion for Summary Judgment (Doc. 44, the "Order")).

93.     The Court's Order ruled that Plaintiff's and Defendant's motions must be treated as motions for summary judgment under Rule 56. (Doc. 44.)

94.     The Court's Order found that Aetna's decision to deny benefits to Plaintiff "did not adequately explain the basis for denial by failing to address whether to authorize a single case agreement for the out-of-network provider at issue" and determined the appropriate relief was to remand the case to Aetna for further administrative review. (Doc. 44.)

95.     The Court, through the Order, issued a non-final order remanding Plaintiff's claim for benefits to Aetna "for a new review and with instructions to specifically address in any decision whether Sandhill should be granted a single case agreement, including consideration of Plaintiff's arguments concerning the adequacy of in-network offerings." (Doc. 44.)

96.     The Order further directed Defendant to "notify the Court within two weeks of the completion of the new review." (Doc. 44.)

97.     The Court retained jurisdiction over this case pending remand. (Doc. 44.)

**I.     Aetna Issues a Determination on Remand, Which Plaintiff Appeals.**

98.     On April 28, 2025, Plaintiff's counsel submitted a letter motion to the Court requesting the Court to enter judgment for Plaintiff (Doc. 45), to which Defendant submitted a letter response in opposition on May 1, 2025 (Doc. 47).

99.    On May 1, 2025, Aetna issued its decision following remand of Plaintiff's claims for benefits (the "May 1, 2025 Determination"), upholding its earlier denial of coverage for A.D.'s residential treatment at Sandhill. (DGIP001862-1910.)

100.    On May 1, 2025, Defendant notified the Court in compliance with the Court's Order that Aetna "complet[ed] its new review" and issued a claim determination on remand. (Doc. 46.)

101.    Aetna's May 1, 2025 Determination specifically considered Plaintiff's request that Aetna approve Sandhill, notwithstanding its status as an out-of-network provider, on a single case agreement basis, including Plaintiff's claim that there were no adequate in-network facilities available to provide A.D. with the necessary care. (DGIP001862-1867.)

102.    Aetna's May 1, 2025 Determination explained that a single case agreement was not appropriate or warranted for Sandhill because there were adequate in-network facilities available, including Meridell Achievement Center, Oak Plains Academy, and Center for Discovery, and explained that these in-network residential treatment facilities were appropriate and available to promptly accept A.D. for residential treatment-based care following Aetna's contact with those facilities. (DGIP001862-1867.)

103.    Aetna's May 1, 2025 Determination further explained that even if the in-network residential treatment facilities it identified as appropriate and available to provide residential treatment to A.D. were inappropriate or unavailable, Sandhill nonetheless would not qualify for approval as an out-of-network provider on a single case agreement basis because Sandhill did not meet Aetna's quality of care requirements for residential treatment facilities. (DGIP001864.)

104.    Aetna provided to Plaintiff the relevant quality of care requirements, and explained the specific criteria Sandhill failed to satisfy, with its May 1, 2025 Determination. (DGIP001864-1910.)

105.    On May 14, 2025, the Court held a teleconference with counsel for the parties, in which it requested Defendant "notify the Court by letter whether it will consent to Plaintiff filing an appeal" to Aetna's May 1, 2025 Determination. (May 14, 2025 Minute Entry; text-only entry).

106.    On May 19, 2025, Defendant notified the Court that it consented to Plaintiff's submission of an administrative appeal to Aetna's May 1, 2025 Determination and submitted a proposed agreed schedule for Plaintiff's appeal and Aetna's response to that appeal. (Doc. 49.)

107.    On May 20, 2025, the Court issued a Memo Endorsement directing Plaintiff to file an administrative appeal to Aetna's May 1, 2025 Determination within ninety days, and directing Aetna to respond to Plaintiff's appeal within ninety days of receipt of that appeal. (Doc. 50.)

108.    On August 13, 2025, Plaintiff submitted an appeal to Aetna's May 1, 2025 Determination (the "August 13, 2025 Appeal") in which Plaintiff restated A.D.'s treatment history and Plaintiff's position that Plaintiff's claim for benefits for A.D.'s residential treatment at Sandhill, although provided by an out-of-network provider, should have nonetheless been approved on a single case agreement basis because in-network residential treatment options were either unavailable and/or inappropriate. (DGIP001911-1922.)

109.    Plaintiff's August 13, 2025 Appeal also restated arguments previously made by Plaintiff in prior appeals relating to the in-network residential treatment facilities identified by Aetna for A.D.'s care, including Plaintiff's personal opinions about several of those facilities. (DGIP001916-1981.)

110.    Plaintiff's August 13, 2025 Appeal included letters from several of A.D.'s health care providers dated June or July 2025, and thus three years after those providers treated A.D and recommended he receive continuing care in a residential treatment facility. Those letters asserted

– for the first time – those providers' opinions that Sandhill was the only appropriate residential treatment facility for A.D. in 2022. (DGIP001936-1948.)

111.    Plaintiff's August 13, 2025 Appeal additionally reiterated Plaintiff's prior arguments that Sandhill satisfied the Plan's definition of "provider" and "residential treatment facility" and that the network adequacy requirements of the federal Affordable Care Act and New York State insurance regulations required Aetna to approve Plaintiff's claim for out-of-network coverage. (DGIP001915.)

112.    Plaintiff's August 13, 2025 Appeal also enclosed documents relating to Sandhill's licensure and certifications in November 2023 – which was more than a year after A.D.'s admission at Sandhill. (DGIP001949-50.)

**J.    Aetna Considers All Materials Submitted by Plaintiff's Appeal, Provides a Full and Fair Review, and Denies Plaintiff's Claim for Benefits on Remand.**

113.    On November 11, 2025, Aetna responded to Plaintiff's August 13, 2025 Appeal (the "November 11, 2025 Determination"). (DGIP001951-1966.)

114.    Aetna's November 11, 2025 Determination was made by a licensed psychiatrist who is board certified in child and adolescent psychiatry and who was not previously involved in any prior Aetna determinations with respect to A.D.'s treatment or claims relating thereto, including Plaintiff's prior appeals (the "Appeal Reviewer"). (DGIP001951-1952.)

115.    The November 11, 2025 Determination entailed the Appeal Reviewer's review of the entire Administrative Record, including Plaintiff's August 13, 2025 Appeal and the documents submitted with it. (DGIP001951-1952.)

116.    The November 11, 2025 Determination specifically and extensively addressed Plaintiff's arguments with respect to coverage for A.D.'s residential treatment at Sandhill, including Plaintiff's contentions with respect to network inadequacy and a single case agreement,

as well as the materials submitted by Plaintiff with all prior appeals, including the August 13, 2025

Appeal. (DGIP001951-1966.)

117.    The Appeal Reviewer's November 11, 2025 Determination explained that as an

out-of-network provider, Sandhill did not qualify for coverage under the terms of the Plan, nor was

coverage for A.D.'s residential treatment at Sandhill necessary or appropriate on a single case

agreement basis. (DGIP001951-1966.)

118.    Referencing Plan language, the Appeal Reviewer noted that the Plan expressly does

not cover out-of-network care and explained that although Aetna retains discretion to enter into a

single case agreement for coverage by an out-of-network provider, it also retains discretion to not

do so, including when clinically appropriate in-network providers are available. (DGIP001953;

DGIP001962-1964.)

119.    The Appeal Reviewer specifically cited the Plan's Prior Authorization language,

which permits Aetna to consider requests for out-of-network provider coverage through use of the

utilization review process, including review of a requested service's clinical necessity,

appropriateness, efficacy, or efficiency, and using utilization review techniques such as

ambulatory review, prospective review, second opinion, certification, concurrent review, case

management, discharge planning, retrospective review, or similar programs. (DGIP001963-1964.)

120.    The Appeal Reviewer explained that Aetna's prior approval of a single case

agreement for A.D.'s non-residential, outpatient, episodic therapy from an out-of-network

provider did not necessitate or warrant approval of a single case agreement for clinically different,

continuous, ongoing, and residential treatment for A.D. (DGIP001953.)

121.    The Appeal Reviewer also explained that the Affordable Care Act and insurance-related regulations cited by Plaintiff relating to out-of-network coverage are inapplicable to the Plan based on its self-funded status. (DGIP001953.)

122.    The Appeal Reviewer concluded that the Plan provided clinically appropriate and available in-network residential treatment facility options for A.D.'s care such that no network deficiency existed, explaining that "a single case agreement to cover residential treatment services at Sandhill Center, an out-of-network provider, was not necessary, appropriate, or likely to provide cost savings or be more efficient when compared to a contracted in-network provider." (DGIP001954.)

123.    The Appeal Reviewer thoroughly reviewed each of Plaintiff's arguments concerning each of the in-network RTCs researched and identified by Aetna in conjunction with A.D.'s discharge from Huntsman in 2022, including Plaintiff's claim that Aetna was unable to locate a clinically appropriate and available in-network RTC that would accept A.D. (DGIP001954.) In doing so, the Appeal Reviewer considered arguments contained in Plaintiff's August 13, 2025 Appeal, the Administrative Record broadly (including the efforts made by Aetna's Care Advocate in 2022 to place A.D. in an appropriate in-network RTC), the letter provided by A.D.'s parents with Plaintiff's August 13, 2025 Appeal, and additional documents submitted with Plaintiff's August 13, 2025 Appeal, including letters written in in 2025 by various health care providers who treated A.D. in 2022. (DGIP0001954-1956.)

124.    The Appeal Reviewer determined that at least four in-network RTCs were offered and available to provide clinically appropriate care to A.D. (DGIP001954.)

125.    More specifically, the Appeal Reviewer considered and responded to Plaintiff's arguments presented in the Administrative Record (including in the August 13, 2025 Appeal and

supporting materials) regarding the clinical appropriateness and availability of each these four RTCs: Meridell Achievement Center; Oak Plains Academy; San Marcos Treatment Center; and Center for Discovery. (DGIP001955-1961.)

126. The Appeal Reviewer further specifically considered and responded to Plaintiff's argument and the opinions A.D.'s health care providers submitted in 2025 (which Plaintiff included with the August 13, 2025 Appeal) that a single case agreement with Sandhill should be granted because the identified in-network RTCs were inadequate due to: untimely responses from the facilities; lengthy wait times; age restrictions; IQ restrictions; duration of treatment concerns; insufficient expertise in the treatment of A.D.'s conditions (including providing services to patients in a mixed milieu); and concerns about neglect or abuse in the facilities based on Plaintiff's Internet-based research. (DGIP001955-1962.)

127. The Appeal Reviewer explicitly noted that (1) any limitations on the search for in-network RTCs based on geography were based on Plaintiff's request in discussions with the Aetna Care Advocate; (2) in-network RTC options were considered available if the in-network RTC confirmed it would accept A.D. after taking into consideration A.D.'s age and individualized clinical factors; and (3) A.D.'s medical records did not present clinical evidence that A.D.'s transfer from Huntsman to a residential treatment facility was needed immediately, such that a reasonable transfer delay from Huntsman directly to a residential treatment facility could not be accommodated. (DGIP001956.)

128. The Appeal Reviewer relied on their certification in child and adolescent psychiatry, personal review of each of the identified facilities (including each facility's licensure, credentialing, and clinical program offerings), A.D.'s medical records (including A.D.'s age, personal clinical history, and diagnostic profile), the letters from A.D.'s parents and treating

providers, and the Administrative Record in full, to determine that each of the four identified in-network RTCs was clinically appropriate to provide residential treatment care to A.D. and thus a network deficiency did not exist to warrant consideration of a single case agreement with an out-of-network provider. (DGIP001956-1961.)

129.    As to Meridell Achievement Center, the Appeal Reviewer determined that A.D.'s age and IQ did not preclude his admission, as confirmed by Aetna's Care Advocate and Meridell materials; Meridell offered sufficient duration of stay and clinically appropriate treatment; and Plaintiff's concerns relating to unspecified complaints of abuse and negligence involving Meridell were not supported by Aetna's review of Meridell as an in-network facility with regard to safety violations, licensure, and credentialing. (DGIP01956-1957.)

130.    The Appeal Reviewer concluded that "based on its licensure, credentialing, and clinical program offering, Meridell was suitable to provide appropriate Residential Treatment Services to [A.D.]. Specifically, this facility provided physician-led behavioral and neurobehavioral programs using evidence-based, trauma-informed interventions, including family therapy to target dysregulation and aggressive behaviors, improving functioning at home and school." (DGIP01956-1957.)

131.    As to Oak Plains Academy, the Appeal Reviewer determined information provided by Oak Plains supported its suitability for admission of A.D., with specific consideration given to A.D.'s IQ and history of violent outbursts; that Oak Plains did not require demonstration of violent behavior as a clinical requirement for remaining at the facility; that concerns about short term discharge were not warranted because discharge was based upon completion goals; that Plaintiff's concerns of a reported patient death occurring at Oak Plains *after A.D.'s admission to Sandhill* was not supported by Aetna's review of Oak Plains as an in-network facility with regard to safety

violations, licensure, and credentialing; and that Plaintiff's concern about a five-week admission delay was not supported by Aetna's own review and communications with Oak Plains when planning for A.D.'s discharge from Huntsman into RTC care. (DGIP01957-1958.)

132.    The Appeal Reviewer concluded that Oak Plains "was suitable to provide appropriate Residential Treatment Services to [A.D.]. Specifically, this facility is a trauma-informed psychiatric residential treatment program for children ages 7 to 17 struggling with emotional and behavioral issues, highlighting family therapy as part of its interventions." (DGIP01958-1959.)

133.    As to San Marcos Treatment Center, the Appeal Reviewer determined San Marcos was responsive and communicative with Aetna regarding admission of A.D.; that San Marcos offers adequate round the clock treatment for autism spectrum disorders as presented by A.D. and including for A.D.'s age; that the 2025 letters from various physicians who treated A.D. three years earlier (and which were submitted years after A.D.'s admission to RTC care) alleging San Marcos was not appropriate and "more of a hospital program" were not supported by San Marcos' treatment offerings and modalities, as A.D. would not have been treated alongside older patients receiving treatment for alcohol dependency, or that A.D.'s treatment would have been limited to an insufficient duration; and that the longer waitlist of San Marcos was common and is often accommodated after a follow-up to determine if a faster admission can be provided. (DGIP001956; DGIP001959-1960.)

134.    The Appeal Reviewer concluded that, "based on its licensure, credentialing, and clinical program offering, San Marcos was suitable to provide appropriate Residential Treatment services to [A.D.]. Specifically, this facility provided physician-led, evidence-based child-centered

interventions including weekly family therapy to target dysregulation and aggressive behaviors, improving functioning at home and school." (DGIP001960.)

135.    As to Center for Discovery, the Appeal Reviewer determined the facility would have accepted A.D., with consideration of his age and his diagnosis, as Center for Discovery treated 10-year-old patients and the full range of behavioral health issues and psychiatric disorders; that its many different treatment units and programs supported separate (i.e., not mixed) clinical populations, including by age, diagnosis, and gender, such that A.D. would receive clinically appropriate, individualized care; and that treatment was not subject to predetermined time limits. (DGIP001960-1961.)

136.    The Appeal Reviewer concluded that, "Center for Discovery was able to accept a 10-year-old . . . they operate 8–10 facilities nationwide that provide physician-led, evidence-based residential care for complex child and adolescent mental health disorders, offering five to six hours of daily psychotherapy and weekly psychiatric visits." (DGIP001961.)

137.    The Appeal Reviewer further concluded that even if a network deficiency did exist, Sandhill nonetheless would not be appropriate for coverage on a single case agreement basis. (DGIP001961-1962.)

138.    In response to Plaintiff's arguments that Sandhill satisfied the Plan's definitions of "provider" and "residential treatment facility," the Appeal Reviewer explained that the Plan expressly excludes Sandhill from coverage as an out-of-network provider, and exception-based coverage was confined to the prior authorization utilization review process. (DGIP001953 (quoting DGIP001667): "if you choose to receive Covered Health Services from an Out-of-Network provider, you are responsible for obtaining prior authorization before you receive the services.")

139.    The Appeal Reviewer reiterated the quality control and safety criteria considered by Aetna in the utilization review process for approval of single case agreements for out-of-network RTC care, which had been previously provided to the Plaintiff: "Included in those criteria are that the out-of-network residential treatment facility 'be accredited by one of the following agencies, commissions or committees for the services being provided: The Joint Commission (TJC), Committee on Accreditation of Rehabilitation Facilities (CARF), American Osteopathic Association's Healthcare Facilities Accreditation Program (HFAP), or the Council on Accreditation (COA); or is credentialed by Aetna.' The criteria further provide that in addition to accreditation, a licensed behavioral health provider must be actively on duty at the facility 24 hours per day for 7 days a week; the patient must be treated by a psychiatrist at least once per week; and the facility's medical director must be a psychiatrist." (DGIP001868-1910; DGIP001961-1962.)

140.    The Appeal Reviewer explained why Aetna determined that Sandhill did not meet such criteria at the time of A.D.'s discharge planning from Huntsman: "it was not accredited or credentialed as required by the criteria, it did not have a licensed behavioral health provider actively on duty 24/7, [A.D.] was not being treated by a psychiatrist at least one time per week since his admission, and Sandhill Center's medical director was not a psychiatrist." (DGIP001961-1962.)

141.    The Appeal Reviewer also explained that Sandhill's treatment approaches and techniques (including basing patient care on the Neurosequential Model of Therapeutics) did not have adequate support of the academic and clinical community for purposes of best accepted standard of care, prohibiting eligibility for Aetna's provider network or approval on a single case agreement basis. (DGIP001962.)

142. The Appeal Reviewer acknowledged the opinions stated by A.D.'s health care providers in their June/July 2025 letters that Sandhill was the only appropriate option for A.D. in 2022 and noting that as of 2025 (and thus after A.D.'s discharge from Sandhill), Sandhill was licensed in New Mexico, focused on children with clinical profiles like A.D., and that staffing was adequate. (DGIP001962.) The Appeal Reviewer also acknowledged that the foregoing providers and A.D.'s parents opined that Meridell Achievement Center, Oak Plains Academy, San Marcos Treatment Center, and Center for Discovery were not appropriate for A.D. and that Sandhill was more appropriate due to perceived inadequacies in each identified in-network RTC (for example, A.D.'s age, the RTC's therapeutic focus, or clinical milieu). (DGIP0001956.) The Appeal Reviewer explained that such opinions were considered, but even if accepted, they could not override Aetna's minimum safety clinical standards for coverage, as had been previously explained in earlier communications to Plaintiff. (DGIP001956; 1962.)

143. Based on the foregoing, the Appeal Reviewer concluded that the utilization review process parameters would not authorize coverage for Sandhill, even in the event of a network deficiency, on a single case agreement basis. (DGIP001962.)

144. Relying on Plan terms, including Schedule of Benefits, Prior Authorization, and Interpretation of Benefits, the Appeal Reviewer determined that at least four clinically appropriate in-network options for A.D.'s residential treatment were available and thus there was no network deficiency, and that even if there was a network deficiency, coverage for Sandhill as an out-of-network provider on a single case agreement basis was not appropriate, and therefore Aetna's denial of coverage decision must be upheld. (DGIP001961-1964.)

DATED:  January 30, 2026                    Respectfully submitted,

                                            */s/ Daniel B. Pasternak*
                                            Daniel B. Pasternak (admitted *pro hac vice*)
                                            SQUIRE PATTON BOGGS (US) LLP
                                            2325 East Camelback Road, Suite 700
                                            Phoenix, Arizona 85016
                                            T:  (602) 528-4000
                                            F:  (602) 253-8129
                                            daniel.pasternak@squirepb.com

                                            Paul D. Erian
                                            SQUIRE PATTON BOGGS (US) LLP
                                            1120 Avenue of the Americas, 13th Floor
                                            New York, New York  10036
                                            T:  (212) 872-9800
                                            F:  (212) 872-9815
                                            paul.erian@squirepb.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 30, 2026, I caused a copy of the foregoing **DEFENDANT DELOITTE, LLP GROUP INSURANCE PLAN'S STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1** to be served via ECF/CM filing on the ECF registrants for this case.

*/s/Tammy Gougeon*