Elizabeth K. Green, admitted *pro hac vice*
GREEN HEALTH LAW APC
201 N. Brand Blvd., Suite 200
Telephone: (818 722-1164
E-mail: egreen@greenhealthlaw.com

Attorneys for Plaintiff
John Doe

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

JOHN DOE,                                            23-CV-04743-JPC

                Plaintiff,            **PLAINTIFF'S RESPONSE TO
                                                     DEFENDANT'S STATEMENT OF
       -against-                          UNDISPUTED MATERIAL FACTS
                                                     PURSUANT TO LOCAL RULE
                                                     56.1**

DELOITTE LLP GROUP INSURANCE PLAN,

              Defendant.            ECF CASE

-------------------------------------------------------------X

       Plaintiff John Doe respectfully submits the following response to Defendant's Statement

of Undisputed Material Facts Pursuant to Local Rule 56.1.

## <u>PRELIMINARY OBJECTIONS</u>

       1.     Plaintiff objects to each and every statement to the extent that Defendant fails to

include citations to record evidence that would be admissible as set forth in Federal Rule of Civil

Procedure 56(e).

       2.     Plaintiff objects to each and every statement that references evidence that was not

identified in Defendant's Rule 26(a) disclosures, or otherwise produced in discovery.

       3.     Plaintiff objects to each and every statement to the extent that it references

hearsay evidence not attached to a sworn declaration or affidavit made on personal knowledge.

## PLAINTIFF'S RESPONSES TO

## DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    Plan Information.

1.    Deloitte LLP sponsors multiple ERISA-governed health and welfare benefit plans through which it offers medical and other insurance coverage to its employees. (DGIP001655-56; 1738.)[1]

**Plaintiff's Response**: Undisputed.

2.    Defendant is the legal entity through which Deloitte LLP provides health and welfare benefits to eligible individuals under the plans it sponsors. (DGIP001655-56; DGIP001738.)

**Plaintiff's Response**: Undisputed.

3.    One of the ERISA-governed health and welfare benefit plans sponsored by Deloitte LLP and offered through DGIP is the self-funded Aetna Open Access Select EPO Plan. (DGIP001655; 1733; 1738.)

**Plaintiff's Response**: Undisputed.

4.    The Aetna Open Access Select EPO Plan Summary Plan Description (the "Plan") is an ERISA plan document that sets forth and describes in detail medical benefit options, coverage, and claims administration for Plan participants. (DGIP001651-1757.)

**Plaintiff's Response**: Undisputed as to the SPD's contents.

---

[1] Citation to "DGIP00_____" refers to Bates-labeled pages in Exhibit A to Defendant's Unopposed Motion for Leave to File Under Seal (Doc. 55). Because Plaintiff's Complaint alleges a single claim for a denial of benefits under Section 1132(a)(1)(B) of the Employee Retirement and Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), Exhibit A (DGIP00001 – DGIP001966), which is the administrative record of Plaintiff's benefit claim (supplemented with 105 additional pages of post-remand documents), constitutes the complete factual record in this case (the "Administrative Record").

5.      More specifically, the Plan is the ERISA plan document that comprises both the plan itself as well as the summary plan description setting forth its terms. (DGIP001655: "This summary represents the Aetna Open Access Select EPO medical benefit option, herein 'the Plan', for eligible Partners, Principals, and employees of Deloitte LLP and its subsidiaries (the "Deloitte Firms") effective January 1, 2022.")

**Plaintiff's Response**: Disputed. There is no evidence that the SPD comprises "both the plan itself as well as the summary plan description," particularly when the SPD states: "This summary provides general information about the Plan, who is eligible to receive benefits under the Plan, what those benefits are, and how to obtain benefits. It does not cover all provisions, limitations, and exclusions. No general explanation can adequately give you all the details of the Plan." DGIP1655

6.      The Plan designates Aetna Life Insurance Company ("Aetna") as the Claims Administrator. (DGIP001733; 1745.)

**Plaintiff's Response**: Undisputed as to the SPD's contents.

7.      References to "We" in the Plan refer to the Plan Sponsor, Deloitte LLP. (DGIP001655.)

**Plaintiff's Response**: Undisputed as to the SPD's contents.

8.      The Plan invests Aetna, as Claims Administrator, with discretionary authority to interpret the Plan, determine benefits, and construe Plan terms:

### Interpretation of Benefits

We and the Claims Administrator have sole and exclusive discretion to do all of the following:

- Interpret Benefits under the Plan
- Interpret the other terms, conditions, limitations, and exclusions of the Plan, including this SPD and any Riders and Amendments
- Make factual determinations related to the Plan and its Benefits

We and the Claims Administrator may delegate this discretionary authority to other persons or entities that provide services in regard to the administration of the Plan.

(DGIP001739.)

**Plaintiff's Response**: Disputed. There is no evidence that the Plan administrator had the authority to delegate discretion to Aetna or that the SPD contained specific procedures for delegation.

9.    The Plan contains a detailed description of the claims administration process, including that the Claims Administrator (Aetna) makes final benefit claims and appeals determinations. (DGIP001710-15.)

**Plaintiff's Response**: Undisputed as to the SPD's contents.

**B.    Plaintiff Doe is a Plan Participant.**

10.    Plaintiff is a participant in the Plan. (Complaint (Doc. 1), ¶ 2.)

**Plaintiff's Response**: Undisputed.

11.    Plaintiff's dependent son, A.D., is a beneficiary eligible for medical benefits pursuant to the terms of the Plan by virtue of Plaintiff's participation in the Plan. (Complaint (Doc. 1), ¶ 2.)

**Plaintiff's Response**: Undisputed.

**C.    The Plan Covers Medically Necessary Residential Treatment Center Care Expenses, But Not For Out-of-Network Providers.**

12.    The Plan distinguishes between network, or "participating," providers and out-of-network providers. (DGIP001663; 1749-50.)

**Plaintiff's Response**: Undisputed as to the SPD's contents.

13.    A "network provider" is defined in the Plan as "[a] provider listed in the directory for your plan. . . . A network provider can also be referred to as an in-network provider." (DGIP001749.)

**Plaintiff's Response**: Undisputed as to the SPD's contents.

14. An "out-of-network provider" is defined in the Plan as "[a] provider who is not a network provider." (DGIP001750.)

**Plaintiff's Response**: Undisputed as to the SPD's contents.

15. Medical expenses incurred by Plan participants or beneficiaries from network or "participating" providers are potentially covered by the Plan under a defined Schedule of Benefits and description of what services are covered. (DGIP001663-66; 1669-1704.)

**Plaintiff's Response**: Undisputed as to the SPD's contents. Disputed as to Defendant's characterization of the SPD.

16. The Plan expressly states: "Out-of-Network care is not a covered expense in this Plan." (DGIP001663 (emphasis in original).)

**Plaintiff's Response**: Undisputed as to the SPD's contents.

17. The Plan covers listed health care-related services, including mental health services for Plan participants and beneficiaries, so long as Plan requirements are met, including that the service is provided by an in-network provider (*i.e.*, a member of the "network of participating physicians, specialist, and hospitals that meet Aetna's requirements for quality and service" and "are monitored for quality of care, patient satisfaction, cost-effectiveness of treatment, office standards and ongoing training") and the service is "medically necessary for the prevention, diagnosis or treatment of [the individual's] illness or condition." (DGIP001663;1665;1668-69; 1682-84.)

**Plaintiff's Response**: Undisputed as to the SPD's contents. Disputed as to Defendant's characterization of the SPD.

18.     Some health care-related services require that a Plan participant or beneficiary request and receive from the Claims Administrator prior authorization for those services to be "Covered Health Services" under the Plan. (DGIP001667-68.)

**Plaintiff's Response**: Undisputed as to the SPD's contents.

19.     Mental health care-related services at a "Residential Treatment Facility"[2] are a type of service that requires prior authorization to be a "Covered Health Service" under the Plan. (DGIP001667-68.)

**Plaintiff's Response**: Undisputed as to the SPD's contents.

20.     Mental health care services consisting of Residential Treatment Facility care generally refers to "treatment of mental health disorders by behavioral health providers" and "room and board at a semi-private room rate and other services and supplies provided" during a stay at a Residential Treatment Facility "appropriately licensed by the state Department of Health or its equivalent." (DGIP001682.)

**Plaintiff's Response**: Undisputed as to the SPD's contents.

21.     The Plan defines a "Treatment Center" as "[a] facility that provides a program of effective Mental Disorder Treatment and meets all of the following requirements: it is established and operated in accordance with any applicable state law; it provides a program of treatment approved by a Physician and the Claims Administrator; it has or maintains a written, specific, and detailed regimen requiring full-time residence and full-time participation by the patient; [and] it provides at least the following basic services: Room and Board (if this Plan provides inpatient benefits at Treatment Center; Evaluation and Diagnosis; Counseling; Referral and orientation to

---

[2] The term "Residential Treatment Facility" is also referred to as a "Residential Treatment Center," or an "RTC," throughout the Administrative Record and the parties' briefing.

specialized community resources. A Treatment Center which qualifies as a Hospital is covered as a Hospital and not a Treatment Center." (DGIP001754-55.)

**Plaintiff's Response**: Undisputed as to the SPD's contents.

22.    Residential Treatment Facility care expenses incurred by a Plan participant or beneficiary are covered as Covered Health Services by the Plan if the Residential Treatment Facility is in-network, the services provided are medically necessary, and the participant or beneficiary obtains prior authorization prior to receiving services from the Residential Treatment Facility. (DGIP001663; 1665; 1667-69; 1682-83.)

**Plaintiff's Response**: Undisputed as to the SPD's contents.

23.    The Plan states, "[y]our mental health/substance use disorder benefits will be provided by participating behavior health providers," and "[y]ou are encouraged to contact the Mental Health/Substance Abuse Disorder Administrator for referrals to providers and coordination of care." (DGIP001682-83.)

**Plaintiff's Response**: Undisputed as to the SPD's contents.

24.    Regarding out-of-network care, the Plan states, "if you choose to receive Covered Health Services from an Out-of-Network provider, you are responsible for obtaining prior authorization before you receive the services. . . . To obtain prior authorization, call the toll-free telephone number on the back of your I.D. card. This call starts the utilization review process." (DGIP001667.)

**Plaintiff's Response**: Undisputed as to the SPD's contents.

25.    The contact information on the I.D. card directs participants to Aetna, the Claims Administrator responsible for reviewing out-of-network prior authorization requests and conducting the utilization review process. (DGIP001662; 1667-68.)

**Plaintiff's Response**: Undisputed as to the SPD's contents.

26.    The utilization review process on a request for prior authorization for services provided by an out-of-network Residential Treatment Facility provider entails Aetna assessing the safety and adequacy of the facility through "formal techniques designed to monitor the use of, or evaluate the clinical necessity, appropriateness, efficacy, or efficiency of, health care services, procedures, or settings. Such techniques may include ambulatory review, prospective review, second opinion, certification, concurrent review, case management, discharge planning, retrospective review or similar programs." (DGIP001667-68.) (*See also, infra* at ¶ 58.)

**Plaintiff's Response**: Undisputed as to the SPD's contents. Disputed as to Defendant's characterization of the SPD.

**D.    Plaintiff's Dependent, A.D., Has a Long and Complex Medical History.**

27.    A.D.'s medical records show significant complex, long-term mental health issues beginning as a young child and continuing into 2022, which is the timeframe relevant to this matter. (DGIP0000037.)

**Plaintiff's Response**: Undisputed.

28.    A.D. has been diagnosed with disruptive mood dysregulation disorder, generalized anxiety disorder, attention deficit hyperactivity disorder, and autism spectrum disorder. (DGIP000037.)

**Plaintiff's Response**: Undisputed.

29.    Prior to 2022, A.D. had utilized a variety of health care services and Plaintiff had worked extensively with Aetna regarding coverage and coordination of care under the terms of the Plan. (*See generally,* DGIP001758-1861.)

**Plaintiff's Response**: Undisputed.

30.    On or around September 6, 2022, A.D. was admitted to Huntsman Mental Health Institute ("Huntsman") based on "danger of harm to himself and others and inability to function in a less restrictive setting." (DGIP000037; 46-58.)

**Plaintiff's Response**: Undisputed.

31.    On or about September 21, 2022, Huntsman as well as A.D.'s treating clinical psychologist (Dr. Anne Tatti), his behavior therapist (Lavere Harward), and another treating psychologist (Pamela C. Wilkison) each recommended A.D.'s admission into a Residential Treatment Facility (a/k/a "RTC" (see note 2, *supra*)) upon discharge from Huntsman. (DGIP00037-45.)

**Plaintiff's Response**: Undisputed.

32.    A.D.'s health care providers recommended RTC care at a facility that would accept A.D, but none recommended for or against any specific RTC facility. (DGIP00037-45.)

**Plaintiff's Response**: Disputed. DGIP0130 ("Parents discussed the centers that Aetna put forward with their clinical team, which included an expert on mental health placements."); DGIP0132 ("[A.D.'s] parents, in consultation with his treatment team (outpatient therapist Ann Tatti, ABA therapist Lavere Harward, Huntsman psychologist Dr Meagan Heilman, Huntsman social worker Maggie Blau, and placement consultant Jennifer  Taylor), carefully reviewed the facilities provided by the Aetna team."); DGIP0133 ("The treatment team felt that none of the Aetna recommended centers would be appropriate in meeting [A.D.'s] needs. They came up with two facilities that they felt were appropriate: Sandhill Center and lnterMountain Academy in Montana. lnterMountain felt that [A.D.'s] level of violence was too high and did not admit him. Sandhill meets nearly all of the needs described in Dr Tatti's letter."); DGIP0885 ("Everyone on the team wanted to find an in-network residential treatment center but it was not possible.").

33.    At the time relevant for his admission into RTC care, A.D. was 10 years old (date of birth ▮▮▮▮). (DGIP00037.)

**Plaintiff's Response**: Undisputed.

E.    **Aetna Agrees RTC Care is Appropriate for A.D. in September 2022 and Provides Multiple In-Network Options, Which Plaintiff Rejects.**

34.    Shortly after A.D.'s admission to Huntsman and his health care providers' recommendation that A.D. transition directly to RTC care after discharge, Aetna agreed to provide in-network RTC care options covered by the Plan. (DGIP001846-51.)

**Plaintiff's Response**: Undisputed.

35.    Kevin Gutierrez Barrios, Aetna's designated Care Advocate ("CA") liaison between Plaintiff and Aetna, assisted Plaintiff in identifying in-network RTCs to allow for A.D.'s RTC expenses to be covered in accordance with the terms of the Plan. (*See generally* DGIP001758-1861.)

**Plaintiff's Response**: Undisputed except for the additional qualification "to be covered in accordance with the terms of the Plan" which is not supported by the citations.

36.    Mr. Gutierrez Barrios worked extensively with Plaintiff between September 2022 and March 2023 to locate and to refer Plaintiff to appropriate in-network RTCs for A.D.'s treatment. The communication log between Mr. Gutierrez Barrios and Plaintiff is included in the Administrative Record, with the majority of these communications located at DGIP001758-1861.

**Plaintiff's Response**: Undisputed as to the record at DGIP001758-1861. Disputed as to Defendant's characterization including Mr. Gutierrez Barrios "worked extensively" with Plaintiff.

37. On or around September 12, 2022, while A.D. remained in-patient at Huntsman, Aetna, through Mr. Gutierrez Barrios, began researching in-network RTCs and contacting those facilities on behalf of Plaintiff. (DGIP001851.)

**Plaintiff's Response**: Undisputed as to the contents of the record at DGIP001851.

38. Plaintiff informed Aetna on September 13, 2022 that Plaintiff had hired an educational consultant separate from Aetna to independently assist in locating an RTC for A.D.'s treatment. (DGIP001857.)

**Plaintiff's Response**: Undisputed as to the record stating at DGIP001857: "The family hired an educational consultant to assist with locating an RTC."

39. Neither Aetna nor Plaintiff (or Plaintiff's separately engaged consultant) identified any RTC located in Utah suitable for or available to admit A.D. and thus Plaintiff indicated a willingness to consider in-network but out-of-state RTCs (*See generally,* DGIP001758-1861, and specifically DGIP001794; 1846.)

**Plaintiff's Response**: Undisputed.

40. Aetna vetted more than fifteen in-network RTCs for suitability and availability to admit A.D. Although the majority were unable to admit A.D. after discharge from Huntsman principally due to age limitations and waitlists, those RTC facilities that were presented as viable in-network options were rejected by Plaintiff based on Plaintiff's own considerations. (DGIP001764-69; 1775-81; 1787; 1791-96; 1803; 1807-11; 1813-22; 1824-25; 1828-30; 1835; 1838-40; 1854-55.)

**Plaintiff's Response**: Disputed as Defendant's characterization that Aetna "vetted" facilities for "suitability and availability" as legal argument. Disputed that Aetna provided any

residential treatment facilities that were viable options. Disputed that Plaintiff "rejected" facilities based on "Plaintiff's own considerations."

The record shows that in-network facilities identified by Aetna were all inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons:

• Discovery Mood, TX (aka Center for Discovery): 2-4 week wait, did not treat children with ASD, A.D. was too young for their program, did not accept children under age 11, short-term stabilization and assessment, not a long-term program, placed patients in mixed milieu (patients diagnosed mental health disorders placed with patients diagnosed with substance abuse disorder). DGIP0132, 1775, 1815, 1854.

• Meridell, TX: A.D. was too young for their program, did not accept children under age 11, did not respond to telephone calls from Plaintiff. DGIP0132, 1825.

• Kennedy Krieger, MD: hospitalization only, not a residential treatment program. DGIP0132, 1817.

• Oak Plains Academy, TN: 5 week wait, short term program, allegations of children harmed in the facility, accepts patients with very low IQ which did not describe A.D. DGIP0132, 1765.

• San Marcos Treatment Center: 6-8 week wait, did not respond to telephone calls from Plaintiff, allegations of child abuse and riots. DGIP0133, 1764, 1765.

• North Springs Behavioral Health, VA: did not accept children outside of Virginia, allegations of children harmed in the facility including a child who died during improper restraints, no response to Aetna's inquiry. DGIP0133, 1765, 1781, 1787.

• Texas Neurorehab: would not accept because A.D.'s IQ was too high, facility worked with developmentally delayed patients and A.D. would not be appropriate. DGIP1764.

- Provo Canyon School: A.D. was too young for their program. DGIP1766.

- Willow Springs: A.D. was too young for their program, minimum age is 12. DGIP1768.

- Pathlight Mood and Anxiety Center: A.D. was too young for their program, minimum age is 12. DGIP1776.

- BellFaire: waitlist extends "well into 2023." DGIP1792.

- Millcreek of Pontotoc: no response to Aetna's inquiry. DGIP1793.

- Harbor Point Behavioral Health Center: unable to accommodate a patient with an ASD diagnosis. DGIP1807.

- Youthcare: A.D. was too young for their program, minimum age is 11. DGIP1818.

- Great Circle: 6-8 month wait. DGIP1839.

The facilities were found to be inappropriate or unavailable based on thorough review by Plaintiff, his wife, and A.D.'s treatment team. DGIP0130 ("Parents discussed the centers that Aetna put forward with their clinical team, which included an expert on mental health placements."); DGIP0132 ("[A.D.'s] parents, in consultation with his treatment team (outpatient therapist Ann Tatti, ABA therapist Lavere Harward, Huntsman psychologist Dr Meagan Heilman, Huntsman social worker Maggie Blau, and placement consultant Jennifer Taylor), carefully reviewed the facilities provided by the Aetna team."); DGIP0133 ("The treatment team felt that none of the Aetna recommended centers would be appropriate in meeting [A.D.'s] needs. They came up with two facilities that they felt were appropriate: Sandhill Center and lnterMountain Academy in Montana. lnterMountain felt that [A.D.'s] level of violence was too high and did not admit him. Sandhill meets nearly all of the needs described in Dr Tatti's letter."); DGIP0885 ("Everyone on the team wanted to find an in-network residential treatment center but it was not possible.") (emphasis added).

41.     Aetna recommended at least three in-network RTCs covered by the Plan that were available to accept A.D. for admission following discharge from Huntsman, in accordance with the recommendations from A.D.'s health care providers (*see infra* ¶¶ 47-57), however Plaintiff rejected each of these RTCs. (*Id.*)

**Plaintiff's Response**: Disputed. The record shows that in-network facilities identified by Aetna were all inappropriate and/or unavailable to provide residential treatment to A.D. for the reasons cited in response to statement No. 40 above.

42.     The only RTCs Plaintiff expressed a willingness to consider for A.D.'s admission were Sandhill Center ("Sandhill") and Intermountain Academy. (Pl. Mot., at 10.)

**Plaintiff's Response**: Disputed. Defendant cites no evidence to support the statement. Plaintiff expressed a willingness to consider any in-network residential facility available and appropriate for A.D. but Aetna was unable to identify such facilities. DGIP0130 ("Parents discussed the centers that Aetna put forward with their clinical team, which included an expert on mental health placements."); DGIP0132 ("[A.D.'s] parents, in consultation with his treatment team (outpatient therapist Ann Tatti, ABA therapist Lavere Harward, Huntsman psychologist Dr Meagan Heilman, Huntsman social worker Maggie Blau, and placement consultant Jennifer Taylor), carefully reviewed the facilities provided by the Aetna team."); DGIP0133 ("The treatment team felt that none of the Aetna recommended centers would be appropriate in meeting [A.D.'s] needs. They came up with two facilities that they felt were appropriate: Sandhill Center and lnterMountain Academy in Montana. lnterMountain felt that [A.D.'s] level of violence was too high and did not admit him. Sandhill meets nearly all of the needs described in Dr Tatti's

letter."); DGIP0885 ("Everyone on the team wanted to find an in-network residential treatment center but it was not possible.") (emphasis added).

43.     Neither Sandhill nor Intermountain Academy is an in-network provider under the Plan. (DGIP001784; 1795; 1816-17.)

**Plaintiff's Response**: Undisputed.

44.     Intermountain Academy advised Plaintiff that it was not a suitable facility based on A.D.'s needs, and that it would not admit A.D. (Pl. Mot. at 10.)

**Plaintiff's Response**: Undisputed.

45.     Of the in-network RTCs offering residential treatment care covered by the Plan, the following were determined to be not suitable for A.D.: Kennedy Krieger Institute (primarily a long-term hospitalization center) (DGIP001777, 1817); Pathlight Mood and Anxiety Center (A.D. too young to be admitted) (DGIP001776); Provo Canyon School (A.D. too young to be admitted) (DGIP001766); Texas NeuroRehab (A.D. did not meet admission profile due to higher IQ than patients cared for at that facility) (DGIP001764); San Marcos Treatment Center (unable to accept A.D. without a substantial delay) (DGIP001764); Willow Springs (A.D. too young to be admitted) (DGIP001768); Bellfaire JCB (unable to accept A.D. without substantial delay) (DGIP001792); Harbor Point Behavioral Health Center (A.D. not a candidate for services based on diagnosis) (DGIP001807); Youthcare (A.D. too young to be admitted) (DGIP001818); CHNK (unable to accept A.D. without substantial delay) (DGIP001830); and Great Circle (unable to accept A.D. without substantial delay) (DGIP001839).

**Plaintiff's Response**: Undisputed that Aetna did not identify any in-network residential treatment facilities available or appropriate for A.D. In addition to the list above, the following in-network residential facilities were unavailable and/or inappropriate and/or unresponsive:

Discovery Mood (DGIP0132, 1775, 1815, 1854); Meridell (DGIP0132, 1825); Oak Plains Academy (DGIP0132, 1765); North Springs Behavioral Health (DGIP0133, 1765, 1781, 1787); Millcreek of Pontotoc (DGIP1793).

46.    Aetna also identified North Spring Behavioral Healthcare and Millcreek on Pontotoc as potential in-network RTC facilities for A.D. but Aetna was unable to confirm availability to admit A.D. because, as to North Spring Behavioral Healthcare, Plaintiff refused to reach out to the facility, and, as to Millcreek on Pontotoc, Aetna did not receive a response from the facility. (DGIP001765, 1793.)

**Plaintiff's Response:** Disputed. North Springs Behavioral Health did not accept children outside of Virginia, there were allegations of children harmed in the facility including a child who died during improper restraints, and there was no response to Aetna's inquiry. DGIP0133, 1765, 1781, 1787. Undisputed as to Millcreek not responding to Aetna's inquiry.

47.    Of the Plan's in-network RTC facilities, the following were determined to be suitable for A.D. and were able to admit A.D. without substantial delay: Center for Discovery, Meridell Achievement Center ("Meridell"), and Oak Plains. (DGIP001775; 1808-09; 1854.)

**Plaintiff's Response:** Disputed for the reasons cited in response to statement No. 40 above.

48.    Explained in detail below, Plaintiff rejected each of these in-network RTC facilities based on Plaintiff's preference that A.D. instead receive treatment at Sandhill. (DGIP001816-17.)

**Plaintiff's Response:** Disputed for the reasons cited in response to statement Nos. 40 and 42 above.

49.    On September 19, 2022 (and again later on), Aetna advised Plaintiff that Center for Discovery was an in-network RTC that could admit A.D., accounting for A.D.'s specific needs and age, with admission available within a few weeks. (DGIP001775; 1815; 1821; 1845-46.)

**Plaintiff's Response:** Disputed for the reasons cited in response to statement Nos. 40 and 42 above.

50.    Plaintiff's separately engaged consultant confirmed that Center for Discovery indicated it would accept A.D. and that A.D. could be admitted within a few weeks of September 19, 2022. (DGIP001775: "I called them and they told me that they'll take him even though he's 10. There is a 3-4 week waitlist.")

**Plaintiff's Response:** Disputed for the reasons cited in response to statement No. 40 above.

51.    Through communications between September 19 and 23, 2022, Plaintiff refused to admit A.D. to Center for Discovery because Plaintiff and/or Plaintiff's separately engaged consultant "[did] not believe it is a good environment for the member" based upon beliefs that it is a "short-term stabilization and assessment" facility, it was a "mixed milieu" environment, and because it "contracts with insurance companies." (DGIP001775; 1795; 1825; 1835; 1854.)

**Plaintiff's Response:** Disputed. Center for Discovery was inappropriate and unavailable for residential treatment of A.D. because there was a 2-4 week wait, the facility did not treat children with ASD, A.D. was too young for their program, did not accept children under age 11, the facility was only short-term stabilization and assessment, not a long-term program, and the facility placed patients in mixed milieu (patients diagnosed mental health disorders placed with patients diagnosed with substance abuse disorder). DGIP0132, 1775, 1815, 1854; *see also* DGIP0130 ("Parents discussed the centers that Aetna put forward with their clinical team, which included an expert on mental health placements."); DGIP0132 ("[A.D.'s] parents, in consultation with his treatment team (outpatient therapist Ann Tatti, ABA therapist Lavere Harward, Huntsman psychologist Dr Meagan Heilman, Huntsman social worker Maggie Blau, and placement consultant Jennifer  Taylor), carefully reviewed the facilities provided by the Aetna team.");

DGIP0133 ("The treatment team felt that none of the Aetna recommended centers would be appropriate in meeting [A.D.'s] needs.").

52.    On September 19, 2022 (and again on September 21, 2022 and later in March 2023), Aetna advised Plaintiff that Meridell was an in-network RTC that could admit A.D. in two weeks (and thus in early October 2022), factoring into consideration A.D.'s specific needs and age. (DGIP001769; 1775; 1791; 1815; 1821; 1846; 1854: "CA emailed parents stating that he had spoken to the facility and the member's age does not exclude him. There is a 2-week waitlist and they are willing to interview him. CA informed them that this is not short-term and is a residential facility. There is availability in the next 2 weeks.".)

**Plaintiff's Response:** Disputed. Meridell was inappropriate and unavailable for residential treatment of A.D. because A.D. was too young for their program, did not accept children under age 11, did not respond to telephone calls from Plaintiff. DGIP0132, 1825.

53.    Through communications between September 19 and 22, 2022, Plaintiff refused to admit A.D. for RTC care at Meridell, despite Meridell being fully accredited and vetted by Aetna and approved as an in-network RTC under the Plan, based on Plaintiff's expressed concern that Meridell would not be a good fit due to A.D.'s age and IQ and because Plaintiff's separately engaged consultant believed it was a short-term facility, notwithstanding Aetna's clarification to the contrary. (DGIP001825; 1835; 1854.)

**Plaintiff's Response:** Disputed. Meridell was inappropriate and unavailable for residential treatment of A.D. because A.D. was too young for their program, did not accept children under age 11, did not respond to telephone calls from Plaintiff. DGIP0132, 1825; *see also* DGIP0130 ("Parents discussed the centers that Aetna put forward with their clinical team, which included an expert on mental health placements."); DGIP0132 ("[A.D.'s] parents, in consultation with his

treatment team (outpatient therapist Ann Tatti, ABA therapist Lavere Harward, Huntsman psychologist Dr Meagan Heilman, Huntsman social worker Maggie Blau, and placement consultant Jennifer  Taylor), carefully reviewed the facilities provided by the Aetna team."); DGIP0133 ("The treatment team felt that none of the Aetna recommended centers would be appropriate in meeting [A.D.'s] needs.").

54.    Through communications between September 20 and 21, 2022 (and again in March 2023), Aetna advised Plaintiff that Oak Plains was an in-network RTC that could admit A.D. within seven to ten days, with consideration given to A.D.'s specific needs and age. (DGIP001769; 1808-09: "CA spoke to Marc, the director of admissions 931-362-2008, who stated that the member's age and ASD dx are not exclusionary. There will be availability in the next 7-10 days and the member's parents can call him directly to start the intake process;" *see also* DGIP001820.)

**Plaintiff's Response:** Disputed. Oak Plains was inappropriate and unavailable for residential treatment of A.D. the facility had a 5 week wait, was a short term program, there were allegations of children harmed in the facility, and the program accepted patients with very low IQ which did not describe A.D. who had a high IQ. DGIP0132, 1765; *see also* DGIP0130 ("Parents discussed the centers that Aetna put forward with their clinical team, which included an expert on mental health placements."); DGIP0132 ("[A.D.'s] parents, in consultation with his treatment team (outpatient therapist Ann Tatti, ABA therapist Lavere Harward, Huntsman psychologist Dr Meagan Heilman, Huntsman social worker Maggie Blau, and placement consultant Jennifer Taylor), carefully reviewed the facilities provided by the Aetna team."); DGIP0133 ("The treatment team felt that none of the Aetna recommended centers would be appropriate in meeting [A.D.'s] needs.").

55.    As of September 24, 2022, Plaintiff refused to admit A.D. to Oak Plains, despite Oak Plains being fully accredited and vetted by Aetna and approved as an in-network RTC under the Plan, based on Plaintiff's and/or Plaintiff's separately engaged consultant's review of negative online reviews and based on concerns surrounding A.D.'s IQ and the care environment. (DGIP001765; 1803; 1835.)

**Plaintiff's Response:** Disputed for the reasons cited in response to statement No. 54 above.

56.    Before and after Plaintiff declined the Plan's referrals to suitable, available RTC in-network facilities, Aetna continued answering Plaintiff's inquiries regarding terms of Plan coverage, available in-network RTC facilities covered by the Plan, and how length of stay at an RTC is determined based on the individual's treatment needs and progress. (*See, e.g.*, DGIP001769; 1828; 1854-55.)

**Plaintiff's Response**: Undisputed as to the contents of the record. Disputed as to Defendant's characterization of the record.

57.    As late as March 2023 – approximately five months after A.D.'s admission to Sandhill – Aetna continued to contact in-network RTC facilities to obtain updated availability to admit A.D. and continually provided updates to Plaintiff with the facilities' ability to admit A.D. and the associated timelines. (*See, e.g.*, DGIP001769; 1791; 1796; 1820; 1840.)

**Plaintiff's Response**: Undisputed as to the contents of the record. Disputed as to Defendant's characterization of the record.

58.    Aetna additionally explained that even if there were no in-network RTCs suitable for A.D.'s care per the terms of the Plan, Sandhill would not be approved on a single case agreement network exception basis because it did not meet the RTC criteria considered when in-network RTC facilities are not available: Sandhill lacked appropriate credentials for an RTC; did

not have a licensed behavioral health provider on duty 24/7; did not employ a psychiatrist at the facility; and did not have a medical director that is a psychiatrist. (DGIP001772-73; 1785; 1790; *see also* DGIP001668 (explaining the review process)).

**Plaintiff's Response**: Undisputed as to the contents of the record. Disputed as to Defendant's characterization of the record.

###### F.    Plaintiff Submits a Benefits Claim for Reimbursement of Sandhill Expenses, Which is Denied Due to Sandhill's Out-Of-Network Status.

59.    Despite Plaintiff repeatedly being informed that as an out-of-network provider, services provided to A.D. by Sandhill would not be a covered expense under the express terms of the Plan, Plaintiff arranged for A.D.'s admission to Sandhill following his discharge from Huntsman. (DGIP001795; 1804-05; 1816-17: "The CA informed the parents about Sandhill Center's failure to meet criteria for OON [out of network] RTC's. The parents believe the facility's insurance advocacy team can assist with it. Parents have continued to decline INN [in-network] options.")

**Plaintiff's Response**: Undisputed that A.D. was admitted to Sandhill for residential treatment from his discharge at Huntsman. Disputed as to Defendant's characterization of the record.

60.    A.D. was admitted to Sandhill on October 11, 2022. (DGIP000120.)

**Plaintiff's Response**: Undisputed.

61.    After A.D. was admitted to Sandhill, Plaintiff requested that the Plan pay for expenses incurred for A.D.'s treatment and care at Sandhill. (Pl. Mot., at 11; DGIP000011-17.)

**Plaintiff's Response**: Undisputed that Plaintiff submitted requests for Plan benefits for A.D.'s residential treatment at Sandhill. *i.e.* DGIP0136.

62.    On October 17, 2022, Aetna denied Plaintiff's request for reimbursement of Sandhill expenses, consistent with the reasons given to Plaintiff by Aetna's CA over the preceding month. (DGIP000011-17.)

**Plaintiff's Response**: Disputed. Aetna's denial did not reflect the informal communications between Aetna's representative and Plaintiff over the preceding month. Rather, the denial provided no facts regarding A.D. or his treatment history and instead offered the conclusory reason: "This is not a covered service under the terms of the plan." DGIP0012.

63.    Aetna's claim denial letter does not dispute the medical necessity for A.D.'s receipt of RTC care, but instead explains that the Plan does not cover out-of-network provider expenses. (DGIP000011-17.)

**Plaintiff's Response**: Undisputed that the denial letter does not dispute the medical necessity of A.D.'s residential treatment. Disputed that the denial letter "explains that the Plan does not cover out of network provider expenses." The denial letter does not provide such an explanation.

64.    On November 14, 2022, Plaintiff submitted an appeal to Aetna's October 17, 2022 claim denial prepared by an advocacy organization called Mental Health and Autism Insurance Project. (DGIP00021-125; the letter advocating for Plaintiff's position is located at DGIP000021-29, and the documentation provided with the appeal letter is located at DGIP00030-125.)

**Plaintiff's Response**: Undisputed.

65.    Through the appeal letter, Plaintiff's advocate alleged the in-network RTC facilities identified and vetted by Aetna, several of which confirmed their ability and willingness to timely admit A.D. following his discharge from Huntsman, were not suitable for A.D. (DGIP000021-27.)

**Plaintiff's Response**: Disputed. The November 14, 2022 appeal letter is not disputed. Defendant's characterization of the appeal letter is disputed as legal argument.

66.    The appeal letter reiterates the exact same issues Plaintiff expressed to Aetna in September 2022 through October 2022 regarding the in-network RTC referrals provided by Aetna, which Aetna had already addressed with Plaintiff, as set forth *supra* ¶¶ 36-58. (DGIP000021-27.)

**Plaintiff's Response**: Undisputed as to the contents of the November 14, 2022 appeal submission. Defendant's characterization of the appeal letter is disputed as it is legal argument.

67.    Plaintiff's advocate attached to the appeal letter correspondence from various of A.D.'s treating health care providers, medical records outlining A.D.'s treatment history, and prior Aetna correspondence. (DGIP00030-125.)

**Plaintiff's Response**: Undisputed that Plaintiff provided several enclosures with the appeal letter which are listed at DGIP0136-0137.

68.    The heath care providers' letters submitted in support of the appeal all recommend RTC care for A.D. upon discharge from Huntsman. (DGIP00037-45.)

**Plaintiff's Response**: Undisputed.

69.    None of A.D.'s health care providers recommended any specific RTC facility (including Sandhill) nor did they advise against any specific RTC facility. (DGIP00037-45.)

**Plaintiff's Response**: Disputed. DGIP0130 ("Parents discussed the centers that Aetna put forward with their clinical team, which included an expert on mental health placements."); DGIP0132 ("[A.D.'s] parents, in consultation with his treatment team (outpatient therapist Ann Tatti, ABA therapist Lavere Harward, Huntsman psychologist Dr Meagan Heilman, Huntsman social worker Maggie Blau, and placement consultant Jennifer Taylor), carefully reviewed the facilities provided by the Aetna team."); DGIP0133 ("The treatment team felt that none of the

Aetna recommended centers would be appropriate in meeting [A.D.'s] needs. They came up with two facilities that they felt were appropriate: Sandhill Center and lnterMountain Academy in Montana. lnterMountain felt that [A.D.'s] level of violence was too high and did not admit him. Sandhill meets nearly all of the needs described in Dr Tatti's letter."); DGIP0885 ("Everyone on the team wanted to find an in-network residential treatment center but it was not possible.").

70.    None of A.D.'s health care providers stated A.D. needed a specific type of RTC facility based on A.D.'s IQ, recommended length of stay, or a specific therapeutic milieu. (DGIP00037-45.)

**Plaintiff's Response**: Disputed. The appeal letter describes how the residential facilities identified by Aetna were inappropriate for A.D. based on several factors pursuant to consultation with A.D.'s treatment team. DGIP0023; *see also* DGIP0130 ("Parents discussed the centers that Aetna put forward with their clinical team, which included an expert on mental health placements."); DGIP0132 ("[A.D.'s] parents, in consultation with his treatment team (outpatient therapist Ann Tatti, ABA therapist Lavere Harward, Huntsman psychologist Dr Meagan Heilman, Huntsman social worker Maggie Blau, and placement consultant Jennifer  Taylor), carefully reviewed the facilities provided by the Aetna team."); DGIP0133 ("The treatment team felt that none of the Aetna recommended centers would be appropriate in meeting [A.D.'s] needs. They came up with two facilities that they felt were appropriate: Sandhill Center and lnterMountain Academy in Montana. lnterMountain felt that [A.D.'s] level of violence was too high and did not admit him. Sandhill meets nearly all of the needs described in Dr Tatti's letter."); DGIP0885 ("Everyone on the team wanted to find an in-network residential treatment center but it was not possible.").

71.     Plaintiff rejected or otherwise refused to consider the in-network RTC facilities covered by the Plan that would admit A.D. upon discharge from Huntsman, opting instead to admit to Sandhill with full knowledge that Sandhill was an out-of-network provider and that as such, under the terms of the Plan, coverage would not be provided for A.D.'s treatment at Sandhill. (*See, supra*, ¶¶ 41-59.)

**Plaintiff's Response**: Disputed as legal argument. Disputed for the reasons cited in response to statement Nos. 41-59 above.

72.     On December 14, 2022, Aetna denied Plaintiff's appeal. (DGIP000870-78.)

**Plaintiff's Response**: Undisputed.

73.     The appeal denial letter explained the appealable issue, the materials reviewed in responding to the appeal, the decision reached, how the decision was made, and the Plan language and bases for denying the request for reimbursement. (DGIP000870-78.)

**Plaintiff's Response**: Undisputed as to the contents of the December 14, 2022 appeal denial letter. Defendant's characterization of the appeal denial letter is disputed.

74.     The appeal denial letter also explained how Plaintiff could pursue a second level appeal and provided member resources for assistance. (DGIP000873-74.)

**Plaintiff's Response**: Undisputed as to the contents of the December 14, 2022 appeal denial letter.

75.     Plaintiff's advocate submitted a second level appeal on February 22, 2023. (DGIP000881-1000; the letter advocating for Plaintiff's position is located at DGIP000881-892, and the documentation provided with the appeal letter is located at DGIP000893-1000.)

**Plaintiff's Response**: Undisputed.

76.     In this second level appeal, Plaintiff's advocate repeated the position previously expressed in the first appeal regarding issues with the in-network RTC facilities identified by Aetna as suitable for, and available to provide, care to A.D. (which Aetna previously already addressed with Plaintiff), and took issue with both the Plan's out-of-network language and Aetna's prior authorization for A.D.'s recurring (twice weekly, see DGIP000039) individual therapy from an out-of-network therapist (Dr. Tatti) while rejecting coverage for full-time, residential mental health care services from an out-of-network RTC (Sandhill). (DGIP000881-892.)

**Plaintiff's Response**: Undisputed as to the contents of the February 22, 2023 appeal letter. Defendant's characterization of the appeal letter is disputed.

77.     Plaintiff's advocate acknowledged in Plaintiff's second level appeal that Aetna does not approve single case agreements for out-of-network providers absent a network inadequacy for the type of health care service requested. (DGIP000888.)

**Plaintiff's Response**: Undisputed as to the contents of the February 22, 2023 appeal letter. Defendant's characterization of the appeal letter is disputed.

78.     Nearly all documentation submitted by Plaintiff's advocate in support of Plaintiff's second level appeal was duplicative of the materials submitted with Plaintiff's initial appeal. (*Compare* DGIP000891-1000 *with* DGIP00027-125.)

**Plaintiff's Response**: Undisputed as to the contents of the February 22, 2023 appeal letter. Defendant's characterization of the appeal letter is disputed.

79.     On February 28, 2022, Aetna denied Plaintiff's second level appeal. (DGIP0001148-56.)

**Plaintiff's Response**: Disputed. The second appeal denial letter was dated February 28, 2023. DGIP1148.

80.     The second level appeal denial letter explained the materials reviewed, the decision, the basis for denial and how the determination was made, relevant Plan documents and language relevant to the denial (including terms regarding the Plan's network and the prior authorization process), and Plaintiff's rights to further dispute the Plan's decision. (DGIP0001148-56.)

**Plaintiff's Response**: Undisputed as to the contents of the February 28, 2023 appeal denial letter.

81.     At all relevant times, Sandhill was a "non-contracted" RTC, *i.e.*, an out-of-network provider for which Plaintiff had not received prior authorization. (DGIP001149; 1816-17.)

**Plaintiff's Response**: Undisputed that Sandhill was not a contracted provider.

82.     The Plan does not cover RTC expenses from out-of-network providers unless prior authorization for services from an out-of-network RTC has been requested and approved. (DGIP001149; 1663; 1667).)

**Plaintiff's Response**: Undisputed that the Plan purports not to cover services with out-of-network providers but does offer out-of-network coverage due to network inadequacy.

83.     An individual may request coverage for out-of-network RTC prior to services being rendered; whether that request is approved is based upon Aetna's discretionary review of network status, reported services, member eligibility, and other Plan provisions and limits based on the specific service at issue. (DGIP001149; 1667-68.)

**Plaintiff's Response**: Undisputed that the Plan may cover services with out-of-network providers.

84.     When Plaintiff requested the Plan cover Sandhill RTC expenses, Aetna denied that request because Sandhill was an out-of-network provider and in-network providers were available,

and even if they were not, Sandhill did not meet Aetna's criteria for single case agreement exception-based coverage of an out-of-network RTC provider. (*See, generally*, DGIP000870-78,1148-56; *see also* DGIP001772-73, 1790, 1816-17.)

**Plaintiff's Response**: Disputed. Aetna's written denial letters to Plaintiff did not state that benefits were denied due to Sandhill not meeting Aetna's criteria. *i.e.* DGIP0011-0015, 0870-0872, 1132-1134.

G.     **Plaintiff Files A Complaint for Recovery of Plan Benefits Under ERISA.**

85.     Plaintiff filed the Complaint on June 6, 2023. (Doc. 1.)

**Plaintiff's Response**: Undisputed.

86.     Plaintiff's Complaint alleges a single cause of action for denial of benefits pursuant to 29 U.S.C. § 1132(a)(1)(B). (Doc. 1, ¶¶ 27-34.)

**Plaintiff's Response**: Undisputed.

87.     At no time has Plaintiff alleged any other cause of action nor amended the Complaint to seek relief on any other basis, including, without limitation, under the Mental Health Parity and Addiction Equity Act, the Affordable Care Act, or New York Insurance Law. (Doc. 1.)

**Plaintiff's Response**: Undisputed.

H.     **The Parties Each Seek Judgment Based Upon the Administrative Record and the Court Orders Remand for Further Administrative Review.**

88.     On April 5, 2024, Plaintiff submitted to the Court a Rule 52 Motion for Judgment (Doc. 33).

**Plaintiff's Response:**  Undisputed.

89.     On May 3, 2024, Defendant submitted to the Court a Rule 56 Motion for Summary Judgment and Opposition to Plaintiff's Rule 52 Motion for Judgment (Doc. 36).

**Plaintiff's Response:**  Undisputed.

90.     On May 31, 2024, Plaintiff submitted to the Court an Opposition to Defendant's Rule 56 Motion for Summary Judgment and Reply in Support of Plaintiff's Rule 52 Motion for Judgment (Doc. 41).

**Plaintiff's Response:**  Undisputed.

91.     On June 14, 2024, Defendant submitted to the Court a Reply in Support of its Rule 56 Motion for Summary Judgment. (Doc. 42.)

**Plaintiff's Response:**  Undisputed.

92.     On February 24, 2025, the Court issued a Memorandum Opinion and Order on Plaintiff's Rule 52 Motion for Judgment and Defendant's Rule 56 Motion for Summary Judgment (Doc. 44, the "Order")).

**Plaintiff's Response:**  Undisputed.

93.     The Court's Order ruled that Plaintiff's and Defendant's motions must be treated as motions for summary judgment under Rule 56. (Doc. 44.)

**Plaintiff's Response:**  Undisputed.

94.     The Court's Order found that Aetna's decision to deny benefits to Plaintiff "did not adequately explain the basis for denial by failing to address whether to authorize a single case agreement for the out-of-network provider at issue" and determined the appropriate relief was to remand the case to Aetna for further administrative review. (Doc. 44.)

**Plaintiff's Response:**   Undisputed that the Court found Aetna's decision did not adequately explain the basis for denial by failing to address the single case agreement. Disputed to the extent Defendant characterizes this as the only deficiency identified by the Court. The Court found the denial was arbitrary and capricious and rendered "without reason." ECF No. 44 at p. 6.

95.     The Court, through the Order, issued a non-final order remanding Plaintiff's claim for benefits to Aetna "for a new review and with instructions to specifically address in any decision whether Sandhill should be granted a single case agreement, including consideration of Plaintiff's arguments concerning the adequacy of in-network offerings." (Doc. 44.)

**Plaintiff's Response:**  Undisputed.

96.     The Order further directed Defendant to "notify the Court within two weeks of the completion of the new review." (Doc. 44.)

**Plaintiff's Response:**  Undisputed.

97.     The Court retained jurisdiction over this case pending remand. (Doc. 44.)

**Plaintiff's Response:**  Undisputed.

**I.     Aetna Issues a Determination on Remand, Which Plaintiff Appeals.**

98.     On April 28, 2025, Plaintiff's counsel submitted a letter motion to the Court requesting the Court to enter judgment for Plaintiff (Doc. 45), to which Defendant submitted a letter response in opposition on May 1, 2025 (Doc. 47).

**Plaintiff's Response:**  Undisputed.

99.     On May 1, 2025, Aetna issued its decision following remand of Plaintiff's claims for benefits (the "May 1, 2025 Determination"), upholding its earlier denial of coverage for A.D.'s residential treatment at Sandhill. (DGIP001862-1910.)

**Plaintiff's Response:**  Undisputed.

100.     On May 1, 2025, Defendant notified the Court in compliance with the Court's Order that Aetna "complet[ed] its new review" and issued a claim determination on remand. (Doc. 46.)

**Plaintiff's Response:**  Undisputed.

101.    Aetna's May 1, 2025 Determination specifically considered Plaintiff's request that Aetna approve Sandhill, notwithstanding its status as an out-of-network provider, on a single case agreement basis, including Plaintiff's claim that there were no adequate in-network facilities available to provide A.D. with the necessary care. (DGIP001862-1867.)

**Plaintiff's Response:**    Undisputed as to the contents of the record. Disputed as to Defendant's characterization of the record. Aetna did not consider all of Plaintiff's arguments on appeal.

102.    Aetna's May 1, 2025 Determination explained that a single case agreement was not appropriate or warranted for Sandhill because there were adequate in-network facilities available, including Meridell Achievement Center, Oak Plains Academy, and Center for Discovery, and explained that these in-network residential treatment facilities were appropriate and available to promptly accept A.D. for residential treatment-based care following Aetna's contact with those facilities. (DGIP001862-1867.)

**Plaintiff's Response:**    Undisputed as to the contents of the record. Disputed as to Defendant's characterization of what was explained by Aetna in the denial letter.

103.    Aetna's May 1, 2025 Determination further explained that even if the in-network residential treatment facilities it identified as appropriate and available to provide residential treatment to A.D. were inappropriate or unavailable, Sandhill nonetheless would not qualify for approval as an out-of-network provider on a single case agreement basis because Sandhill did not meet Aetna's quality of care requirements for residential treatment facilities. (DGIP001864.)

**Plaintiff's Response:**    Undisputed as to the contents of the record. Disputed as to Defendant's characterization of what was explained by Aetna in the denial letter.

104.    Aetna provided to Plaintiff the relevant quality of care requirements, and explained the specific criteria Sandhill failed to satisfy, with its May 1, 2025 Determination. (DGIP001864-1910.)

**Plaintiff's Response:**  Undisputed as to the contents of the record. Disputed as to Defendant's characterization of what was explained by Aetna in the denial letter and criteria provided by Aetna that are not contained in the Plan.

105.    On May 14, 2025, the Court held a teleconference with counsel for the parties, in which it requested Defendant "notify the Court by letter whether it will consent to Plaintiff filing an appeal" to Aetna's May 1, 2025 Determination. (May 14, 2025 Minute Entry; text-only entry).

**Plaintiff's Response:**  Undisputed.

106.    On May 19, 2025, Defendant notified the Court that it consented to Plaintiff's submission of an administrative appeal to Aetna's May 1, 2025 Determination and submitted a proposed agreed schedule for Plaintiff's appeal and Aetna's response to that appeal. (Doc. 49.)

**Plaintiff's Response:**  Undisputed.

107.    On May 20, 2025, the Court issued a Memo Endorsement directing Plaintiff to file an administrative appeal to Aetna's May 1, 2025 Determination within ninety days, and directing Aetna to respond to Plaintiff's appeal within ninety days of receipt of that appeal. (Doc. 50.)

**Plaintiff's Response:**  Undisputed.

108.    On August 13, 2025, Plaintiff submitted an appeal to Aetna's May 1, 2025 Determination (the "August 13, 2025 Appeal") in which Plaintiff restated A.D.'s treatment history and Plaintiff's position that Plaintiff's claim for benefits for A.D.'s residential treatment at Sandhill, although provided by an out-of-network provider, should have nonetheless been

approved on a single case agreement basis because in-network residential treatment options were either unavailable and/or inappropriate. (DGIP001911-1922.)

**Plaintiff's Response:** Undisputed as to the contents of the August 13, 2025 Appeal. Disputed as to Defendant's characterization of the appeal as merely restating prior arguments. The appeal also included new evidence and new arguments, including letters from residential treatment specialists who personally visited the in-network facilities, letters from treating providers written in 2025, and arguments regarding the Court's Order, the Plan's express coverage requirements, and Aetna's application of undisclosed criteria not contained in the Plan. DGIP1911-1950.

109.    Plaintiff's August 13, 2025 Appeal also restated arguments previously made by Plaintiff in prior appeals relating to the in-network residential treatment facilities identified by Aetna for A.D.'s care, including Plaintiff's personal opinions about several of those facilities. (DGIP001916-1981.)

**Plaintiff's Response:** Undisputed as to the contents of the record. Disputed as to Defendant's characterization of Plaintiff's documented concerns about the in-network facilities as "personal opinions." The concerns raised by Plaintiff were based on information provided by the facilities themselves, and on the opinions of A.D.'s treating providers and residential treatment specialists who personally visited the facilities. DGIP1916-1918; DGIP1942-1944; DGIP1947-1948.

110.    Plaintiff's August 13, 2025 Appeal included letters from several of A.D.'s health care providers dated June or July 2025, and thus three years after those providers treated A.D and recommended he receive continuing care in a residential treatment facility. Those letters asserted – for the first time – those providers' opinions that Sandhill was the only appropriate residential treatment facility for A.D. in 2022. (DGIP001936-1948.)

**Plaintiff's Response:**  Undisputed as to the contents of the record. Disputed as to Defendant's characterization. The 2025 letters supplemented and elaborated on the providers' prior opinions recommending residential treatment at Sandhill. The statements that the in-network facilities were inappropriate for A.D. were consistent with the providers' prior recommendations. DGIP1936-1948. Additionally, letters from residential treatment specialists Dr. Russell Hyken and Jennifer Taylor who personally visited the proffered in-network facilities were submitted for the first time and provided direct knowledge of those facilities in addition to direct knowledge about A.D.'s clinical needs in 2022. DGIP1942-1944; DGIP1947-1948.

111.    Plaintiff's August 13, 2025 Appeal additionally reiterated Plaintiff's prior arguments that Sandhill satisfied the Plan's definition of "provider" and "residential treatment facility" and that the network adequacy requirements of the federal Affordable Care Act and New York State insurance regulations required Aetna to approve Plaintiff's claim for out-of-network coverage. (DGIP001915.)

**Plaintiff's Response:** Undisputed as to the contents of the record. Disputed as to Defendant's characterization.

112.    Plaintiff's August 13, 2025 Appeal also enclosed documents relating to Sandhill's licensure and certifications in November 2023 – which was more than a year after A.D.'s admission at Sandhill. (DGIP001949-50.)

**Plaintiff's Response:** Undisputed as to the contents of the record. Disputed as to Defendant's characterization. The Plan requires only that a residential treatment facility be "appropriately licensed by the state Department of Health or its equivalent." DGIP1682. Sandhill

was licensed at the time of A.D.'s admission. DGIP0136; 0890. The 2023 licensure certificates were the most recently available certificates and confirmed Sandhill's ongoing licensure status.

### J.   Aetna Considers All Materials Submitted by Plaintiff's Appeal, Provides a Full and Fair Review, and Denies Plaintiff's Claim for Benefits on Remand.

113.    On November 11, 2025, Aetna responded to Plaintiff's August 13, 2025 Appeal (the "November 11, 2025 Determination"). (DGIP001951-1966.)

**Plaintiff's Response:** Undisputed.

114.    Aetna's November 11, 2025 Determination was made by a licensed psychiatrist who is board certified in child and adolescent psychiatry and who was not previously involved in any prior Aetna determinations with respect to A.D.'s treatment or claims relating thereto, including Plaintiff's prior appeals (the "Appeal Reviewer"). (DGIP001951-1952.)

**Plaintiff's Response:** Undisputed as to the contents of the record. Disputed as to Defendant's characterization. The Appeal Reviewer never met or evaluated A.D., never visited any of the in-network facilities or Sandhill, and did not consult with a residential treatment specialist. DGIP1951-1966.

115.    The November 11, 2025 Determination entailed the Appeal Reviewer's review of the entire Administrative Record, including Plaintiff's August 13, 2025 Appeal and the documents submitted with it. (DGIP001951-1952.)

**Plaintiff's Response:** Undisputed as to the contents of the record. Disputed as to Defendant's characterization. Despite purporting to review the entire Administrative Record, the Appeal Reviewer failed to address Plaintiff's argument that Sandhill satisfied the Plan's express requirements for a residential treatment facility and failed to identify any Plan provision authorizing application of the Aetna criteria to restrict coverage. DGIP1921; 1961-1963.

116.    The November 11, 2025 Determination specifically and extensively addressed Plaintiff's arguments with respect to coverage for A.D.'s residential treatment at Sandhill, including Plaintiff's contentions with respect to network inadequacy and a single case agreement, as well as the materials submitted by Plaintiff with all prior appeals, including the August 13, 2025 Appeal. (DGIP001951-1966.)

**Plaintiff's Response:**  Disputed. The denial letter did not specifically or extensively respond to Plaintiff's appeal. The denial letter failed to address specific arguments raised in Plaintiff's appeal including that Sandhill satisfied the Plan requirements for coverage, the ACA requirements apply to Aetna's network used for the Deloitte benefit plan, and the Aetna criteria are not applicable and restrict coverage under the Plan.

117.    The Appeal Reviewer's November 11, 2025 Determination explained that as an out-of-network provider, Sandhill did not qualify for coverage under the terms of the Plan, nor was coverage for A.D.'s residential treatment at Sandhill necessary or appropriate on a single case agreement basis. (DGIP001951-1966.)

**Plaintiff's Response:**  Undisputed as to the contents of the record. Disputed as to Defendant's characterization. The denial letter ignored the actual Plan language and Plaintiff's argument that Sandhill satisfied the Plan requirements for coverage.

118.    Referencing Plan language, the Appeal Reviewer noted that the Plan expressly does not cover out-of-network care and explained that although Aetna retains discretion to enter into a single case agreement for coverage by an out-of-network provider, it also retains discretion to not do so, including when clinically appropriate in-network providers are available. (DGIP001953; DGIP001962-1964.)

**Plaintiff's Response:** Undisputed as to the contents of the record. Disputed as to Defendant's characterization. The denial letter ignored the actual Plan language and Plaintiff's argument that Sandhill satisfied the Plan requirements for coverage.

119.    The Appeal Reviewer specifically cited the Plan's Prior Authorization language, which permits Aetna to consider requests for out-of-network provider coverage through use of the utilization review process, including review of a requested service's clinical necessity, appropriateness, efficacy, or efficiency, and using utilization review techniques such as ambulatory review, prospective review, second opinion, certification, concurrent review, case management, discharge planning, retrospective review, or similar programs. (DGIP001963-1964.)

**Plaintiff's Response:** Undisputed as to the contents of the record. Disputed as to Defendant's characterization. The utilization review process is limited to evaluating clinical necessity, appropriateness, efficacy, or efficiency. It does not authorize Aetna to impose facility accreditation requirements or staffing criteria not contained in the Plan and which restricts coverage provided under the Plan.

120.    The Appeal Reviewer explained that Aetna's prior approval of a single case agreement for A.D.'s non-residential, outpatient, episodic therapy from an out-of-network provider did not necessitate or warrant approval of a single case agreement for clinically different, continuous, ongoing, and residential treatment for A.D. (DGIP001953.)

**Plaintiff's Response:** Undisputed as to the contents of the record. Disputed as to Defendant's characterization.

121.    The Appeal Reviewer also explained that the Affordable Care Act and insurance-related regulations cited by Plaintiff relating to out-of-network coverage are inapplicable to the Plan based on its self-funded status. (DGIP001953.)

**Plaintiff's Response:** Undisputed as to the contents of the record. Disputed as to Defendant's characterization. The Appeal Reviewer did not address Plaintiff's specific argument that the ACA requirements apply because Aetna uses the same provider network for both self-funded and insured plans. DGIP1915; 1953.

122.     The Appeal Reviewer concluded that the Plan provided clinically appropriate and available in-network residential treatment facility options for A.D.'s care such that no network deficiency existed, explaining that "a single case agreement to cover residential treatment services at Sandhill Center, an out-of-network provider, was not necessary, appropriate, or likely to provide cost savings or be more efficient when compared to a contracted in-network provider." (DGIP001954.)

**Plaintiff's Response:** Disputed. The record does not support the conclusion that clinically appropriate and available in-network options existed for A.D. For the entire United States, Aetna was able to identify only four in-network facilities that it claimed could have provided residential treatment to A.D. DGIP1954. Each of those facilities was unavailable and/or inappropriate for A.D. as confirmed by Plaintiff, his wife, A.D.'s treatment team, and residential treatment specialists who personally visited the facilities. DGIP1916-1918; DGIP1942-1944; DGIP1947-1948.

123.     The Appeal Reviewer thoroughly reviewed each of Plaintiff's arguments concerning each of the in-network RTCs researched and identified by Aetna in conjunction with A.D.'s discharge from Huntsman in 2022, including Plaintiff's claim that Aetna was unable to locate a clinically appropriate and available in-network RTC that would accept A.D. (DGIP001954.) In doing so, the Appeal Reviewer considered arguments contained in Plaintiff's

August 13, 2025 Appeal, the Administrative Record broadly (including the efforts made by Aetna's Care Advocate in 2022 to place A.D. in an appropriate in-network RTC), the letter provided by A.D.'s parents with Plaintiff's August 13, 2025 Appeal, and additional documents submitted with Plaintiff's August 13, 2025 Appeal, including letters written in in 2025 by various health care providers who treated A.D. in 2022. (DGIP0001954-1956.)

**Plaintiff's Response:** Disputed. The Appeal Reviewer did not thoroughly review Plaintiff's arguments or respond to all of Plaintiff's arguments or evidence. The Appeal Reviewer dismissed the detailed opinions of residential treatment specialists Dr. Hyken and Ms. Taylor without providing contrary evidence and without consulting a residential treatment specialist. DGIP1956. The Appeal Reviewer conducted a paper review without meeting or evaluating A.D. and without visiting any of the facilities. DGIP1951-1966.

124.    The Appeal Reviewer determined that at least four in-network RTCs were offered and available to provide clinically appropriate care to A.D. (DGIP001954.)

**Plaintiff's Response:** Disputed. The record does not support this determination. Each of the four facilities identified by the Appeal Reviewer was unavailable and/or inappropriate for A.D. The record shows that in-network facilities identified by Aetna were all inappropriate and/or unavailable to provide residential treatment to A.D. for the reasons cited in response to statement No. 40 above.

125.    More specifically, the Appeal Reviewer considered and responded to Plaintiff's arguments presented in the Administrative Record (including in the August 13, 2025 Appeal and supporting materials) regarding the clinical appropriateness and availability of each these four RTCs: Meridell Achievement Center; Oak Plains Academy; San Marcos Treatment Center; and Center for Discovery. (DGIP001955-1961.)

**Plaintiff's Response:** Disputed. The record does not support this determination. Each of the four facilities identified by the Appeal Reviewer was unavailable and/or inappropriate for A.D. The record shows that in-network facilities identified by Aetna were all inappropriate and/or unavailable to provide residential treatment to A.D. for the reasons cited in response to statement No. 40 above and DGIP1911-1922.

126.    The Appeal Reviewer further specifically considered and responded to Plaintiff's argument and the opinions A.D.'s health care providers submitted in 2025 (which Plaintiff included with the August 13, 2025 Appeal) that a single case agreement with Sandhill should be granted because the identified in-network RTCs were inadequate due to: untimely responses from the facilities; lengthy wait times; age restrictions; IQ restrictions; duration of treatment concerns; insufficient expertise in the treatment of A.D.'s conditions (including providing services to patients in a mixed milieu); and concerns about neglect or abuse in the facilities based on Plaintiff's Internet-based research. (DGIP001955-1962.)

**Plaintiff's Response:** Disputed. The Appeal Reviewer did not thoroughly review Plaintiff's arguments or respond to all of Plaintiff's arguments or evidence. Aetna did not dispute facts showing the in-network facilities were unavailable and inappropriate. Aetna did not dispute that Plaintiff received no return phone calls from Meridell or San Marcos. DGIP1957, 1959. Aetna did not dispute that Plaintiff was advised that Meridell and Center for Discovery did not accept children under age 11, and that A.D. was a newly turned 10-year-old who was emotionally immature for his age. DGIP1916, 1957, 1960. Aetna did not dispute that Plaintiff was informed that Oak Plains had a five-week wait and San Marcos had a six-to-eight week wait. DGIP1917, 1958-1959. Aetna did not dispute that the in-network facilities focused on short-term assessment

and stabilization rather than the intensive long-term care A.D. required. DGIP1957-1960. Aetna unreasonably dismissed safety concerns regarding Oak Plains. DGIP1958.

Aetna incorrectly claimed there was "no clinical evidence" that A.D.'s transfer to residential treatment was needed immediately. That claim is directly contradicted by Aetna's actions as set forth in Plaintiff's appeal: "[A.D.'s] need to transfer to residential treatment was accelerated when Aetna denied further benefits for [A.D.'s] hospitalization at Huntsman on October 3, 2022, and Huntsman unequivocally stated that [A.D.] was unsafe to return home." DGIP1917. Aetna did not address these facts in its decision.

Aetna failed to address Plaintiff's evidence on appeal that Aetna's secret criteria were unreasonable because they do not reflect the standard of care for mental health residential treatment in the treatment of mental illness in children. DGIP1921-1922, 1942-1944.

127.    The Appeal Reviewer explicitly noted that (1) any limitations on the search for in-network RTCs based on geography were based on Plaintiff's request in discussions with the Aetna Care Advocate; (2) in-network RTC options were considered available if the in-network RTC confirmed it would accept A.D. after taking into consideration A.D.'s age and individualized clinical factors; and (3) A.D.'s medical records did not present clinical evidence that A.D.'s transfer from Huntsman to a residential treatment facility was needed immediately, such that a reasonable transfer delay from Huntsman directly to a residential treatment facility could not be accommodated. (DGIP001956.)

**Plaintiff's Response:** Disputed. The record does not support this determination. The record shows that in-network facilities identified by Aetna were all inappropriate and/or unavailable to provide residential treatment to A.D. for the reasons cited in response to statement Nos. 40 and 126 above and DGIP1911-1922.

128.    The Appeal Reviewer relied on their certification in child and adolescent psychiatry, personal review of each of the identified facilities (including each facility's licensure, credentialing, and clinical program offerings), A.D.'s medical records (including A.D.'s age, personal clinical history, and diagnostic profile), the letters from A.D.'s parents and treating providers, and the Administrative Record in full, to determine that each of the four identified in-network RTCs was clinically appropriate to provide residential treatment care to A.D. and thus a network deficiency did not exist to warrant consideration of a single case agreement with an out-of-network provider. (DGIP001956-1961.)

**Plaintiff's Response:** Undisputed as to the contents of the record. Disputed as to Defendant's characterization and speculation as to what the Appeal Reviewer relied on for the determination.

129.    As to Meridell Achievement Center, the Appeal Reviewer determined that A.D.'s age and IQ did not preclude his admission, as confirmed by Aetna's Care Advocate and Meridell materials; Meridell offered sufficient duration of stay and clinically appropriate treatment; and Plaintiff's concerns relating to unspecified complaints of abuse and negligence involving Meridell were not supported by Aetna's review of Meridell as an in-network facility with regard to safety violations, licensure, and credentialing. (DGIP01956-1957.)

**Plaintiff's Response:** Disputed. The record shows that Plaintiff did not receive return phone calls from Meridell and that Meridell did not accept children under age 11. DGIP1916, 1957. Aetna did not dispute either of these facts. DGIP1957. The Appeal Reviewer's paper review contradicts information provided directly by Meridell to Plaintiff and his wife.

130.    The Appeal Reviewer concluded that "based on its licensure, credentialing, and clinical program offering, Meridell was suitable to provide appropriate Residential Treatment

Services to [A.D.]. Specifically, this facility provided physician-led behavioral and neurobehavioral programs using evidence-based, trauma-informed interventions, including family therapy to target dysregulation and aggressive behaviors, improving functioning at home and school." (DGIP01956-1957.)

**Plaintiff's Response:**  Disputed. The Appeal Reviewer's conclusion is not supported by the record for the reasons stated in response to statement No. 129 above.

131.    As to Oak Plains Academy, the Appeal Reviewer determined information provided by Oak Plains supported its suitability for admission of A.D., with specific consideration given to A.D.'s IQ and history of violent outbursts; that Oak Plains did not require demonstration of violent behavior as a clinical requirement for remaining at the facility; that concerns about short term discharge were not warranted because discharge was based upon completion goals; that Plaintiff's concerns of a reported patient death occurring at Oak Plains *after A.D.'s admission to Sandhill* was not supported by Aetna's review of Oak Plains as an in-network facility with regard to safety violations, licensure, and credentialing; and that Plaintiff's concern about a five-week admission delay was not supported by Aetna's own review and communications with Oak Plains when planning for A.D.'s discharge from Huntsman into RTC care. (DGIP01957-1958.)

**Plaintiff's Response:** Disputed. Aetna unreasonably dismissed safety concerns regarding Oak Plains. Plaintiff cited a published news article reporting the fatal overdose of two female adolescent patients at Oak Plains during the period Aetna recommended it for A.D. DGIP1917. Aetna claimed these deaths were not "substantiated by any authority" – a factually incorrect assertion, as the deaths were confirmed by the Montgomery County Sheriff's Office. DGIP1917. Rather than address this evidence, Aetna speculated that Oak Plains had "appropriate de-escalation and restraint procedures, if needed," without any acknowledgment of A.D.'s documented history

of violent behaviors toward peers of lower IQ, which was precisely the population Oak Plains served.[3] DGIP1958. The Appeal Reviewer's paper review also contradicts information provided directly by Oak Plains to Plaintiff and his wife regarding a five-week wait list. DGIP1958.

132.    The Appeal Reviewer concluded that Oak Plains "was suitable to provide appropriate Residential Treatment Services to [A.D.]. Specifically, this facility is a trauma-informed psychiatric residential treatment program for children ages 7 to 17 struggling with emotional and behavioral issues, highlighting family therapy as part of its interventions." (DGIP01958-1959.)

**Plaintiff's Response:**  Disputed. The Appeal Reviewer's conclusion is not supported by the record for the reasons stated in response to statement No. 131 above.

133.    As to San Marcos Treatment Center, the Appeal Reviewer determined San Marcos was responsive and communicative with Aetna regarding admission of A.D.; that San Marcos offers adequate round the clock treatment for autism spectrum disorders as presented by A.D. and including for A.D.'s age; that the 2025 letters from various physicians who treated A.D. three years earlier (and which were submitted years after A.D.'s admission to RTC care) alleging San Marcos was not appropriate and "more of a hospital program" were not supported by San Marcos' treatment offerings and modalities, as A.D. would not have been treated alongside older patients receiving treatment for alcohol dependency, or that A.D.'s treatment would have been limited to an insufficient duration; and that the longer waitlist of San Marcos was common and is often

---

[3] Defendant also dismisses the deaths at Oak Plains as occurring after A.D.'s admission to Sandhill. Plaintiff raised safety concerns about Oak Plains before A.D.'s admission to Sandhill. DGIP1765 ("I am very concerned to learn that two of the places recommended (Oak Plains and North Spring) seem to have multiple allegations of harming children in their care."). The subsequent death of two patients at Sandhill confirms Plaintiff's fears were justified.

accommodated after a follow-up to determine if a faster admission can be provided. (DGIP001956; DGIP001959-1960.)

**Plaintiff's Response:** Disputed. Aetna did not dispute that Plaintiff did not receive return phone calls from San Marcos. DGIP1917; 1959. Aetna dismissed reports from residential treatment specialist Dr. Hyken who reported that San Marcos was "more of a hospital program." DGIP1959. Aetna did not dispute that San Marcos had a six-to-eight week wait. DGIP1959.

134.    The Appeal Reviewer concluded that, "based on its licensure, credentialing, and clinical program offering, San Marcos was suitable to provide appropriate Residential Treatment services to [A.D.]. Specifically, this facility provided physician-led, evidence-based child-centered interventions including weekly family therapy to target dysregulation and aggressive behaviors, improving functioning at home and school." (DGIP001960.)

**Plaintiff's Response:**  Disputed. The Appeal Reviewer's conclusion is not supported by the record for the reasons stated in response to statement No. 133 above.

135.    As to Center for Discovery, the Appeal Reviewer determined the facility would have accepted A.D., with consideration of his age and his diagnosis, as Center for Discovery treated 10-year-old patients and the full range of behavioral health issues and psychiatric disorders; that its many different treatment units and programs supported separate (i.e., not mixed) clinical populations, including by age, diagnosis, and gender, such that A.D. would receive clinically appropriate, individualized care; and that treatment was not subject to predetermined time limits. (DGIP001960-1961.)

**Plaintiff's Response:** Disputed. Residential treatment specialist Ms. Taylor, who personally toured Center for Discovery, reported that it did not treat patients with ASD. DGIP1948. Dr. Tatti also confirmed that the programs offered by Aetna were not appropriate for A.D.

DGIP1937. Aetna rejected Ms. Taylor's reports without offering contrary evidence. DGIP1960. Aetna also did not dispute that Center for Discovery did not accept children under age 11 and that A.D. was newly age 10 and emotionally immature for his age. DGIP1916, 1960.

136.    The Appeal Reviewer concluded that, "Center for Discovery was able to accept a 10-year-old . . . they operate 8–10 facilities nationwide that provide physician-led, evidence-based residential care for complex child and adolescent mental health disorders, offering five to six hours of daily psychotherapy and weekly psychiatric visits." (DGIP001961.)

**Plaintiff's Response:**  Disputed. The Appeal Reviewer's conclusion is not supported by the record for the reasons stated in response to statement No. 135 above.

137.    The Appeal Reviewer further concluded that even if a network deficiency did exist, Sandhill nonetheless would not be appropriate for coverage on a single case agreement basis. (DGIP001961-1962.)

**Plaintiff's Response:** Disputed. Sandhill satisfied the Plan's requirements for a residential treatment facility as a state licensed residential treatment center. DGIP0136, 0890, 1682, 1752. Aetna's criteria are not contained in the Plan and Aetna did not identify any Plan provision authorizing their application. DGIP1921, 1961-1963.

138.    In response to Plaintiff's arguments that Sandhill satisfied the Plan's definitions of "provider" and "residential treatment facility," the Appeal Reviewer explained that the Plan expressly excludes Sandhill from coverage as an out-of-network provider, and exception-based coverage was confined to the prior authorization utilization review process. (DGIP001953 (quoting DGIP001667): "if you choose to receive Covered Health Services from an Out-of-Network provider, you are responsible for obtaining prior authorization before you receive the services.")

**Plaintiff's Response:** Disputed. The Appeal Reviewer did not address or acknowledge the Plan language requiring only state licensure for residential treatment facilities (DGIP1682, 1752), did not address the claim that Sandhill met the Plan requirements (DGIP0136, 0890), and did not identify any Plan provision authorizing application of the Aetna criteria. DGIP1921, 1961-1963.

139.    The Appeal Reviewer reiterated the quality control and safety criteria considered by Aetna in the utilization review process for approval of single case agreements for out-of-network RTC care, which had been previously provided to the Plaintiff: "Included in those criteria are that the out-of-network residential treatment facility 'be accredited by one of the following agencies, commissions or committees for the services being provided: The Joint Commission (TJC), Committee on Accreditation of Rehabilitation Facilities (CARF), American Osteopathic Association's Healthcare Facilities Accreditation Program (HFAP), or the Council on Accreditation (COA); or is credentialed by Aetna.' The criteria further provide that in addition to accreditation, a licensed behavioral health provider must be actively on duty at the facility 24 hours per day for 7 days a week; the patient must be treated by a psychiatrist at least once per week; and the facility's medical director must be a psychiatrist." (DGIP001868-1910; DGIP001961-1962.)

**Plaintiff's Response:** Undisputed as to the contents of the record. Disputed as to Defendant's characterization. The Aetna criteria are not referenced in or authorized by the Plan. Aetna did not identify any Plan provision authorizing application of the Aetna criteria. DGIP1951-1966.

140.    The Appeal Reviewer explained why Aetna determined that Sandhill did not meet such criteria at the time of A.D.'s discharge planning from Huntsman: "it was not accredited or credentialed as required by the criteria, it did not have a licensed behavioral health provider actively on duty 24/7, [A.D.] was not being treated by a psychiatrist at least one time per week

since his admission, and Sandhill Center's medical director was not a psychiatrist." (DGIP001961-1962.)

**Plaintiff's Response:** Undisputed as to the contents of the record. Disputed as to Defendant's characterization. The Plan does not require accreditation by organizations, 24/7 licensed behavioral health care provider actively on duty, weekly psychiatrist visits, or a psychiatrist medical director. DGIP1682, 1752. Sandhill satisfied the Plan's requirements for a provider, residential treatment center, and treatment center. DGIP0136; 0890.

141.    The Appeal Reviewer also explained that Sandhill's treatment approaches and techniques (including basing patient care on the Neurosequential Model of Therapeutics) did not have adequate support of the academic and clinical community for purposes of best accepted standard of care, prohibiting eligibility for Aetna's provider network or approval on a single case agreement basis. (DGIP001962.)

**Plaintiff's Response:** Undisputed as to the contents of the record. Disputed as to Defendant's characterization. The record does not support the Appeal Reviewer's statements.

142.    The Appeal Reviewer acknowledged the opinions stated by A.D.'s health care providers in their June/July 2025 letters that Sandhill was the only appropriate option for A.D. in 2022 and noting that as of 2025 (and thus after A.D.'s discharge from Sandhill), Sandhill was licensed in New Mexico, focused on children with clinical profiles like A.D., and that staffing was adequate. (DGIP001962.) The Appeal Reviewer also acknowledged that the foregoing providers and A.D.'s parents opined that Meridell Achievement Center, Oak Plains Academy, San Marcos Treatment Center, and Center for Discovery were not appropriate for A.D. and that Sandhill was more appropriate due to perceived inadequacies in each identified in-network RTC (for example, A.D.'s age, the RTC's therapeutic focus, or clinical milieu). (DGIP0001956.) The Appeal

Reviewer explained that such opinions were considered, but even if accepted, they could not override Aetna's minimum safety clinical standards for coverage, as had been previously explained in earlier communications to Plaintiff. (DGIP001956; 1962.)

**Plaintiff's Response:** Disputed. The Appeal Reviewer dismissed the detailed and particularized opinions of A.D.'s treating providers and residential treatment specialists without providing contrary clinical evidence, without consulting a residential treatment specialist, and without visiting the facilities.

143.    Based on the foregoing, the Appeal Reviewer concluded that the utilization review process parameters would not authorize coverage for Sandhill, even in the event of a network deficiency, on a single case agreement basis. (DGIP001962.)

**Plaintiff's Response:**  Disputed. The utilization review process does not authorize Aetna to impose accreditation and staffing requirements not contained in the Plan. The Plan's utilization review process is limited to evaluating clinical necessity, appropriateness, efficacy, or efficiency. DGIP1667-1668. Sandhill satisfied the Plan's requirements for a residential treatment facility. DGIP0136, 0890, 1682, 1752.

144.    Relying on Plan terms, including Schedule of Benefits, Prior Authorization, and Interpretation of Benefits, the Appeal Reviewer determined that at least four clinically appropriate in-network options for A.D.'s residential treatment were available and thus there was no network deficiency, and that even if there was a network deficiency, coverage for Sandhill as an out-of-network provider on a single case agreement basis was not appropriate, and therefore Aetna's denial of coverage decision must be upheld. (DGIP001961-1964.)

**Plaintiff's Response:** Undisputed as to the contents of the record. Disputed as to Defendant's characterization. The record does not support the Appeal Reviewer's conclusions.

## PLAINTIFF'S STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS

A.      ERISA Plan

1.      A.D. is a covered dependent under the Plan pursuant to his father's employment with the plan sponsor, Deloitte LLP. DGIP1651-1757.

2.      The Plan is described in the "Aetna Open Access Select EPO Plan Summary Plan Description (SPD)" (hereinafter "SPD"). DGIP1651.

3.      The SPD provides general information about the Plan and does not cover all provisions, limitations, and exclusions. DGIP1655.

4.      The SPD states that it does not provide benefits for out-of-network providers except on a limited basis. *i.e.* DGIP1663, 1669.

5.      The SPD does not list services from out-of-network providers as an exclusion. DGIP1705-1706.

6.      The SPD provides benefits for residential treatment for patients of patients diagnosed with mental health disorders. DGIP1682.

7.      The SPD requires that residential treatment facilities must be "appropriately licensed by the state Department of Health or its equivalent." DGIP1682.

8.      The SPD defines a "provider" as "a facility licensed or certified by law to provide health care services to you." DGIP1752.

9.      The SPD requires prior authorization before receiving services from an out-of-network provider and for residential treatment. DGIP1667, 1668.

B.      A.D.'s Mental Illness and Treatment History

10.     In October 2022, A.D. was a 10-year-old boy with mental health diagnoses including ASD, major depressive disorder, attention deficit hyperactivity disorder ("ADHD"),

generalized anxiety disorder, mood dysregulation disorder, and oppositional defiant disorder. DGIP0130-0131, 0146, 0150.

1.    Early Childhood Development and Diagnoses

11.    At age 3, A.D. was diagnosed with ASD and began receiving applied behavior analysis ("ABA") therapy 20 to 25 hours per week. DGIP0131, 1857.

12.    At age 5, A.D. was diagnosed with ADHD. DGIP0131.

13.    At age 7, A.D.'s aggressive incidents increased and much of ABA therapy became focused on maintaining safety. DGIP0131.

2.    Hospitalizations

14.    In March 2019, Plaintiff and his wife took A.D. (age 7) to the emergency department due to increasing violence at home. DGIP0131, 0182.

15.    A.D. was hospitalized in the general pediatric unit awaiting a psychiatric bed. DGIP0131, 0182.

16.    A.D. was emotionally dysregulated and alternatively cried for and attached his mother: "Furniture and equipment had to be removed from his room. He attacked the social worker when she asked to speak with his mother outside the room." DGIP0131, 0182.

17.    A.D. was transferred to a psychiatric hospital and hospitalized for nine weeks due to ongoing concerns about his ability to remain safe. DGIP0131, 0181.

18.    A.D.'s outbursts gradually decreased but he "continued to endorse thoughts of killing certain staff members and made lists of those he wanted to hurt." DGIP0182.

19.    Following hospitalization, A.D. was admitted to residential treatment for approximately six weeks. DGIP0131, 0182.

20.     In residential treatment, A.D. did not act out. DGIP1816. However, "every time he spoke to his parents he would discuss how he wanted to kill certain staff members and would describe how he would do so." *Id.*

21.     Following residential treatment, in June 2019, A.D. was admitted to the University of Utah's Huntsman Center ("Huntsman") Comprehensive Assessment and Treatment ("CAT") Program for diagnostic assessment and recommendations for treatment. DGIP0131, 0181.

22.     The reason for hospitalization was stated as: "Risk of harm toward others." DGIP0181.

23.     It was reported that over the past year, A.D.'s tantrums became so severe that his mother and brother had to lock themselves in their rooms to stay safe. DGIP0181.

24.     A.D. hit, kick, bit, and tried to strangle others and threatened to kill his mother, brother, and in-home therapists. DGIP0181.

25.     The behaviors occurred during emotional outbursts but A.D. also hurt others when he was calm. DGIP0181.

26.     A.D. reported seeing and hearing things that do not exist. DGIP0181-0182.

27.     A.D. was hospitalized for his safety and the safety of others. DGIP0184.

28.     During his treatment, A.D. did not demonstrate physical aggression but did make several statements about wanting to kill or harm staff or peers including wanting to shoot a staff member in the heart and writing a "death list" which described wanting to hurt specific staff members. DGIP0200.

29.    Following the CAT Program, A.D. stepped down to the University of Utah's Kidstar partial hospitalization, followed by outpatient treatment, followed by hospitalization again. DGIP0131.

30.    During this time, Plaintiff and his family relocated to Salt Lake City, Utah, for A.D. to attend the partial hospitalization while living at home. DGIP0131, 0208.

31.    In February 2021, A.D.'s condition worsened and he was hospitalized at Huntsman three times over the following six months. DGIP0131.

32.    When A.D. attempted to return to in-person school in the fall of 2021, he had multiple daily incidents of "out-of-control" and aggressive behaviors escalated continuously including property destruction, physical aggression, and threats toward peers and adults. DGIP0131-0132, 1786, 1812.

33.    A.D. tried to cut a peer with scissors, punched other children at summer camp, tried to strangle his behavioral therapist, threw things at them, threw a four-year-old across a sport court, and hit a six-year-old while on vacation. DGIP0157, 1800.

34.    A.D. had been eloping from his 1:1 aide at school and having outbursts of screaming and threatening to kill himself at recess. DGIP0156.

35.    A.D. has also hit and tried to strangle babysitters. DGIP1800.

36.    ABA therapy was inconsistently provided due to the provider being unable to locate staff that were willing to treat A.D. due to his aggression. DGIP0157, 1786, 1812.

37.    According to the ABA therapist, A.D. "displayed malicious behavior and can often hold onto negative feelings for an extended period of time without indication or sign of anger; He does not display remorse once the malicious act has been committed." DGIP1858.

38.    By September 2022, A.D.'s condition further escalated. DGIP0132, 0156, 1812.

39.     A.D. was physically violent with his parents and brother and he had homicidal and suicidal ideation at home and school. DGIP0132, 0156, 1812.

40.     A.D. had suicidal intent with a plan to drown himself in a pool, jump out a window, or strangle himself. DGIP0156, 0157.

41.     A.D. regularly banged his head, punched and kicked his mother, threatened his brother with a knife, repeatedly slapped his mother and brother out of the blue, attempted to strangle his mother, and choked a child at school. DGIP1175, 0156, 0158.

42.     A.D.'s brother, B.D. age 7, was psychiatrically hospitalized due to trauma from his brother's aggression, which included A.D. punching him in the face causing his nose to bleed. DGIP0156-0158, 1175, 1797.

43.     Plaintiff and his wife were afraid of A.D. DGIP1797.

44.     On September 6, 2022, A.D. was hospitalized at the University of Utah's Huntsman Mental Health Institute ("Huntsman"). DGIP0155, 1175.

45.     This was A.D.'s seventh admission to Huntsman. DGIP0156.

46.     Huntsman provided a timeline of the major milestones of A.D.'s life including treatment history, diagnosis, and interventions. DGIP0170-0172.

47.     The Huntsman treatment team and outpatient providers unanimously recommended long-term residential treatment for A.D. DGIP0130, 0132, 0146, 0148, 0152, 0154, 0167.

48.     A.D. reported that he was at Huntsman because "something really sudden happened and I got mad at my brother, and I got out a steak knife and told him I was going to kill him." DGIP0155.

49.     At this time, A.D.'s providers and caregivers withdrew their services. DGIP0131.

50. The ABA provider withdrew its services because their staff did not feel safe after prior incidents with A.D. DGIP1786.

51. The ABA provider raised concerns that A.D.'s behavior may be a threat to B.D. as well as Plaintiff and his wife. DGIP1786.

52. A.D.'s nanny service determined that the nanny needed to leave the home for her safety. DGIP1787.

53. The treatment team at Huntsman and two outpatient clinical psychologists recommended that A.D. be admitted to residential treatment directly from the hospital, without any time at home, for the safety of A.D.'s family. DGIP0146, 0148, 0154.

54. The care plan was to have A.D. transferred and admitted to residential treatment within two weeks from September 15, 2022. DGIP1797.

C.     Aetna In-Network Providers Were Unavailable and/or Inappropriate for A.D.'s Residential Treatment

56. Plaintiff and his wife contacted Aetna for assistance locating a residential treatment facility. DGIP1812.

57. Plaintiff and his wife informed Aetna that they were afraid that A.D. would hurt a family member. DGIP1812.

58. Plaintiff and his wife enlisted the aid of a placement consultant to assist in reviewing the residential treatment facilities offered by Aetna. DGIP0132.

59. Plaintiff and his wife searched for a facility that would meet their son's immediate and long-term needs and satisfy the treatment recommendations: long-term residential treatment for a 10-year-old boy with several mental health diagnoses, including ASD, and history aggressive and violent behaviors towards family, peers, and staff. DGIP0132.

60.     Plaintiff advised Aetna that A.D. is "highly triggered by children who have low IQ and are very low functioning and is likely to hurt them." DGIP1835.

61.     Discovery Mood, TX (aka Center for Discovery) was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: 2-4 week wait, did not treat children with ASD, A.D. was too young for their program, did not accept children under age 11, short-term stabilization and assessment, not a long-term program, placed patients in mixed milieu (patients diagnosed mental health disorders placed with patients diagnosed with substance abuse disorder). DGIP0132, 1775, 1815, 1854.

62.     Meridell, TX was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: A.D. was too young for their program, did not accept children under age 11, did not respond to telephone calls from Plaintiff. DGIP0132, 1825.

63.     Kennedy Krieger, MD was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: hospitalization only, not a residential treatment program. DGIP0132, 1817.

64.     Oak Plains Academy, TN was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: five week wait, short term program, allegations of children harmed in the facility, accepts patients with very low IQ which did not describe A.D. DGIP0132, 1765.

65.     San Marcos Treatment Center was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: six to eight week wait, did not respond to telephone calls from Plaintiff, allegations of child abuse and riots. DGIP0133, 1764, 1765.

66.     North Springs Behavioral Health, VA was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: did not accept children outside of

Virginia, allegations of children harmed in the facility including a child who died during improper restraints, no response to Aetna's inquiry. DGIP0133, 1765, 1781, 1787.

67.     Texas Neurorehab was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: would not accept because A.D.'s IQ was too high, facility worked with developmentally delayed patients and A.D. would not be appropriate. DGIP1764.

68.     Provo Canyon School was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: A.D. was too young for their program. DGIP1766.

69.     Willow Springs was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: A.D. was too young for their program, minimum age is 12. DGIP1768.

70.     Pathlight Mood and Anxiety Center was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: A.D. was too young for their program, minimum age is 12. DGIP1776.

71.     BellFaire was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: waitlist extends "well into 2023." DGIP1792.

72.     Millcreek of Pontotoc was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: no response to Aetna's inquiry. DGIP1793.

73.     Harbor Point Behavioral Health Center was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: unable to accommodate a patient with an ASD diagnosis. DGIP1807.

74.    Youthcare was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: A.D. was too young for their program, minimum age is 11. DGIP1818.

75.    Great Circle was inappropriate and/or unavailable to provide residential treatment to A.D. for the following reasons: six to eight month wait. DGIP1839.

76.    Aetna conceded it had no network provider within 100 miles of Plaintiff's home. DGIP 1797.

77.    Then Aetna conceded it had no network provider within the entire state of Utah. DGIP1792.

78.    Then Aetna emailed Plaintiff and his wife on September 20, 2023 stating that "the results of the provider search did not yield anything" and would they be "willing to enroll the member in RTC out of state." DGIP1792.

79.    Plaintiff found two residential facilities that were appropriate for A.D. and would accept him as a patient: Sandhill and Intermountain Academy. DGIP0133.

80.    Intermountain Academy declined to accept A.D. because his level of violence was too high. DGIP0133.

81.    Sandhill which would accept A.D. as a patient and was in New Mexico which was driving distance from their home in Utah. DGIP0133.

82.    Sandhill is fully licensed as a residential treatment center by the State of New Mexico. DGIP0136, 0890.

83.    On October 3, 2022, Aetna denied further benefits for A.D.'s hospitalization at Huntsman. DGIP1826.

84.    Plaintiff informed Aetna that A.D. was not safe out of the hospital and not safe to return home. DGIP1825-1826.

85.    Plaintiff arranged for A.D.'s admission to Sandhill on October 11, 2022, the soonest he could be admitted. DGIP1826.

D.    A.D.'s Admission to Residential Treatment and Request for Benefits

86.    On October 11, 2022, A.D. was discharged from Huntsman and admitted directly to Sandhill for residential treatment. DGIP0131.

87.    Plaintiff requested Aetna approve benefits for A.D.'s residential treatment at Sandhill. DGIP0130.

88.    Plaintiff also requested a single case agreement ("SCA") for Sandhill to be covered as an in-network provider due to the unavailability of a network provider. DGIP0136.

1.    Aetna's Denial of Benefits

89.    In an October 17, 2022 letter, Aetna denied benefits for the sole reason that "this is not a covered service under the terms of the plan." DGIP0011-0012.

90.    Aetna agreed residential treatment was medically necessary. DGIP0134, 1175.

2.    Plaintiff's First Appeal

91.    On November 14, 2022, Plaintiff submitted a written expedited appeal. DGIP0126-0226.

92.    Plaintiff provided A.D.'s mental health and treatment history, letters of support from treatment providers, psychiatric evaluation and treatment records, correspondence with Aetna, and Sandhill treatment plan for A.D. DGIP0126-0226.

93.    The appeal documented the above treatment history. DGIP0126-0226.

94.     In his appeal, Plaintiff explained that he researched and contacted the facilities provided by Aetna and none of the facilities were available or appropriate to provide residential treatment to A.D. for various reasons (detailed above), including: would not accept a child as young as 10 years old, would not accept a child with ASD diagnosis, not a residential program, a short-term stabilization program and did not provide long-term care, did not return calls to Plaintiff, and/or would not accept treatment of a child who lived out-of-state. *i.e.* DGIP0132-0133.

95.     Plaintiff requested that Aetna approve Sandhill for a single case agreement because it was a fully licensed residential treatment center, met A.D.'s treatment needs, was willing to accept him, and was located in a neighboring state. DGIP0133.

96.     Plaintiff provided letters from A.D.'s treatment providers. DGIP0126-0226.

97.     Plaintiff provided a letter from Dr. Ryan Cephas, Child Psychiatrist at Huntsman, and Maggie Blau, LCSW Youth Inpatient Social Worker at Huntsman. Dr. Cephas and Ms. Blau treated A.D. on an inpatient basis and in day treatment at Huntsman. DGIP0146.

98.     Dr. Cephas and Ms. Blau wrote: "The inpatient treatment team is recommending that [A.D.] transition to a residential treatment facility to address aggression, mood, family relationships, and ASD. . . He is not safe to discharge home prior to finding next placement due to unsafe behaviors and danger to family members." DGIP0146.

99.     Plaintiff provided a letter from Dr. Anne Tatti, Clinical Psychologist. Dr. Tatti wrote that A.D. had been in her care since October 2019 and she has seen him two times per week during the past three years. DGIP0148.

100.     Dr. Tatti wrote that over the past three months A.D. had become increasingly aggressive and threatening. DGIP0148.

101.    Dr. Tatti wrote that A.D.'s target when aggressive or violent had always been his family and particularly his younger brother. DGIP0148.

102.    Dr. Tatti wrote that B.D. "endured numerous assaults at the hands of [A.D.], including being hit, pushed, choked and most recently threatened with a knife. DGIP0148.

103.    Dr. Tatti wrote that during this most recent incident with the knife, [A.D.] reportedly stated to his brother, 'I am going to kill you in real life' and then secured a knife from the kitchen." DGIP0148.

104.    Dr. Tatti wrote that she agreed with A.D.'s inpatient treatment team and outpatient ABA team that residential treatment was the appropriate level of care. DGIP0148.

105.    Dr. Tatti wrote that while he needed to be hospitalized and not discharged back home because B.D.'s "physical as well as mental well being are at severe risk if [A.D.] is allowed to re-enter the home before a transfer to Residential Treatment is secured." DGIP0148.

106.    Dr. Tatti wrote that although A.D. worked well in treatment and made progress, "his inclination towards aggression and violence has remained." DGIP0150.

107.    In the summer of 2022, A.D. became "increasingly aggressive and threatening" which culminated in A.D. brandishing a knife in front of his family. DGIP0150.

108.    Dr. Tatti wrote that A.D.'s propensity towards aggression and threats remained a serious concern and "needs to be addressed in a higher level of care" and recommended that he be transferred to residential treatment. DGIP0150.

109.    Plaintiff provided a letter from Lavere Harward, Board Certified Behavior Analyst, an ABA therapist for A.D. Mr. Harward recommended that A.D. be committed to a residential treatment facility due to the severity of behaviors witnessed during treatment, and safety concerns for A.D. and his family. DGIP0152.

110.    Mr. Harward wrote that he observed "[m]ultiple instances of calculated, patient, and malicious behavior" by A.D. DGIP0152.

111.    Mr. Harward further wrote that A.D. "is extremely patient and selective when he decides to act with ill intent, and can often hold onto negative/malicious feelings for extended periods of time without indication or sign of anger, nor remorse once the act has been committed." DGIP0152.

112.    Plaintiff provided a letter from B.D.'s psychologist, Pamela C. Wilkison, Licensed Psychologist. DGIP0154.

113.    Ms. Wilkison treated B.D. due to the traumatic experiences living with this brother. DGIP0154.

114.    Ms. Wilkison wrote that she witnessed some of A.D.'s interactions with his brother and that B.D. "was assaulted numerous times over the years, including being choked, threatened with a knife, pushed down. hit, and bit. He's endured verbal threats of harm, put downs, and comments about fears to believe." DGIP0154.

115.    She wrote that it "is imperative that [A.D.] remain hospitalized until he can enter residential treatment, without any time at home, for [B.D.'s] safety and psychological well-being." DGIP0154.

116.    Plaintiff requested that Aetna immediately approve benefits for A.D.'s residential treatment at Sandhill and approve a SCA for Sandhill. DGIP0136.

      3.    <u>Aetna's Denial of Plaintiff's First Appeal</u>

117.    In a December 14, 2022 letter, Aetna denied Plaintiff's first appeal for the sole reason that "your plan does not cover out of network benefits." DGIP0871.

118.    Aetna denied the request for a single case agreement without explanation.
DGIP0871.

### 4.    Plaintiff's Second Appeal

119.    On February 22, 2023, Plaintiff submitted a written second level appeal.
DGIP0881-1000.

120.    Plaintiff explained that Aetna does approve services with out-of-network
providers when an in-network provider is unavailable, as demonstrated by Aetna's approval of
A.D.'s out-of-network psychologist, Dr. Tatti, for several years. DGIP0882, 0888.

121.    Plaintiff wrote that the Plan did not disclose how it complied with Paul Wellstone
and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA")
despite Plaintiff's request. DGIP0883.

122.    Plaintiff further wrote that the ACA required Aetna to provide a sufficient
provider network without unreasonable delay. DGIP0882.

123.    Plaintiff explained that the facilities offered by Aetna were unavailable or
inappropriate for A.D. DGIP0885-0886.

124.    Plaintiff requested that Aetna immediately approve benefits for A.D.'s residential
treatment at Sandhill. DGIP0890.

125.    Subsequently, Plaintiff emailed Aetna and wrote that A.D. "is at Sandhill because
his entire medical team recommended it, and none of the programs on Aetna's in-network list
were appropriate, and you haven't given us any reasonable alternatives." DGIP1789.

### 5.    Aetna's Denial of Plaintiff's Second Appeal

126.    In a February 28, 2023 letter, Aetna denied Plaintiff's second and final appeal for the sole reason that "the plan does not cover services performed by out-of-network providers." DGIP1132-1134.

127.    Again, Aetna did not acknowledge, address, or dispute arguments raised in Plaintiff's appeal, including Plaintiff's contention that the facilities Aetna recommended to Plaintiff were inappropriate and/or unavailable for residential treatment for A.D. and that the Plan did approve out-of-network providers for A.D., *e.g.* Dr. Tatti. DGIP1132-1134.

128.    On March 1, 2024, A.D. discharged from Sandhill. Plaintiff paid the cost of A.D.'s treatment at Sandhill. Green Decl., ¶ 2.

E.      The Court's Order and Remand to Aetna

129.    On February 24, 2025, this Court issued a Memorandum Opinion and Order ("Order") denying Defendant's Motion for Summary Judgment and granted Plaintiff's Cross-Motion in part. ECF No. 44.

130.    The Court determined Aetna's decision to deny benefits was arbitrary and capricious and rendered "without reason," and remanded for a new review by Aetna. *Id.* at p. 6.

Aetna Denied Benefits on Remand

A.      Aetna's Denial

131.    Aetna issued a new decision denying benefits on May 1, 2025. DGIP1862-1910.

132.    Aetna claimed there were "multiple suitable in-network residential treatment facilities available to promptly accept" A.D. for treatment and named three facilities: Meridell Achievement Center, Oak Plains Academy, and Center for Discovery.[4] DGIP1863.

---

[4] Aetna would include fourth facility, San Marcos Treatment Center, in its appeal denial. DGIP1959-1960.

133.    Aetna did not cite or address the Plan language describing the requirements for coverage of mental health services at residential treatment facilities[5], or the Plan definition of a healthcare provider[6] despite Plaintiff specifically quoting the applicable Plan language in his appeals. DGIP0134, 0887.

134.    Aetna claimed that it would not authorize Sandhill for A.D.'s residential treatment because it contended Sandhill did not meet Aetna's criteria in "Aetna Criteria for Recognizing Non-Contracted Residential Treatment Facilities: ALIC (Traditional Plans) – Residential Treatment Facility (Mental Disorders) – ALIC (Traditional), effective for Plan year 2022" ("Aetna ALIC Criteria"). DGIP1863.

135.    Aetna did not explain its application of the Aetna ALIC Criteria instead of the Plan terms. DGIP1863.

136.    Aetna claimed it had no obligation to comply with the Affordable Care Act ("ACA"). DGIP1863.

137.    Aetna claimed the Plan did not specifically provide for SCAs and that it made the correct decision to not offer a SCA based on Aetna's "National Clinical Services (NCS) 512 Non-Participating Provider Requests for In-Network Benefits Policy and Procedure." ("Aetna NCS Criteria"). DGIP1863.

B.    Plaintiff's Appeal

138.    Plaintiff appealed Aetna's decision on August 13, 2025. DGIP1911-1950.

_____

[5] DGIP1682 ("This Plan covers room and board at the semi-private room rate and other services and supplies provided during your stay in a psychiatric hospital or residential treatment facility, appropriately licensed by the state Department of Health or its equivalent.").

[6] DGIP1752 ("A physician, health professional, person, or facility, licensed or certified by law to provide health care services to you. If state law does not specifically provide for licensure or certification, they must meet all Medicare approval standards even if they don't participate in Medicare.").

139.    Plaintiff wrote that the Plan provides for SCAs, citing this Court's Order: "The Plan provides for such an exception, *see* DGIP 1667-1668 (discussing procedures for the receipt of "Covered Health Services from an Out-of-Network provider"). . ." ECF No. 44 at p. 7.

140.    Plaintiff wrote that Aetna routinely approved SCAs for A.D.'s outpatient psychologist. DGIP1915, fn 3.

141.    Plaintiff wrote that the ACA requires insurers, such as Aetna, to maintain sufficient provider networks. DGIP1915.

142.    Plaintiff wrote that the ACA requirements apply to Aetna's provider network which has the same provider network for insured plans and self-funded plans. DGIP1915.

143.    Plaintiff wrote that the New York State Department of Financial Services ("DFS"), which regulates health insurance policies issued in New York, provides guidance as to the network adequacy requirements. DGIP1915.

144.    Plaintiff wrote that the facilities named by Aetna were unavailable and/or inappropriate for A.D., as confirmed by Plaintiff, his wife, and A.D.'s treatment team. DGIP1916.

145.    Plaintiff provided a detailed explanation of the research of, and communications with, each in-network facility named by Aetna, confirming that none were available and/or appropriate to treat A.D. DGIP1916-1918.

146.    Plaintiff's provided letters from Dr. Russell Hyken and Ms. Jennifer Taylor, residential treatment specialists, who have years of experience assisting with the placement of patients into residential facilities. DGIP1942-1943 (Dr. Hyken: "I am deeply knowledgeable about Sandhill and other treatment programs. . . I have visited and worked with multiple facilities that were recommended on this list."); DGIP1947 (Ms. Taylor: "We are a residential specialist

and therapeutic educational advocacy group for children between the ages of 6 and 24. Our practice has been consulting since 2016. Our practice visits and tours over 120 programs a year including some of the noted programs below.").

147.    Dr. Hyken and Ms. Taylor provided information about each in-network facility identified by Aetna and confirmed that none were available and/or appropriate to treat A.D. DGIP1942-1944, 1947-1948.

148.    Plaintiff explained that A.D.'s treatment team recommended Sandhill as the only viable and appropriate treatment option and provided letters of support from his treatment team. DGIP1918-1920.

149.    Dr. Tatti, A.D.'s longstanding outpatient clinical psychologist, wrote:

> Sandhill works exclusively with children 8-13 years old, with diagnoses/concerns being Autism Spectrum Disorder, emotional dysregulation, unsafe behaviors, manipulative behaviors, depression and anxiety disorders and resistance to adult care just to name a few. This program was tailor-made for a child with [A.D.'s] level of complexity as well as need.

> The other programs Aetna offered were not, in any way, appropriate to address [A.D.'s] needs.

DGIP1937.

150.    Lavere Harward, A.D.'s therapist from Advanced Behavior Analysis, wrote:

> As a team, Sandhill Center was specifically selected due to its specialization in treating children aged 8–13 with emotional and behavioral dysregulation. No in-state facilities provided equivalent expertise or staffing models to address the complexity of [A.D.'s] case at the time. This placement prevented repeated hospitalizations, preserved family stability, and allowed [A.D.] to make measurable progress in a safe, structured environment.

DGIP1941.

151.    Plaintiff disputed Aetna's claim that Sandhill did not qualify for a SCA. DGIP1920-1922.

152.    Plaintiff again cited the Plan language defining a healthcare provider and residential treatment facility and asserted that Sandhill satisfied the Plan requirements because it was licensed by the state as a residential treatment facility (and enclosed certificates of licensure). DGIP1921, 1949-1950.

153.    Plaintiff wrote that Aetna has approved benefits for residential treatment of other patients at Sandhill, as confirmed by Dr. Hyken and Ms. Taylor. DGIP1920.

154.    Plaintiff wrote that the Aetna ALIC and NCS Criteria were undisclosed to participants, applied new requirements for coverage that do not exist in the Plan, and not reflective of the standard of care for residential treatment of children. DGIP1921.

C.    Aetna's Appeal Denial

155.    Aetna denied the appeal on November 11, 2025. DGIP1951-1966.

156.    Aetna claimed there was no network deficiency, no basis for consideration of a SCA for Sandhill, and regardless, Sandhill did not meet Aetna's ALIC Criteria. DGIP1952-1953.

157.    Aetna reiterated that the ACA does not apply to "self-funded plans like the Plan" but Aetna did not address the argument made in Plaintiff's appeal that the ACA requires insurers, such as Aetna, to maintain sufficient provider networks and Aetna uses the same provider network for both self-funded and insured plans. DGIP1915.

158.    Aetna did not address Plaintiff's argument regarding the New York State DFS regulations. DGIP1915.

159.    Aetna did not address the Court's Order finding that the Plan provides for SCAs. ECF No. 44 at p. 7.

160.    Aetna disagreed with Plaintiff's statement that it was a challenge for Aetna to locate an available and appropriate residential treatment facility that would accept A.D. as a patient. DGIP1954.

161.    Yet, for the entire United States, Aetna was able to identify only four in-network facilities that it claimed would have provided residential treatment to A.D. DGIP1954.

162.    Aetna admitted that it initially offered several other in-network facilities which Aetna later "removed from consideration." DGIP1954, 1931-1934.

163.    Aetna did not dispute facts provided in Plaintiff's appeal which demonstrated that in-network facilities were unavailable and/or inappropriate for A.D. Aetna did not dispute that Plaintiff did not receive return phone calls from Meridell (DGIP1916) and San Marcos (DGIP1917). DGIP1957, 1959.

164.    Aetna did not dispute that Plaintiff received information that Meridell and Center for Discovery did not accept children under age 11 and A.D. was newly age 10 and emotionally immature for his age. DGIP1916, 1957, 1960.

165.    Aetna did not provide evidence to support its claim that Ms. Taylor confirmed information with Center for Discovery. DGIP1960.

166.    Aetna did not dispute that Plaintiff received information that the in-network facilities focused on short-term assessment and stabilization and A.D. required intensive long-term residential care. DGIP1957-1960;

167.    Aetna did not dispute that Plaintiff received information that multiple facilities cited long waitlists for admission (*i.e.* five week wait for Oak Plains (DGIP1917); six to eight week wait for San Marcos (DGIP1917)). DGIP1958-1959.

168.    Aetna did not dispute that Plaintiff received information that Oak Plains was unavailable to accept A.D. because it was not taking new referrals until April 1, 2023, more than six months after A.D. was discharged from Huntsman. DGIP001769, 1918.

169.    Aetna disputed Plaintiff's safety concerns regarding Oak Plains and Plaintiff citing a published news article and law enforcement officials who confirmed the fatal overdose of two female adolescent patients at Oak Plains during the time which Aetna recommended placement for A.D. DGIP1917, 1958.

170.    Aetna claimed the deaths were not "substantiated by any authority," despite confirmation of the deaths by the Montgomery County Sheriff's Office. DGIP1917. https://www.wdbj7.com/2022/12/01/two-teens-die-benadryl-overdoes-treatment-facility-sheriffs-office-says/.

171.    Plaintiff received information that Oak Plains accepted children with an IQ as low as 65, and Plaintiff advised Aetna that A.D. was triggered by, and exhibited violent behavior toward, children of low IQ. DGIP1958.

172.    Aetna dismissed Plaintiff's concern by speculating as to the facility's approach and assuming the facility to have "appropriate de-escalation and restraint procedures, if needed," without acknowledging the A.D.'s history of violent behaviors. DGIP1958.

173.    Aetna dismissed the opinions of residential treatment specialists (*i.e.* Dr. Russell Hyken and Jennifer Taylor), who provided specific knowledge of the in-network facilities identified by Aetna. DGIP1956.

174.    The information provided by Dr. Hyken and Ms. Taylor was based on their years of experience in assisting with the placement of patients in residential facilities. DGIP1942-1943; DGIP 1947.

175.    Dr. Hyken reported that San Marco is more of a hospital program, a statement that Aetna dismissed without reason. DGIP1959.

176.    Ms. Taylor reported that Center for Discovery did not treat patients with ASD (a statement confirmed by Dr. Tatti) and verified her statement by reporting that she had toured Center for Discovery. DGIP1948, 1960.

177.    Aetna rejected Ms. Taylor's reports without offering contrary evidence. DGIP1960.

178.    Aetna did not provide any contrary evidence from a residential treatment specialist. DGIP1951-1966.

179.    The denial letter was signed by Patricia Roode, Senior Manager, Complaints and Appeals, a non-clinician with no identifiable experience evaluating residential treatment facilities and who did not consult with a residential treatment specialist. DGIP1966.

180.    Although Ms. Roode referenced an unnamed physician reviewer, Aetna did not disclose the reviewer's qualifications, the physician's review, or the physician's identity. DGIP1951-1966.

181.    Aetna dismissed the timing of A.D.'s transfer to residential treatment, contending "there was no clinical evidence" suggesting a transfer from Huntsman to residential treatment was "needed immediately." DGIP1956.

182.    That contention is directly contradicted by Plaintiff's appeal: "[A.D.'s] need to transfer to residential treatment was accelerated when Aetna denied further benefits for [A.D.'s] hospitalization at Huntsman on October 3, 2025, and Huntsman unequivocally stated that [A.D.] was unsafe to return home." DGIP1917. Aetna did not address these facts. DGIP1951-1966.

183. Aetna claimed that Sandhill did not qualify for a SCA because it did not meet Aetna's requirements for a residential treatment facility. DGIP1961-1963.

184. Aetna did not address or acknowledge the Plan language that only required residential treatment facilities to be "appropriately licensed by the state Department of Health or its equivalent," or the Plan language that defined healthcare providers as facilities "licensed or certified by law to provide health care services to you." DGIP1921, 1961-1963.

185. Aetna did not address Plaintiff's contention that he satisfied the terms of the Plan because he requested residential treatment for his son with a state licensed provider. DGIP1951-1966.

186. Aetna ignored Plaintiff's contention that Aetna may not impose new requirements for coverage that do not exist in the Plan and Aetna must apply to the Plan terms for coverage. DGIP1951-1966.

187. Aetna ignored Plaintiff's contention that the Aetna ALIC and NCS Criteria are undisclosed additional requirements for residential treatment. DGIP1951-1966.

188. Aetna did not identify any Plan provision that permitted it to impose the Aetna ALIC or NCS Criteria in denying Plaintiff's benefit request. DGIP1951-1966.

189. Aetna ignored the specific reasons cited by Dr. Hyken to support finding that Sandhill is an appropriately licensed residential treatment center. DGIP1943-1944, 1951-1966.

190. Aetna claimed that its "standards and requirements" were not met, without citing any such requirements set forth by the Plan. DGIP1962.

191. Aetna ignored confirmed reports from Dr. Hyken and Ms. Taylor that Aetna has approved and paid for residential treatment at Sandhill. DGIP1920, 1951-1966.

Dated: February 27, 2026

By: /s/ *Elizabeth K. Green*

Elizabeth K. Green, admitted *pro hac vice*
California State Bar No. 199634
GREEN HEALTH LAW, APC
201 N. Brand Blvd., Suite 200
Telephone: (818 722-1164
E-mail: egreen@greenhealthlaw.com

Eugene Killian, Jr., Esq. (Attorney ID 2043289)
Dimitri Teresh, Esq. (Attorney ID 5125281)
THE KILLIAN FIRM, P.C.
48 Wall Street, 11th Floor,
New York, NY 10005
(732) 912-2100
E-mail: ekillian@tkfpc.com
E-mail: dteresh@tkfpc.com

Attorneys for Plaintiff
John Doe