UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN DOE,

Plaintiff,

-v-

DELOITTE LLP GROUP INSURANCE PLAN,

Defendant.

23 Civ. 4743 (JPC)

OPINION AND ORDER

JOHN P. CRONAN, United States District Judge:

Plaintiff John Doe brings this civil enforcement action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132. Plaintiff was a participant in the Defendant employee health benefit plan, Deloitte LLP Group Insurance Plan, and subscribed to the Aetna Open Access Select EPO Plan (the "Plan"), which is administered by Aetna Life Insurance Company ("Aetna"). Plaintiff challenges the denial of health benefits related to residential mental health treatment at an out-of-network provider for his dependent son, A.D.

Pending before the Court are the parties' second round of motions for summary judgment. In an Opinion and Order addressing the parties' prior motions for summary judgment, the Court held that "the denial of benefits was arbitrary and capricious because Aetna did not adequately explain the basis for denial by failing to address whether to authorize a single case agreement for the out-of-network provider at issue." *Doe v. Deloitte LLP Grp. Ins. Plan*, 767 F. Supp. 3d 106, 109 (S.D.N.Y. 2025). That prior Order remanded the case "to Aetna for a new review and further explanation of the basis of its decision." *Id.* Aetna has since done so, and has once again denied Plaintiff's request to cover the out-of-network treatment for his son. For the reasons that follow,

Defendant's motion for summary judgment is granted, and Plaintiff's motion for summary judgment is denied.

## I. Background[1]

In the fall of 2022, Plaintiff sought coverage for A.D.'s residential treatment at Sandhill Center ("Sandhill"), a facility in New Mexico that is not part of Aetna's provider network. The Plan generally does not cover out-of-network treatment but allows for exceptions to that general rule. In determining whether to approve out-of-network single case agreements, Aetna relies on its Criteria for Recognizing Non-Contracted Residential Treatment Facilities ("ALIC Criteria"), which are not described in the Plan. This dispute is over whether Aetna should have approved A.D.'s out-of-network treatment. More specifically, the parties dispute whether there were in-network providers that could have treated A.D. instead, and whether Aetna's use of the ALIC Criteria to make determinations as to out-of-network treatment was permissible.

[1] The following facts are undisputed unless otherwise noted and are drawn from the parties' statements and counterstatements of material facts submitted pursuant to Local Civil Rule 56.1, Dkt. 56-2 ("Pl. 56.1 Stmt."); Dkt. 57-2 ("Deft. 56.1 Stmt."); Dkt. 60 ("Deft. 56.1 Counter Stmt."); Dkt. 61-1 ("Pl. 56.1 Counter Stmt."); Dkt. 64 (Defendant's Rule 56.1 reply statement), and the administrative record, Dkt. 55. The Court cites only to a party's counterstatement where that party does not dispute the fact, has not offered admissible evidence to refute it, or simply seeks to offer its own "spin" on the fact or otherwise dispute the inference drawn from it. Pages in the administrative record are cited with the prefix "DGIP."

The parties move to seal the administrative record. Dkt 54. The Court has reviewed the proposed exhibits in light of the principles set forth in *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006), and its progeny. As the Court's prior Opinion and Order in this case explained, "this case entails highly sensitive and personal matters involving Plaintiff's son's mental health, which allegedly manifested in several ways, including thoughts of suicide." *Doe*, 767 F. Supp. 3d at 110 n.3. Thus, the Court finds that sealing of these records is warranted because they contain numerous documents concerning the sensitive and private medical treatment of A.D., a minor, including a multitude of documents with A.D.'s full name and other identifying information. The Court finds that Plaintiff's and A.D.'s privacy interests in these materials outweigh the right of public access and therefore grants the motion to seal.

### A. The Plan's Relevant Terms

The Plan's terms are set out in the Aetna Open Access Select EPO Plan Summary Plan Description. Pl. 56.1 Counter Stmt. ¶ 4; DGIP 1651-1757. Aetna is the Plan's Claims Administrator, DGIP 1745, with "sole and exclusive discretion" to "[i]nterpret Benefits under the Plan"; "[i]nterpret the other terms, conditions, limitations, and exclusions of the Plan, including this [Summary Plan Description] and any Riders and Amendments"; and "[m]ake factual determinations related to the Plan and its Benefits," DGIP 1739.

The Plan provides "a network of participating physicians, specialists and hospitals that meet Aetna's requirements for quality and service." DGIP 1663. "Out-of-Network care is not a covered expense." *Id.* The Plan separately defines and distinguishes a "Network provider" from an "Out-of-Network provider." DGIP 1749-1750.

Among the benefits the Plan affords are mental health services. The Plan states that "[y]our mental health/substance use disorder benefits will be provided by participating behavioral health providers," and that "[c]overed expenses include charges made for the treatment of mental disorders by behavioral health providers." DGIP 1682. That coverage extends to inpatient care, including "room and board at the semi-private room rate and other services and supplies provided during your stay in a psychiatric hospital or residential treatment facility, appropriately licensed by the state Department of Health or its equivalent." *Id.* The Plan defines a "Provider" as "[a] physician, health professional, person, or facility, licensed or certified by law to provide health care services to you," DGIP 1752, and a "Behavioral health provider" as "[a] health professional who is licensed or certified to provide covered services for mental health and substance related disorders in the state where the person practices," DGIP 1745. It defines a "Treatment Center" as a facility providing a program of effective mental disorder treatment that satisfies several

requirements, including that it be "established and operated in accordance with any applicable state law" and that "[i]t provides a program of treatment approved by a Physician and the Claims Administrator." DGIP 1754.

The Plan "requires prior authorization for certain Covered Health Services," including mental health "services at a Residential Treatment Facility." DGIP 1667-1668. In general, where services "require prior authorization from Aetna[,] In-Network providers will obtain authorization" on the beneficiary's behalf. DGIP 1663; *see also* DGIP 1667 ("Physicians and other health care professionals who participate in a Network are responsible for obtaining prior authorization."). When a beneficiary chooses to receive services from an out-of-network provider, however, the beneficiary is "responsible for obtaining prior authorization before you receive the services." DGIP 1667. Prior authorization is subject to a "utilization review process," which is

> a set of formal techniques designed to monitor the use of, or evaluate the clinical necessity, appropriateness, efficacy, or efficiency of, health care services, procedures, or settings. Such techniques may include ambulatory review, prospective review, second opinion, certification, concurrent review, case management, discharge planning, retrospective review or similar programs.

DGIP 1668.

**B. A.D.'s Mental Health Treatment and Admission to Sandhill**

A.D. is Plaintiff's dependent son. In October 2022, he was ten years old and carried diagnoses including autism spectrum disorder ("ASD"), major depressive disorder, attention deficit hyperactivity disorder ("ADHD"), generalized anxiety disorder, mood dysregulation disorder, and oppositional defiant disorder. Deft. 56.1 Counter Stmt. ¶ 10. Beginning at the age of seven, A.D. was hospitalized multiple times because of aggressive and violent behavior. *Id.* ¶¶ 13-48. In June 2019, following residential treatment, A.D. was admitted to the University of Utah's Huntsman Center ("Huntsman"). *Id.* ¶ 21. Over the following two years, Plaintiff and his

family relocated to Salt Lake City, Utah, so that A.D. could attend partial hospitalization at Huntsman while living at home. *Id.* ¶ 30. Beginning in February 2021, A.D.'s condition worsened and he was hospitalized multiple times at Huntsman. *Id.* ¶ 31. His aggressive behavior escalated to property destruction, physical aggression, and threats towards peers and adults. *Id.* ¶ 32.

On September 6, 2022, A.D. was hospitalized at Huntsman for the seventh time. *Id.* ¶ 44. The Huntsman treatment team then recommended long-term residential treatment. *Id.* ¶ 47. That day, A.D.'s parents reached out to Aetna to request assistance with locating a residential treatment center ("RTC") for A.D. *Id.* ¶ 56. They also retained an educational consultant separate from Aetna to assist in locating an RTC for A.D.'s treatment. Pl. 56.1 Counter Stmt. ¶ 38. Neither Aetna nor Plaintiff identified any suitable RTCs in Utah, so Plaintiff indicated a willingness to consider in-network but out-of-state RTCs instead. *Id.* ¶ 39.

In the following weeks Aetna and Plaintiff discussed options for RTC treatment. Aetna identified at least fifteen in-network RTCs, but the parties agree that the majority were unable to admit A.D. due to age limitations and waitlists. *See id.* ¶ 40. Their dispute in this case turns on four in-network RTCs—Center for Discovery in Bellevue, Washington; the Meridell Achievement Center in Liberty Hill, Texas ("Meridell"); the Oak Plains Academy in Ashland City, Tennessee ("Oak Plains"), and the San Marcos Treatment Center in Texas ("San Marcos")—that Aetna identified as suitable for A.D. and able to admit him without substantial delay, but whose suitability and timeliness of placement Plaintiff disputes. *See id.* ¶ 40; DGIP 1864, 1955.

The administrative record reflects that on September 19, 2022, Aetna identified Center for Discovery as an appropriate and available in-network RTC. DGIP 1815. Contemporaneous records reflect that Aetna spoke with the admissions department of Center for Discovery, which stated that A.D.'s age and ASD diagnosis were not exclusionary, and that there was a 3-4 week

waitlist. *Id.* Plaintiff's educational consultant emailed Aetna that she called Center for Discovery which confirmed that the facility would accept A.D. "even though he's [ten]" and that "[t]here is a 3-4 week waitlist." DGIP 1775. The educational consultant did not recommend Center for Discovery, however, reasoning that "program will have kids up to age 17 in a mixed milieu with all forms of dual diagnosis as well," and "is short-term stabilization and assessment." *Id.* Plaintiff decided not to move forward with Center for Discovery, and on September 23, 2022, A.D.'s mother told Aetna that she "will not contact Center for Discovery because she does not believe it is a good environment" for A.D. DGIP 1795.

Aetna likewise spoke with Plaintiff about Meridell. Aetna's notes reflect that Plaintiff was provided with Meridell's contact information on September 16, 2022, and that on September 18, the educational consultant stated that "the facility doesn't work with 10-year-olds and its short term." DGIP 1854. The same note reflects that the following day, on September 19, Aetna emailed Plaintiff informing him that it "had spoken to the facility and the member's age does not exclude him," that "[t]here is availability in the next 2 weeks," and that "this is not short term and is a residential facility." *Id.* Also on September 19, Aetna noted that it received an email from Plaintiff's educational consultant confirming that she too had called Meridell, which "confirmed that [A.D.'s] age is fine," advised that it would "take a 9 or 10 year old, as long as they are in 4th or 5th grade," and asked whether A.D. had any physical disabilities and what his IQ was. DGIP 1775.

On September 20, 2022, Aetna identified Oak Plains as a third appropriate and available in-network RTC. DGIP 1854. Aetna's Care Advocate spoke directly with Oak Plains's director of admissions, who "stated that the member's age and ASD dx are not exclusionary," that "[t]here will be availability in the next 7-10 days," and that A.D.'s parents "can call him directly to start

the intake process." DGIP 1809. Plaintiff responded to Aetna by expressing concerns about Oak Plains's suitability, citing allegations of harm to children under the facility's care and concerns about the cognitive functioning of its patient population. DGIP 1765, 1803, 1835. On September 24, 2022, A.D.'s mother informed Aetna that Oak Plains was not an appropriate milieu for A.D. DGIP 1803.

The fourth facility is San Marcos, which Aetna's decision on remand identified as an appropriate in-network RTC. *See* DGIP 1955, 1959. Defendant acknowledges this facility was previously "determined to be not suitable for A.D." because it was "unable to accept A.D. without a substantial delay," Deft. 56.1 Stmt. ¶ 45, which Plaintiff does not dispute, Pl. 56.1 Counter Stmt. ¶ 45. In any event, the administrative record reflects that by September 21, 2022, Aetna provided Plaintiff and A.D.'s mother with San Marcos's contact information and "informed them that there is a 6-8 week waitlist." DGIP 1854. A.D.'s mother also emailed Aetna to say that the facility "has very bad reviews." DGIP 1765.

At the same time Plaintiff was evaluating in-network options, he was also pursuing admission to Sandhill, a residential treatment center in Cuba, New Mexico. Deft. 56.1 Counter Stmt. ¶¶ 79, 81. Sandhill is not an in-network provider under the Plan. Pl. 56.1 Counter Stmt. ¶ 43. On September 27, 2022, after Aetna learned that Plaintiff was considering treatment at Sandhill, Aetna called and spoke to Sandhill's director of admissions about Aetna's criteria for recognizing non-contracted residential treatment facilities. DGIP 1772. Aetna asked about four of its criteria, which Sandhill said that it did not meet. First, Aetna requires that an institution be accredited by Aetna or one of a select set of agencies, while Sandhill said that it was not currently accredited. *Id.* Second, Aetna requires that a licensed behavioral health provider be actively on duty twenty-four hours per day for seven days a week, while Sandhill's nurses and mental health

staff are only at the facility during the day. *Id.* Third, Aetna requires that a patient be treated by a psychiatrist at least once per week, but Sandhill did not have a psychiatrist at the facility. DGIP 1772-1773. Fourth, Aetna requires that the medical director be a psychiatrist, while Sandhill's medical director at the time was a nurse practitioner. DGIP 1773.

On September 28, 2022, Aetna learned that Plaintiff had toured Sandhill, which accepted A.D. for treatment. DGIP 1816. Aetna's contemporaneous notes reflect that an Aetna Care Advocate informed A.D.'s family that he had "discussed the Criteria for Recognizing Non-Contracted Residential Treatment Facilities" with Sandhill and that "the facility did not meet any of it." *Id.* The family said that it had spoken with Sandhill about the criteria, and that Sandhill told them that this was "a way of 'preventing RTC treatment' and they have an insurance advocacy team that will still be pursuing an authorization." *Id.* Plaintiff claims that on October 3, 2022, Aetna denied further benefits for A.D.'s continued hospitalization at Huntsman. Deft. 56.1 Counter Stmt. ¶ 83; DGIP 1826. Plaintiff then arranged for A.D.'s admission to Sandhill on October 11, 2022, Deft. 56.1 Counter Stmt. ¶ 85, which Plaintiff contends was the earliest day he could be admitted, Pl. 56.1 Stmt. ¶ 85.

**C. Aetna's Denial of Coverage and Plaintiff's Administrative Appeals**

After A.D.'s admission, Plaintiff submitted requests for Plan benefits for A.D.'s residential treatment at Sandhill. Pl. 56.1 Counter Stmt. ¶ 61. By letter dated October 17, 2022, Aetna denied Plaintiff's claim for benefits for A.D.'s treatment at Sandhill. DGIP 11-17. The entire explanation for the denial was that "[t]his is not a covered service under the terms of the plan." DGIP 12. On October 20, 2022, Plaintiff wrote to A.D.'s case manager asking, "what do we need to do to have Aetna credential Sandhill." DGIP 1773. The Care Advocate responded on October 26, 2022,

again explaining that Sandhill did not satisfy Aetna's ALIC Criteria for out-of-network residential treatment facilities. DGIP 1790.

Plaintiff then appealed. On appeal, he argued that Aetna's in-network facilities were either unavailable or inappropriate, DGIP 132-133, that the denial letter was overly vague, DGIP 133-134, and that Aetna had apparently relied on its ALIC Criteria, which Plaintiff contended "are not industry standards" and are not mentioned in the Plan, DGIP 134-135.

Aetna denied the appeal on December 14, 2022. DGIP 870-872. Once again, Aetna's only explanation for the denial was that the "plan does not cover out of network benefits." DGIP 871. Plaintiff appealed once more and Aetna upheld the denial of benefits on the basis that "the plan does not cover services performed by out-of-network providers" such as Sandhill. DGIP 1133.

**D. This Court's February 2025 Opinion and Order**

Plaintiff then commenced this action on June 6, 2023 by filing a Complaint, asserting one claim challenging Aetna's denial of benefits under 29 U.S.C. § 1132. Dkt. 1. Plaintiff and Defendant then moved for summary judgment on April 5, 2024, and May 3, 2024, respectively. Dkts. 33, 36.

In an Opinion and Order dated February 24, 2025, the Court denied Defendant's motion and granted Plaintiff's motion in part. *Doe*, 767 F. Supp. 3d 106. The Court explained that "Aetna's denials on appeal stated perfunctorily that Sandhill was not covered because it was an out-of-network provider." *Id.* at 113. This was problematic, the Court concluded, because it was not apparent "that Aetna even considered during the administrative appeals process whether Sandhill, notwithstanding its out-of-network status, should be provided a single case agreement and therefore Plaintiff should be afforded exception-based coverage." *Id.* Accordingly, Aetna's "denial of benefits was arbitrary and capricious because it was 'without reason.'" *Id.* at 112.

Because the issue was "not whether the denial of exception-based coverage was appropriate" but rather whether Aetna's decision violated "Plaintiff's 'procedural rights' as a beneficiary," *id.* at 113 n.8, the Court "remand[ed] this case for further administrative review," *id.* at 115. This case was thus "remanded to Aetna for a new review and with instructions to specifically address in any decision whether Sandhill should be granted a single case agreement, including consideration of Plaintiff's arguments concerning the adequacy of in-network offerings." *Id.* at 115-16.

**E. Proceedings on Remand**

On May 1, 2025, Aetna issued another decision denying Plaintiff's request for benefits (the "Remand Decision"). DGIP 1862-1867. Aetna again explained that the "Plan does not pay for out-of-network expenses." DGIP 1863. This time, however, Aetna also considered and rejected Plaintiff's arguments challenging the adequacy of the in-network offerings and requesting that a single case agreement be granted for Sandhill. Aetna said the regulatory requirements Plaintiff referenced "are inapplicable to self-funded plans like this Plan," but that in any event, "there was no network deficiency that would necessitate a single case agreement with an out of network residential treatment facility" because "[a]t the time of [A.D.'s] admission to Sandhill Center . . . there were multiple suitable in-network residential treatment facilities available to promptly accept [A.D.] for treatment." *Id.* Specifically, Aetna identified Meridell, Oak Plains, and Center for Discovery as "suitable in-network residential treatment facilities." DGIP 1864. Additionally, Aetna explained that Sandhill "would not qualify for precertification as an out of network provider because it did not meet Aetna's quality of care requirements for residential treatment facilities." *Id.* It explained that Sandhill did not meet Aetna's ALIC Criteria because "it was not accredited or credentialed as required, did not have a licensed behavioral health provider actively on duty 24/7, [A.D.] was not being treated by a psychiatrist at least one time per

week, and Sandhill Center's medical director was not a psychiatrist." DGIP 1865. Aetna also provided a copy of its ALIC Criteria. DGIP 1868-1910.

Plaintiff appealed the Remand Decision. DGIP 1911-1950. He submitted letters from A.D.'s treatment team explaining why he believed each facility suggested by Aetna was unavailable or inappropriate. *See* DGIP 1916-1918. And he again argued that "Sandhill meets the Plan requirement for a residential treatment provider because it is a fully licensed residential treatment center in New Mexico," and that Aetna's ALIC Criteria are "undisclosed additional requirements for residential treatment that do not reflect the standard of care for mental health residential treatment." DGIP 1921.

On November 11, 2025, Aetna again upheld on appeal the denial of benefits (the "Remand Appeal Decision"). DGIP 1951-1966. It explained that "[w]here clinically appropriate in-network providers are available . . . [,] Aetna can, in its discretion, decline to enter into a single case agreement." DGIP 1953. And, relying on the administrative record and Aetna's "physician reviewer, who is board certified in child and adolescent psychiatry," Aetna concluded that Meridell, Center for Discovery, Oak Plains, and San Marcos were each suitable in-network providers. DGIP 1954-1960. The Remand Appeal Decision also reiterated that a single case agreement would be inappropriate because Sandhill did not satisfy Aetna's ALIC Criteria. DGIP 1961.

The parties then again moved for summary judgment. On January 30, 2026, both parties filed their motions. Dkts. 56, 56-1 ("Pl. Motion"), 57, 57-1 ("Deft. Motion"). They filed their oppositions on February 27, 2026, Dkts. 59-61, and their replies on March 13, 2026, Dkts. 62-64.

## II. Legal Standard

The Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 620 (2d Cir. 2016) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'" *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In conducting this review, the Court "resolve[s] all ambiguities and draw[s] all reasonable inferences in favor of the nonmoving party." *Mhany Mgmt.*, 819 F.3d at 620.

"The movant bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,' and, if satisfied, the burden then shifts to the non-movant to present 'evidence sufficient to satisfy every element of the claim.'" *Chen*, 2019 WL 1244291, at *4 (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)). The non-movant "may not rely on conclusory allegations or unsubstantiated speculation," and "must offer some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). The non-movant must present more than a "scintilla of evidence" to survive summary judgment. *Anderson*, 477 U.S. at 252. "Where no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,'

summary judgment must be granted." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).

"Where, as here, a district court is tasked with reviewing a denial of benefits under an ERISA plan, summary judgment is 'an appropriate vehicle whereby the Court can apply substantive ERISA law to the administrative record.'" *Savage v. Rabobank Med. Plan*, No. 19 Civ. 9893 (PGG), 2024 WL 4354986, at *14 (S.D.N.Y. Sept. 30, 2024) (quoting *Gannon v. Aetna Life Ins. Co.*, No. 05 Civ. 2160 (JGK), 2007 WL 2844869, at *6 (S.D.N.Y. Sept. 28, 2007)). "However, denial-of-benefits claims do not fit neatly within the traditional summary judgment framework . . . because the Court's role is not to determine whether disputed factual issues exist regarding a claimant's disability, but to review the record and make legal conclusions about whether a plan improperly denied a claimant's benefits." *Taylor v. Long Term Disability Income Plan for Emps. of the Fed. Rsrv. Sys.*, No. 25 Civ. 1134 (LLS), 2026 WL 2607035, at *4 (S.D.N.Y. Sept. 3, 2026) (citation modified).

ERISA allows participants in a covered employee welfare benefit plan to bring a civil action to recover the value of benefits owed under the plan. *See* 29 U.S.C. § 1132(a)(1)(B) (providing that "[a] civil action may be brought . . . to recover benefits due to [a participant or beneficiary] under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan"). Under the usual framework for reviewing a claims administrator's eligibility determination, "'a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan,' in which case an arbitrary and capricious standard applies." *Halo v. Yale Health Plan, Dir. of Benefits & Recs. Yale Univ.*, 819 F.3d 42, 51 (2d Cir. 2016) (quoting *Firestone*

*Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). "The plan administrator bears the burden of proving that the deferential standard of review applies." *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002).

Review of a claims administrator's eligibility determination under the arbitrary-and-capricious standard is "highly deferential." *Halo*, 819 F.3d at 51. Under that standard, a claims administrator's decision to deny benefits "may be overturned . . . only if the decision is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Fay*, 287 F.3d at 104 (internal quotation marks omitted). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and requires more than a scintilla but less than a preponderance." *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 141 (2d Cir. 2010). And in determining whether the claims administrator's decision is adequately supported, the reviewing court is not free to substitute its own judgment for that of the administrator. *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 83-84 (2d Cir. 2009). Even so, "even under the arbitrary and capricious standard, questions of law are reviewed *de novo*." *Harrison v. Metro. Life Ins. Co.*, 417 F. Supp. 2d 424, 436 (S.D.N.Y. 2006).

By contrast, when the *de novo* standard of review applies, a court must determine whether the claimant is entitled to the benefits they seek without affording any deference to the claims administrator's determination. *Colin D. v. Morgan Stanley Med. Plan*, No. 20 Civ. 9120 (LTS), 2023 WL 6849130, at *10 (S.D.N.Y. Oct. 17, 2023). Under that approach, the court must review "all aspects of the denial of an ERISA claim, including fact issues," with fresh eyes. *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 245 (2d Cir. 1999). But even in that posture, the burden generally remains on the claimant to show that they are entitled to benefits under the relevant language of the benefit plan, including when the plan makes medical necessity the

operative standard for eligibility. *Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 765 (2d Cir. 2002) ("Where 'medical necessity' is a prerequisite for entitlement to a benefit under an ERISA plan, the burden of proof will generally be on the plan participant.").

Thus, on *de novo* review a court effectively "stands in the shoes of the original decisionmaker, interprets the terms of the benefits plan, determines the proper diagnostic criteria, reviews the medical evidence, and reaches its own conclusion about whether the plaintiff has shown, by a preponderance of the evidence, that she is entitled to benefits under the plan." *Quigley v. Unum Life Ins. Co. of Am.*, No. 22 Civ. 5906 (JPO), 2023 WL 6387021, at *5 (S.D.N.Y. Sept. 29, 2023). In other words, on *de novo* review "[t]he question for the Court is simply whether the decision to deny [the plaintiff's] claim was correct." *Kagan v. Unum Provident*, 775 F. Supp. 2d 659, 670 (S.D.N.Y. 2011) (internal quotation marks omitted). And in answering that question, the court, absent good cause shown, is "limited to the record in front of the claims administrator" at the time of the adverse benefit determination. *DeFelice v. Am. Int'l Life Assurance Co. of N.Y.*, 112 F.3d 61, 67 (2d Cir. 1997).

## III. Discussion

### A. Standard of Review

The parties' disagreement in this case begins over whether the Court should review Aetna's denial of benefits under the arbitrary-and-capricious standard or under the *de novo* standard. The standard of review turns on whether the Plan "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co.*, 489 U.S. at 115. If it does, then deferential review applies; if not, then the denial of benefits is to be reviewed *de novo*. *Id.*; *Halo*, 819 F.3d at 51.

The Aetna Open Access Select EPO Plan Summary Plan Description provides that Aetna is the "Claims Administrator," and has "sole and exclusive discretion" to "[i]nterpret Benefits under the Plan"; "[i]nterpret the other terms, conditions, limitations, and exclusions of the Plan, including this [Summary Plan Description] and any Riders and Amendments"; and "[m]ake factual determinations related to the Plan and its Benefits." DGIP 1739, 1745. On its face, this language gives Aetna discretion to "construe the terms of the plan," *Firestone Tire & Rubber Co.*, 489 U.S. at 115, and is similar to language that other courts have held sufficient to delegate discretionary authority. *See, e.g.*, *O'Shea v. First Manhattan Co. Thrift Plan & Tr.*, 55 F.3d 109, 112 (2d Cir. 1995) (applying deferential review where the plan stated that the "Trustees shall determine any questions arising in the administration, interpretation, and application of the Plan"); *Savage v. Rabobank Med. Plan*, No. 24-2759-cv, 2026 WL 303600, at *3 (2d Cir. Feb. 5, 2026) (summary order) (holding that deferential review applied where the plan gave the administrator discretionary authority to "(i) construe and interpret the terms of the Plan, (ii) determine the validity of charges submitted . . . under the Plan, and (iii) make final binding determinations concerning the availability of Plan benefits"). Still, Plaintiff raises two arguments for why *de novo* review should apply: first, that the Aetna Open Access Select EPO Plan Summary Plan Description is not "the Plan," and second, that Aetna failed to comply with ERISA claims regulations. Pl. Motion at 23-24; Pl. Opp. at 4-6.

The Aetna Open Access Select EPO Plan Summary Plan Description is the only document in the record describing Plaintiff's coverage. The parties agree that this document describes the Plan. Deft. 56.1 Counter Stmt. ¶ 2. But it includes a disclaimer that "[t]his summary provides general information about the Plan" and "does not cover all provisions, limitations, and exclusions." DGIP 1655. It refers to a "Plan document" that is nowhere in the administrative

record, and explains that "[i]f there is any conflict between the information presented here, or any written or oral communication by an individual representing the Plan, and the Plan document, the terms of the Plan document as interpreted in the sole discretion of the Plan Administrator will govern and will determine the rights and benefits to which you will be entitled under the Plan." *Id.* And the Supreme Court has explained that, at least where a summary document and a plan document both exist, the summary document cannot override the terms of the plan document itself because "[s]ummary documents . . . do not themselves constitute the terms of the plan for purposes of § 502(a)(1)(B)." *CIGNA Corp. v. Amara*, 563 U.S. 421, 438 (2011) (emphasis omitted).

Even so, binding precedent compels the conclusion that the Aetna Open Access Select EPO Plan Summary Plan Description is the "plan" for purposes of this action. In *Feifer v. Prudential Insurance Company of America*, 306 F.3d 1202 (2d Cir. 2002), the Second Circuit confronted a similar situation and held that a "Program Summary" constituted the "plan" under ERISA. In *Feifer*, the "Program Summary" included language that it was "for informational purposes only and is not intended to cover all details of the Plan," and stated that "[t]he actual provisions of the Plan will govern in settling any questions that may arise." *Id.* at 1205. However, there was no indication in the record of any "written document describing benefits under 'the Plan' other than the Program Summary and the accompanying memorandum." *Id.* The Second Circuit acknowledged that "the Program Summary contain[ed] the disclaimer that it was 'not intended to cover all details of the Plan' and that the 'actual provisions of the Plan will govern,'" but "reject[ed] the notion that this disclaimer renders the Program Summary a non-plan during the period when it was the only written document describing benefits." *Id.* at 1209. So too here: despite its disclaimer, the Aetna Open Access Select EPO Plan Summary Plan Description is the only written document in the record describing Plaintiff's benefits. And numerous courts have continued to

recognize that a summary plan description can constitute the plan in these circumstances. *See, e.g.*, *Northwell Health Inc. v. Lamis*, No. 18 Civ. 1178 (WHP), 2019 WL 4688704, at *5 (S.D.N.Y. Sept. 25, 2019) (collecting cases); *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1132 (10th Cir. 2011). Thus, for purposes of the instant case, the Aetna Open Access Select EPO Plan Summary Plan Description is the Plan.

Nor does this Court's previous conclusion that "Aetna's decision to deny benefits to Plaintiff was arbitrary and capricious in that it was rendered, in effect, without reason," *Doe*, 767 F. Supp. 3d at 115 (citation modified), require *de novo* review in *this* Opinion. In general, "when denying a claim for benefits, a plan's failure to comply with the Department of Labor's claims-procedure regulation, 29 C.F.R. § 2560.503-1, will result in that claim being reviewed *de novo* in federal court, unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent and harmless." *Halo*, 819 F.3d at 57-58 (emphasis omitted). But Plaintiff does not identify any failures in Aetna's compliance with the claims-procedure regulation on remand separate from his argument that Aetna again failed to give a full and fair review,[2] and instead relies on the Court's earlier Opinion. The Supreme Court has squarely rejected a rule that "a court need not apply a deferential standard where the administrator has previously construed the same plan terms and we found such a construction to have violated ERISA." *Conkright v. Frommert*, 559 U.S. 506, 513 (2010) (citation modified); *see also Kruk v. Metro. Life Ins. Co.*, 567 F. App'x 17, 19 (2d Cir. 2014) (summary order) (rejecting the argument that "judicial review of MetLife's challenged decision here should be *de novo* in light of a prior

[2] For reasons explained *infra* III.B, the Court rejects Plaintiff's argument that Aetna again failed to provide a full and fair review, *see* Pl. Motion at 29, Pl. Reply at 2-3, 10-11.

vacatur of MetLife's initial denial of benefits as arbitrary and capricious" and applying "the usual standard of deferential review of discretionary decisions"). Aetna's failure to provide a full and fair explanation initially, which it rectified in the appeal on remand, *see infra* III.B, is therefore not a basis for rejecting deferential review.

In brief, Defendant has carried its burden of establishing that the Plan confers on Aetna discretionary authority to determine eligibility for benefits and to construe the terms of the Plan. This Court's review is therefore for abuse of discretion.

**B. Full and Fair Review**

Before turning to the merits of Aetna's denial, it is necessary to address Plaintiff's argument that Aetna failed adequately to consider his arguments or otherwise afford him a full and fair review. *See* Pl. Motion at 29, Pl. Reply at 2-3, 10-11. Under ERISA, an employee benefits plan administrator must

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
>
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133; *see* 29 C.F.R. § 2560.503-1(g) (clarifying the contents of the statutorily required notice). The Second Circuit has explained that this notice requirement has two purposes. "First, notice can provide the member with information necessary for him or her to know what he or she must do to obtain the benefit. Second . . . notice can enable the member effectively to protest [a denial] decision." *Juliano v. Health Maint. Org. of N.J., Inc.*, 221 F.3d 279, 287 (2d Cir. 2000). Therefore, to provide a beneficiary with a "full and fair review" under ERISA, a plan administrator's written notice of denial "must be comprehensible and provide the claimant with

the information necessary to perfect h[is] claim." *Burke v. Kodak Ret. Income Plan*, 336 F.3d 103, 107-09 (2d Cir. 2003), *abrogated on other grounds by Amara*, 563 U.S. 421. Notices under ERISA from a plan administrator should be "candid statements as to why the administrator framing the notice thinks reimbursement is unwarranted," not "meaningless catalogs of every conceivable reason that the cost in question might not be reimbursable." *Juliano*, 221 F.3d at 288. The ultimate goal is to "facilitate 'meaningful dialogues between plan administrators and plan members,' and permit effective review." *Munnelly v. Fordham Univ. Fac.*, 316 F. Supp. 3d 714, 736 (S.D.N.Y. 2018) (quoting *Juliano*, 221 F.3d at 288). A full and fair review concerns a beneficiary's procedural rights, and an administrator's failure to provide adequate reasoning may result in remand even if the denial of benefits may have ultimately been proper. *See, e.g.*, *Pastore v. Witco Corp. Severance Plan*, 196 F. App'x 18, 21 (2d Cir. 2006) (summary order) (remanding for failure to provide adequate reasoning without "imply[ing] any opinion as to whether the denial of severance benefits . . . after proper explanation and investigation[] would be reasonable"); *cf. Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 630 (2d Cir. 2008) (holding that remand is not required where "administrative remand would be futile" even where the plan administrator may have denied the beneficiary a "full and fair review").

The regulations implementing ERISA provide that, in order to provide a claimant with a full and fair review of an adverse benefit determination, the claims procedure must

> [p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

29 C.F.R. § 2560.503-1(h)(2)(iv). When considering evidence, an administrator "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

On the whole, the record reflects that Aetna's decisions on remand afforded Plaintiff a full and fair review. As before, Aetna rejected Plaintiff's argument that treatment at Sandhill was covered under the Plan, explaining that the Plan does not cover out-of-network care, and that Sandhill was an out-of-network residential treatment facility. DGIP 1863-1864, 1952-1954. And this time, both the May 2025 Remand Decision and the November 2025 Remand Appeal Decision considered and rejected Plaintiff's arguments for why Aetna should have approved a single case agreement with Sandhill. Aetna gave two reasons for rejecting this request: (1) there was no network deficiency that would necessitate a single case agreement with an out-of-network residential treatment facility, DGIP 1863-1864, 1952-1954; and (2) even if there had been a network deficiency, Sandhill does not meet Aetna's criteria for residential treatment facilities as set forth in its ALIC Criteria for recognition of out-of-network residential treatment facilities, DGIP 1864-1865, 1961-1962.

Aetna further considered Plaintiff's countervailing arguments as to each of these conclusions. As to Plaintiff's network deficiency argument, Aetna considered and rejected Plaintiff's arguments as to why the identified in-network facilities were deficient, and balanced the evidence submitted by Plaintiff against the contrary evidence in the administrative record. DGIP 1954-1961; *see infra* III.C.1. As to Plaintiff's argument that Sandhill met the Plan's criteria as a state licensed residential treatment facility, Aetna explained that it would only approve an agreement with an out-of-network treatment facility if it met the guidelines in its ALIC Criteria, which Sandhill did not. DGIP 1961-1962; *see infra* III.C.2. Finally, Aetna rejected Plaintiff's argument that the Affordable Care Act required it to offer out-of-network coverage, explaining both that the requirement Plaintiff identified is inapplicable to self-funded plans, and that in any event the administrative record confirms that in-network coverage was adequate. DGIP 1953; *see*

*infra* III.D.[3] This reflects that Aetna "reasonably took up each and every aspect" of the claim. *Hobson*, 574 F.3d at 87.

Although Aetna adequately explained the basis for its denial of benefits, the Court must still consider whether Aetna abused its discretion in reaching that determination. *See, e.g.*, *Waksman v. IBM Separation Allowance Plan*, 138 F. App'x 370, 372 (2d Cir. 2005) (summary order). The Court accordingly turns to the merits of the denial.

**C. Substantial Evidence Supporting Aetna's Determination**

The Plan provides coverage for "charges made for the treatment of mental disorders by behavioral health providers." DGIP 1682. That coverage extends to inpatient care. *Id.* But the Plan explicitly does not cover care at out-of-network providers. *See* DGIP 1663 ("Out-of-Network care is not a covered expense in this Plan."). Although residential treatment of the kind A.D. received is, in general terms, a benefit the Plan affords, there is no dispute that Sandhill is not an in-network provider under the Plan. Pl. 56.1 Counter Stmt. ¶ 43; *see also Doe*, 767 F. Supp. 3d at 112 ("It is undisputed . . . that Sandhill was an out-of-network provider."). ERISA does not require a plan to cover out-of-network care, and courts in this Circuit have regularly affirmed the denial of benefits for out-of-network treatment when a plan provides for such an exclusion. *See, e.g.*, *Anonymous Oxford Health Plan Member With Id No. 6023604*01 v. Oxford Health Plans (N.Y.), Inc.*, No. 08 Civ. 943 (PAC), 2009 WL 667237, at *5 (S.D.N.Y. Mar. 16, 2009) (dismissing

[3] To be sure, Aetna's decisions only referenced Plaintiff's argument about the Affordable Care Act, not the New York Insurance Law. DGIP 1863, 1953. But Aetna's response that "the administrative record confirms that in-network providers were available to provide clinically appropriate residential treatment services," DGIP 1953, applies equally to Plaintiff's argument that the New York Insurance Law also provides consumers with the right to go out-of-network when an in-network provider is unavailable.

denial-of-benefits claim where the plaintiff's plan "preclude[d] coverage for out-of-network, inpatient mental health services").

Still, the fact that Sandhill is out-of-network is not fatal to Plaintiff's claim. As this Court observed in its prior Opinion, the Plan offers "an exception from the Plan's general prohibition on out-of-network care." *Doe*, 767 F. Supp. 3d at 113 (citing DGIP 1667-1668); *see also* DGIP 1739 (conferring discretion on Aetna to "offer Benefits for services that would otherwise not be Covered Health Services"). Plaintiff argues that Aetna should have granted an exception here, and the Court previously held that Aetna violated ERISA when it "stated perfunctorily that Sandhill was not covered because it was an out-of-network provider" without engaging with Plaintiff's argument that it should have authorized a single case agreement. *Doe*, 767 F. Supp. 3d at 113.

Aetna has now done so and offered two reasons for denying Plaintiff's request for exception-based coverage. First, it determined that "there was no network deficiency" because "at the time of [A.D.'s] admission to Sandhill Center, an out of network residential treatment facility, there were multiple clinically appropriate in-network residential treatment facilities available." DGIP 1952-1953. Second, it determined that "even if there had been no clinically appropriate, available in-network residential treatment facilities, Aetna could not authorize [A.D.'s] residential treatment at Sandhill Center because Sandhill Center does not meet Aetna's criteria for residential treatment facilities." DGIP 1953.

**1. Network Deficiency**

On remand, Aetna concluded that no network deficiency existed because there were in-network residential treatment facilities that were clinically appropriate for A.D. and able to admit him without substantial delay. DGIP 1863-1864. Aetna's May 2025 Remand Decision identified three such facilities: Meridell in Liberty Hill, Texas; Oak Plains in Ashland City, Tennessee; and

Center for Discovery in Bellevue, Washington. DGIP 1864. The November 2025 Remand Appeal Decision identified a fourth: San Marcos in Texas. DGIP 1955. Plaintiff contends that none of these in-network facilities was in fact appropriate or available, relying largely on letters from treating physicians identifying deficiencies in these facilities. DGIP 1916-1918.

In making a benefits determination, administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan*, 538 U.S. at 834. But courts may not "require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.* Accordingly, "a plan need not accord the insured's treating physician greater deference than a plan's retained physician." *Demirovic v. Bldg. Serv. 32 B-J Pension Fund*, 467 F.3d 208, 212 (2d Cir. 2006).

Plaintiff's many arguments about why the in-network RTCs Aetna identified were inadequate fall into three general categories: (1) that the in-network RTCs would not admit A.D. at all because of his age, his diagnosis, or an inability to get in contact; (2) that the in-network RTCs had an unreasonable delay for any admission for A.D.; and (3) that the in-network RTCs offered inappropriate or inadequate treatment.

First, Plaintiff argues that Meridell and Center for Discovery were unable to admit A.D. because they "did not accept children under age 11," that Center for Discovery "did not treat children with ASD," and Meridell "did not respond to telephone calls from Plaintiff." Pl. Motion at 9. Aetna properly considered and rejected the argument that these RTCs would not have admitted A.D. Contemporaneous notes in the administrative record reflect that both Meridell and Center for Discovery were willing to accept A.D. despite his age and diagnoses. As to Center for

Discovery, Plaintiff's own separately retained consultant reported on September 19, 2022, that "I called them and they told me that they'll take him even though he's 10." DGIP 1775. Aetna too spoke with the admissions department of Center for Discovery, which stated that A.D.'s "age and ASD diagnosis are not exclusionary." DGIP 1815. As to Meridell, an Aetna Care Advocate recorded that he "had spoken to the facility and [A.D.'s] age does not exclude him." DGIP 1854. And Plaintiff points to no authority suggesting that the fact that Meridell apparently did not return one of Plaintiff's telephone calls is a basis for concluding that Meridell was unavailable. After all, the record reflects that Aetna was able to contact Meridell, DGIP 1821, and that Aetna received an email from Plaintiff's own educational consultant confirming that she spoke to Meridell and received confirmation that "[A.D.'s] age is fine," DGIP 1775. There was thus ample basis for Aetna to reject Plaintiff's argument that the RTCs would not admit him.

Second, Plaintiff argues that certain in-network facilities could not admit A.D. without unreasonable delay, citing a five-week wait at Oak Plains and a six-to-eight-week wait at San Marcos.[4] Pl. Motion at 10, 27. As to San Marcos, Plaintiff may be correct. The Remand Decision did not list San Marcos as an appropriate in-network RTC, *see* DGIP 1864, and Defendant acknowledges that San Marcos was "determined to be not suitable for A.D." because it was "unable to accept A.D. without a substantial delay," Deft. 56.1 Stmt. ¶ 45. The Remand Appeal Decision also acknowledged that San Marcos had "indicated it had a waitlist," but suggested without identifying record support that the waitlist might have been accommodated. DGIP 1959.

[4] Plaintiff's motion for summary judgment lists the "two to four week wait" at Center for Discovery as a reason why that facility was inappropriate or unavailable. Pl. Motion at 9. Plaintiff did not raise this argument in his administrative appeal, *see* DGIP 1932, so Aetna did not address it in the Remand Appeal Decision. In any event, Plaintiff does not explain why a two-to-four-week wait from September 19, 2022 would have been disqualifying, especially considering that A.D. was only admitted to Sandhill three weeks later on October 11. And Plaintiff does not argue that Meridell's "2-week waitlist," DGIP 1854, amounted to an unreasonable delay.

In light of the undisputed evidence that the care plan was to have A.D. admitted to residential treatment within two weeks from September 15, 2022, Deft. 56.1 Counter Stmt. ¶ 54, the Court agrees with Plaintiff that San Marcos was likely unavailable. That is especially so considering the evidence in the record that Aetna denied A.D.'s continued stay at Huntsman on October 3, which may have contributed to Plaintiff's urgency. *See* DGIP 1826.

But there is no basis to reject Aetna's conclusion that Oak Plains was available without an unreasonable delay. Aetna's notes reflect that Oak Plains would have had "availability in the next 7-10 days." DGIP 1809. Aetna was not required to credit Plaintiff's assertion, three years later, that Oak Plains had a five-week wait, DGIP 1917, 1931, when its contemporaneous records contradict that account, *see* DGIP 1958 (rejecting Plaintiff's argument because "[n]o five-week delay was noted when our Care Advocate called to discuss this admission"). Moreover, Plaintiff's argument regarding Oak Plains's purported unavailability rests on a misleading recitation of the record. Plaintiff argues that "Oak Plains was unavailable to accept A.D. because it was not taking new referrals until April 1, 2023, more than six months after A.D. was discharged from Huntsman." Pl. Motion at 20 (citing DGIP 1769); *see* DGIP 1918. The cited page in the administrative record does reflect an email from Aetna saying that Oak Plains was accepting new referrals starting April 1, 2023. DGIP 1769. That email was not dated September 2022, however, but was instead sent on March 15, 2023, as an update regarding the in-network RTC programs that Aetna had identified the previous year. *See id.* The time from March 15, 2023 to April 1, 2023 is approximately two weeks, not five weeks or six months.

Finally, Plaintiff argues that the in-network facilities offered inappropriate or inadequate treatment—specifically, that they provided short-term stabilization rather than the long-term residential care A.D.'s providers recommended, that they placed patients in a "mixed milieu," that

they served populations with substantially lower cognitive functioning than A.D., and that Oak Plains was unsafe. Pl. Motion at 9-10. These objections rest largely on letters A.D.'s treating providers submitted in 2025, which Aetna's physician reviewer considered and addressed facility by facility. DGIP 1954-1961.

Oak Plains poses the closest call. Among Plaintiff's objections to the adequacy of treatment at Oak Plains is that the facility treats children with an IQ of 65 and above. Plaintiff advised Aetna that A.D. is "highly triggered by children who have low IQ and are very low functioning and is likely to hurt them," which Defendant does not deny. Deft. 56.1 Counter Stmt. ¶ 60 (quoting DGIP 1835). Aetna acknowledged this argument, but rejected it on the basis that:

> Oak Plains' materials indicate that a full biopsychosocial history (presumably including a documented history of violent outbursts) would be taken into consideration in setting goals designed to reduce inappropriate behavior – presumably including potentially violent outbursts. Oak Plains personnel were required to be trained in appropriate de-escalation and restraint procedures, if needed.

DGIP 1958. But Plaintiff's concern was not just that A.D. has "violent outbursts" generally, but that he was specifically triggered by children with developmental disabilities and lower IQs. That Oak Plains might have procedures to address violent outbursts generally does not necessarily establish that it was appropriate to place A.D. in an environment likely to trigger such outbursts.

Even assuming, however, that Oak Plains was not an appropriate RTC, substantial evidence supports Aetna's determination that Meridell and Center for Discovery were. As to Meridell, the physician reviewer determined that its "physician-led behavioral and neurobehavioral programs using evidence-based, trauma-informed interventions, including family therapy to target dysregulation and aggressive behaviors" rendered the facility appropriate for A.D. DGIP 1957. Aetna also rejected Plaintiff's arguments that Meridell was tailored towards short-term assessment and stabilization. *Id.* That determination was consistent with what Aetna's Care Advocate told

Plaintiff at the time, after speaking with the facility directly: Meridell "is not short-term and is a residential facility." DGIP 1854. And Aetna found no evidence to substantiate Plaintiff's unverified complaints of "safety concerns." DGIP 1957.

As to Center for Discovery, Aetna's physician reviewer determined that the facility provided appropriate care for A.D. because it offered "physician-led, evidence-based residential care for complex child and adolescent mental health disorders, offering five to six hours of daily psychotherapy and weekly psychiatric visits." DGIP 1961. Aetna rejected Plaintiff's criticism that Center for Discovery improperly placed patients with mental health disorders with patients diagnosed with substance abuse disorders after finding that it "separates different clinical populations into different treatment units, including by age, diagnosis, and gender." DGIP 1960. And Aetna found no basis for Plaintiff's assertion that Center for Discovery offers only short-term assessment and stabilization. *Id.*

At a minimum, the record provides ample grounds for Aetna to have concluded that Meridell and Center for Discovery were willing to treat A.D., able to do so without undue delay, and able to provide appropriate treatment. All that remains is a disagreement between Plaintiff's providers and Aetna's physician reviewer about the suitability of particular treatment settings. Plaintiff argues that A.D.'s treatment team "recommended Sandhill as the only viable and appropriate treatment option," Pl. Motion at 18, and insists that "[p]roviders with direct knowledge of A.D.'s specific condition and needs were in the best position to evaluate residential treatment facilities to meet those needs," Pl. Opp. at 10. But the law is clear that plan administrators need not afford "special deference to the opinions of treating physicians." *Black & Decker Disability Plan*, 538 U.S. at 831; *see Zoller v. INA Life Ins. Co. of N.Y.*, No. 06 Civ. 112 (RJS), 2008 WL 3927462, at *13 (S.D.N.Y. Aug. 25, 2008) ("[I]t is well settled that, in denying a claim for benefits

under ERISA, the plan administrator may rely on the opinion of independent medical reviewers who have not conducted an examination of the applicant, even where the reviewer's opinion conflicts with that of the treating physicians.").

The determination of Aetna's physician reviewer, supported by contemporaneous accounts in the administrative record, offers far "more than a scintilla" of evidence supporting Aetna's determination that there were in-network alternatives to Sandhill available and satisfies the substantial-evidence standard. *Durakovic*, 609 F.3d at 141. The denial of benefits was thus not arbitrary and capricious.

**2. Sandhill's Qualification for a Single Case Agreement**

Aetna also denied benefits for the independent reason that "[t]o be approved as an out-of-network residential treatment facility on a single case agreement basis, Aetna's policy required that the facility meet certain quality control criteria set forth in [the ALIC Criteria]," which Sandhill did not. DGIP 1961-1962. Specifically, the Remand Appeal Decision explained that at the time of A.D.'s discharge planning from Huntsman, Sandhill "was not accredited or credentialed as required by the criteria, it did not have a licensed behavioral health provider actively on duty 24/7, [A.D.] was not being treated by a psychiatrist at least one time per week since his admission, and Sandhill Center's medical director was not a psychiatrist." DGIP 1962. Plaintiff points to nothing in the administrative record showing that Sandhill met those criteria at the time of A.D.'s admission,[5] but argues that Aetna was not permitted to rely on the ALIC Criteria in making its adverse determination.

[5] Plaintiff did, however, submit a letter reflecting that, by 2025, Sandhill's medical director was a psychiatrist. DGIP 1921.

The ALIC Criteria are not in the Plan, but ERISA does not preclude plan administrators from using external guidelines to aid in a plan's administration. Indeed, the regulations implementing ERISA presuppose that there might be criteria external to the plan that the administrator may rely on in making an adverse determination. For example, the regulations governing the claims procedure state:

> If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request . . . .

29 C.F.R. § 2560.503-1(g)(1)(v)(A); *see id.* § 2560.503-1(j)(5)(i) (same rule for appeals). That requirement makes sense only if a claims administrator may "rel[y] upon" an "internal rule, guideline, protocol, or other similar criterion" in making an "adverse determination." Consistent with that premise, courts in this Circuit have often upheld an administrator's use of external guidelines in making benefit determinations. *See, e.g., Krauss*, 517 F.3d at 622-23 (upholding the plan administrator's reliance on an external "Bilateral Surgery Policy" where the plan authorized the administrator to "adopt reasonable policies, procedures, rules, and interpretations"); *S.M. v. Oxford Health Plans (N.Y.), Inc.*, 94 F. Supp. 3d 481, 508 (S.D.N.Y. 2015) (observing that plan language "provid[ing] that Oxford has discretion to deny coverage for any health care service that it determines, in its 'sole judgment,' to not be medically necessary" and allowing Oxford to "adopt reasonable policies, procedures, rules, and interpretations to promote the orderly and efficient administration" of the plan "grants Oxford the right to establish guidelines, such as the [intravenous immunoglobulin] policy, to assist with benefits determinations"); *Stern v. Oxford Health Plans, Inc.*, No. 12 Civ. 2379 (JFB), 2013 WL 3762898, at *8 (E.D.N.Y. July 17, 2013) (rejecting an argument that reliance on a guideline was impermissible because it was "not part of

the Plan" because "the Plan authorizes Oxford to adopt 'reasonable policies, procedures, rules and interpretations'"). Still, the authority to draft "policies and guidelines to interpret terms in the Plan[] is not without limits," and "such internal rules or policies cannot change the definition of a term within a plan or effectively add requirements to that definition." *E.R. v. UnitedHealthcare Ins. Co.*, 248 F. Supp. 3d 348, 362 (D. Conn. 2017).

Plaintiff's theory is that "the Plan provides the definition of provider and residential treatment facility and Aetna may not impose secret criteria that restrict coverage otherwise provided by these Plan definitions." Pl. Reply at 8; *see* Pl. Opp. at 16 (arguing that the criteria "impose[] additional requirements beyond the Plan terms, such as accreditation by specific organizations and staffing ratios as conditions of coverage"). But the Plan's provisions that Plaintiff invokes describe the in-network benefits, and cannot plausibly be read to reach care from an out-of-network facility. The Plan states that "[c]overed expenses include charges made for the treatment of mental disorders by behavioral health providers," including services provided during a stay at a "residential treatment facility, appropriately licensed by the state Department of Health or its equivalent." DGIP 1682. That same provision begins by stating that "[y]our mental health/substance use disorder benefits will be provided by participating behavioral health providers," and the Plan uses "participating" to describe in-network care. DGIP 1663, 1682. The Plan's structure confirms the point. The Plan states that "Out-of-Network care is not a covered expense in this Plan." DGIP 1663. It separately defines and distinguishes a "Network provider" from an "Out-of-Network provider," DGIP 1749-1750, and requires prior authorization before a participant receives services from an out-of-network provider, DGIP 1667. Were the definitions Plaintiff cites sufficient to establish coverage without regard to network status, each of these provisions would be superfluous. *See Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*,

7 F.3d 1091, 1095 (2d Cir. 1993) (explaining that courts should "safeguard against adopting an interpretation that would render any individual provision superfluous"). Plaintiff himself acknowledges that the Plan "does not provide benefits for out-of-network providers except on a limited basis." Pl. Motion at 4 (citing DGIP 1663, 1669). The definitions on which he relies describe the circumstances in which that in-network benefit is available, and do not establish the criteria for approving out-of-network coverage.

The Plan does permit Aetna to make "an exception from the Plan's general prohibition on out-of-network care." *Doe*, 767 F. Supp. 3d at 113 (citing DGIP 1667-1668). Nothing in the Plan provides that Aetna will extend a single case agreement to *any* state-licensed residential treatment facility. The Plan instead states that Aetna may, "for purposes of overall cost savings or efficiency, . . . in [its] sole discretion, offer Benefits for services that would otherwise not be Covered Health Services." DGIP 1739. It requires a participant who chooses out-of-network services to obtain prior authorization, and describes the resulting "utilization review process" as "a set of formal techniques designed to monitor the use of, or evaluate the clinical necessity, appropriateness, efficacy, or efficiency of, health care services, procedures, or settings," which "may include ambulatory review, prospective review, second opinion, certification, concurrent review, case management, discharge planning, retrospective review or similar programs." DGIP 1667-1668.

The question, then, is not whether the ALIC Criteria conflict with the Plan's definitions governing in-network care, but whether they conflict with the provisions creating an exception for out-of-network care. They do not. A residential treatment center is a "setting," and the criteria Aetna applied—that the facility be accredited or credentialed, that a licensed behavioral health provider be on duty at all times, that the patient be seen by a psychiatrist weekly, and that the

facility's medical director be a psychiatrist, DGIP 1961-1962—bear on that setting's "appropriateness" and "efficacy." Far from narrowing any coverage the Plan otherwise supplies, these criteria guide Aetna's discretion in offering out-of-network services the Plan does not otherwise provide. For this reason, Plaintiff's reliance on cases where interpretive guidance conflicted with a plan's terms and limited coverage that would otherwise be provided is misplaced. *See* Pl. Reply at 8-9.

That the criteria are more specific than the Plan does not make them inconsistent with it. The ALIC Criteria "enumerate more specific requirements than those that are found within the [Plan]," but "that by definition is often what an interpretation of a plan term does." *E.R.*, 248 F. Supp. 3d at 362. The Plan commits the decision whether to extend benefits for non-covered services to Aetna's "sole discretion" and describes utilization review using very open language. DGIP 1739, 1667-1668. The Plan's terms do not say "what criteria the reviewers utilize[] to determine whether to authorize a single case agreement," *Doe*, 767 F. Supp. 3d at 113, and the ALIC Criteria fill that gap rather than conflict with any terms in the Plan. *See Krauss*, 517 F.3d at 624 n.7 ("[T]he decision to enact the Bilateral Surgery Policy was itself a discretionary decision in the first instance."). And there is nothing unreasonable about the criteria themselves. Even if Plaintiff were correct that the ALIC Criteria impose requirements that go beyond the standard of care for mental health residential treatment, *see* Pl. Opp. at 17, Aetna was not required to cover out-of-network treatment for all medically appropriate treatments. *Cf. Savage*, 2026 WL 303600, at *3 (affirming denial of medically appropriate treatment that was not covered by the Plan).[6]

[6] Plaintiff raises an argument in his opposition brief that he did not raise in his appeal on remand in 2025: Aetna's criteria violate the Mental Health Parity and Addiction Equity Act (the "Parity Act"), 29 U.S.C. § 1185a, because the ALIC Criteria are specific to the residential treatment of a patient suffering mental illness. Pl. Opp. at 18-19. Plaintiff has not pleaded a claim

Plaintiff's cases do not suggest otherwise. *See* Pl. Opp. at 15-16. Plaintiff cites *Magee v. Metropolitan Life Insurance Co.*, 632 F. Supp. 2d 308, 318-19 (S.D.N.Y. 2009), for the uncontroversial proposition that "ERISA requires that an administrator inform plan participants of . . . the criteria to be applied." Pl. Opp. at 15. But *Magee* involved a scenario where the plan administrator and its consulting physicians concluded that the beneficiary did not "meet the criteria" for coverage but never "explained what criteria they were applying, or what evidence would be necessary." 632 F. Supp. 2d at 319. Far from undermining Aetna's reliance on the ALIC Criteria, *Magee* suggests that it was a virtue, not a defect, that Aetna committed its criteria for approving out-of-network treatment to writing. Another case on which Plaintiff relies, *N.C. v. Premera Blue Cross*, No. 23-35381, 2024 WL 2862586 (9th Cir. June 6, 2024), rested on *de novo* review and Washington state law prohibiting discretionary clauses in the health care services context, *see N.C. v. Premera Blue Cross*, 667 F. Supp. 3d 1102, 1106 (W.D. Wash. 2023) ("Here, Washington law requires de novo review."). *Heasley v. Belden & Blake Corp.*, 2 F.3d 1249 (3d Cir. 1993), and *Pirozzi v. Blue Cross-Blue Shield of Virginia*, 741 F. Supp. 586 (E.D. Va. 1990), are similar, in that neither plan conferred discretion on the plan's administrator to select relevant criteria for treatments, and therefore involved *de novo* review. In *Heasley*, the Third Circuit rejected reliance on a third-party classification to determine what procedures are experimental where the plan did not grant the administrator "discretion to determine which procedures are

---

under that statute, and to the extent he offers the point as evidence that the ALIC Criteria are unreasonable, he has not undertaken the comparative analysis such a showing requires. *See, e.g.*, *Gallagher v. Empire HealthChoice Assur., Inc.*, 339 F. Supp. 3d 248, 256 (S.D.N.Y. 2018) ("To state a Parity Act violation, a plaintiff must allege that (1) the insurance plan is of the type covered by the Parity Act; (2) the insurance plan provides both medical benefits and mental-health benefits; (3) the plan has a treatment limitation – either quantitative or nonquantitative – for one of those benefits that is more restrictive for mental-health treatment than it is for medical treatment; and (4) the mental-health treatment is in the same classification as the medical treatment to which it is being compared." (citation omitted)).

experimental." 2 F.3d at 1258, 1260-61. And *Pirozzi* similarly rejected the administrator's reliance on external criteria to determine whether a treatment was "experimental" where the plan had "an experimental procedure exclusion, as to which the Plan confer[red] no discretion on the administrator." 741 F. Supp. at 589. This distinction was critical, and the court noted in *dicta* that the "coverage denial decision would probably have survived review under an arbitrary and capricious standard." *Id.* at 595 n.20. None of Plaintiff's cases involved a situation where a claims administrator used external guidelines pursuant to discretion granted under the plan to make benefits determinations.

Nor, for that matter, can Plaintiff complain of unfair surprise or *post hoc* justification. Plaintiff repeatedly characterizes Aetna's ALIC Criteria as "secret criteria," and claims that they were "not disclosed to the public or Plan participants." Pl. Opp. at 15. But the record establishes that, in September 2022, an Aetna Care Advocate told A.D.'s family that "he had discussed the Criteria for Recognizing Non-Contracted Residential Treatment Facilities and the [Sandhill] facility did not meet any of it." DGIP 1816. A.D.'s mother confirmed that she spoke with Sandhill about the criteria. *Id.* Here, Plaintiff had notice of the ALIC Criteria before starting treatment at Sandhill and notice of Aetna's view that Sandhill did not satisfy those criteria.

Accordingly, Aetna did not err in denying coverage on the basis that Sandhill did not meet its criteria for approving a single case agreement. At a minimum, Aetna's understanding of its authority under these provisions is a rational one, and under a deferential standard of review that is enough. *See Celardo v. GNY Auto. Dealers Health & Welfare Tr.*, 318 F.3d 142, 146 (2d Cir. 2003).[7]

[7] Because the Court concludes that Aetna did not abuse its discretion in denying benefits on the basis that Sandhill did not comply with the ALIC Criteria, it has no need to consider

**D. Regulatory Requirements**

Finally, Plaintiff contends that federal and state regulations obligated Aetna to approve out-of-network coverage. He points to the Affordable Care Act's implementing regulations, which require that a qualified health plan issuer "[m]aintain[] a network that is sufficient in number and types of providers . . . to assure that all services will be accessible without unreasonable delay," 45 C.F.R. § 156.230(a)(ii), and to New York Insurance Law Section 3241(a), which generally requires a health insurer to maintain a network of participating providers adequate to the needs of its members, *see* Pl. Motion at 27-29.

Even if Plaintiff's interpretation were correct, this argument would establish at most that if there were a network deficiency, then Aetna was required to approve out-of-network treatment. Plaintiff is not asserting a claim under either regulation, *see* Pl. Opp. at 27 ("Plaintiff does not seek a private right of action under New York law."), nor is his argument that a network deficiency *per se* entitles him to benefits. Instead, his argument seems to be that an administrator may not exclude out-of-network treatment solely on that basis when the plan lacks adequate in-network options; *see* Pl. Motion at 23 ("Federal and State Laws Support Approval of Out-of-Network Providers When There is Network Inadequacy"); Pl. Opp. at 27 ("Plaintiff was entitled to a [single case agreement] here because of the inadequacy of Aetna's network."). Accepting Plaintiff's argument as true thus creates a conditional: If there is a network deficiency, then an administrator must approve out-of-network treatment.

In the Remand Appeal Decision, Aetna determined that the federal regulations Plaintiff relies on do not apply, because those requirements "are inapplicable to self-funded plans like the

---

Defendant's argument that Plaintiff has failed to show that Sandhill was even licensed by the State of New Mexico at the time of A.D.'s admission. *See* Deft. Opp. at 11 n.2.

Plan." DGIP 1953. But it also explained why it would deny benefits even if Plaintiff's premise were correct. It explained, in detail, both that there was not a network deficiency, DGIP 1954-1960, and that, even if Aetna were required to approve out-of-network treatment, Sandhill did not meet the criteria, DGIP 1961-1962. For the reasons previously explained, Aetna's conclusions in both respects were supported by substantial evidence and did not constitute an abuse of discretion. *See supra* III.C.1, III.C.2.

The Court accordingly does not decide whether Plaintiff is correct that these regulations are applicable to the Plan. Even if they did apply, they would not support the conclusion that the denial of benefits was arbitrary or capricious.

## IV. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is granted and Plaintiff's motion for summary judgment is denied. Because the Court is able to resolve those motions without the need for oral argument, Defendant's request for argument, Dkt. 58, is denied as moot. The Clerk of Court is respectfully directed to enter judgment in favor of Defendant and to close this case.

SO ORDERED.

Dated: September 29, 2026
New York, New York

JOHN P. CRONAN
United States District Judge